**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **HERMILO HERRERO,** | ' |
| | ' |
| **Petitioner,** | ' |
| | ' |
| **V.** | '  **CAUSE NO. _____** |
| | ' |
| **LORI DAVIS, DIRECTOR,** | ' |
| **TEXAS DEPARTMENT OF CRIMINAL** | ' |
| **JUSTICE, INSTITUTIONAL DIVISION,** | ' |
| | ' |
| **Respondent** | ' |

---

**PETITION FOR A WRIT OF HABEAS CORPUS OF A PERSON IN STATE CUSTODY**
**PURSUANT 28 U.S.C. § 2254**

---

Petitioner, Hermilo Herrero, files this brief in support of his Application for Writ of Habeas Corpus as follows:

## JURISDICTION

This Court has jurisdiction pursuant to Texas Code of Criminal Procedure, Article 11.07.

## STATEMENT OF THE CASE

Petitioner seeks habeas relief from his conviction and sentence to life in prison for the murder of Albert Guajardo.  On April 26, 2002, a Harris County Jury convicted Petitioner of the 1995 murder of Guajardo. 7 RR 48-49.  On April 30, 2002, this Court imposed a term of life in prison.  8 RR 24-25.  Petitioner filed a direct appeal, but on December 9, 2003, the Fourteenth Court of Appeals affirmed the Petitioner's conviction and sentence.  *Herrero v. State,* No. 14-02000534-CR (Tex. App. – Houston [14th] 2003, no pet.).

On January 3, 2005, Herrero filed an 11.07 application. On January 20, 2005, Respondent answered. On January 26, 2005, the trial court designated issues to be resolved and ordered the trial attorney, Dan Cogdell, to file an affidavit addressing the Petitioner's allegations. On January 24, 2005, Herrero filed a motion to withdraw the January 3, 2005, filing. On March 10, 2005, the State moved the Court to rescind the January 26, 2005, order designating issues. The trial court granted the motion to withdraw the January 3, 2005, application and granted the State's motion to rescind. Petitioner refiled his 11.07 Application after death row inmate Jaime Elizalde provided an affidavit admitting he murdered Guajardo.[1] On November 4, 2007, Herrero moved to withdraw the refiled application because the State refused to disclose its trial file while a writ was pending. On December 31, 2007, the trial court granted the motion to dismiss pending 11.07 application and granted Herrero's request that "all evidence during the pendency of said application [be] preserved."

On or about September 30, 2016 Petitioner, represented by new counsel, refiled his 11.07 Application with new claims, filed several supplements, sought an evidentiary hearing, and file proposed issues for an evidentiary hearing. On March 6, 2017, the convicting court, without convening an evidentiary hearing, Judge Randy Roll[2] adopted the State's proposed findings of facts and conclusions of law. On June 6, 2018, the Texas Court of Criminal Appeals denied the 11.07 Application without a written order.

---

[1] The convicting court ordered a hearing, Elizalde was bench warranted, but on his counsel's advice – namely, that if Elizalde confessed in deposition, it would hurt his chance for clemency – Elizalde invoked his Fifth Amendment right to silence.
[2] Judge Rolls took the bench in January 1, 2017; he did not try the case.

## JURISDICTION

This Court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Prible was convicted in a Harris County, Texas, court.  Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

## INTRODUCTION

The 1995 Guajardo murder was a cold case, which, by 2002, had gone unsolved for seven years.  The State had no physical evidence, no eyewitness testimony, and no other leads, not to Herrero and not to anyone else, except a man named Freddie Hernandez.  3 RR 6.  Herrero's conviction, as the prosecutor, Kelly Siegler, admitted, depended on Jesse Moreno's jailhouse informant testimony. 3 RR 7.  Moreno and another inmate, Raphael Dominguez, whose informant testimony mimicked Moreno's, were inmates in FCI Beaumont along with Herrero, because all three had been convicted in the late 1990's in separate federal drug cases.  Moreno and Dominguez testified at trial that Herrero confessed multiple times to slashing Guajardo's throat and then beating him to death with a hammer in the back of a van.

Forensic evidence and Bureau of Prison records discovered post-conviction show that Moreno and Dominguez lied in pretrial interviews and lied throughout trial.  The forensic evidence contradicts every aspect of the confession that Moreno and Dominguez said Herrero gave, by showing that Guajardo died under completely different circumstances than those the informants claimed Herrero described. Ex. '1' (Affidavit of Dr. Tommy Brown).  BOP records prove that Moreno and Dominguez fabricated crucial, inflammatory testimony to the effect that they decided to turn State's witness, and needed federal protection from Herrero, because Herrero supposedly ran a prison organization through which he ordered "hits on" (*i.e.,* violent action against) Moreno

and Dominguez after supposedly discovering in 2000 that the two had cooperated with the United States Attorneys against their codefendants.

BOP records show, instead, that BOP protected Moreno, **not** from Herrero, but because BOP discovered Moreno was smuggling drugs into FCI Beaumont for a prison gang called the Texas Syndicate. Ex. '2' (BOP Memorandum dated March 28, 2001), Ex. '3' (BOP Memorandum dated July 30, 2001). Moreno assisted BOP's investigation into the drug smuggling operation and had to be protected from Texas Syndicate members, which resulted in his transfer to Liberty County. Ex. '4' (BOP Memorandum dated April 17, 2001). As for Dominguez, BOP records show that at no time before trial ended did Dominguez seek or receive protective arrangements from BOP. Ex. '5' (BOP Intake Screening Forms for R. Dominguez). The motive the prosecutor's informants gave for testifying against Herrero, and their recounting at trial of his purported confession, were complete fabrications.

Furthermore, the State suppressed evidence that the prosecutor was making *quid pro quo* arrangements with a ring of informants that included Moreno and Dominguez, as well as non-testifying witnesses Nathan Foreman and Eddie Gomez, to pin cold case murders on defendants confined in FCI Beaumont. Under Rule 35 of the Federal Rules of Criminal Procedure, federal courts have the power to reduce sentences upon the United States Attorney's Office's ("Government's") motion if the Government shows that the federal defendant's cooperation helped with the prosecution of or helped secure a conviction in another case. Normally, the Government rewards defendants for assisting in federal cases. However, the prosecutor promised and was able to use her influence to convince the Government, specifically, Assistant United States Attorneys ("AUSAs"), to seek Rule 35 sentence reductions for members of the ring of informants who assisted her in prosecuting Texas cases.

Even after the prosecutor had proof that her informants[3] had given her false information and testified falsely, she made and kept her *quid pro quo* promises to try to influence the Government into seeking Rule 35 sentence reductions for Moreno, Dominguez, Foreman and Gomez. Ex. '6' (Rule 35 letters (x5) from Siegler to AUSAs). The State therefore trampled basic principles of justice coming and going. The prosecutor wrongly convicted Herrero of capital murder using the false jailhouse informant testimony. She then turned around and rewarded her perjurious witnesses by using her influence to try to reduce their federal sentences and set these criminals free before their time was up. In the name of the State, the prosecutor convicted the innocent and worked to set the guilty free.

## STATEMENT OF THE FACTS

Guajardo's wife, Alma Latisia Moreno ("Alma"), who had remarried by the time of trial, testified that on January 4, 1995, she and Guajardo were living with her parents. At about 4:00 p.m., on that date, "two of [Guajardo's] friends came over," named Freddie and Millie. 3 RR 112. Freddie was Freddie Hernandez; Millie was Hermilo Herrero. *Id.* at 113. The three watched television and bragged about Fernandez's Suburban truck before Fernandez and Herrero left. *Id.* at 113, 121.

On January 5, 1995, the phone rang at 6:00 a.m. 3 RR 118. Guajardo answered and got dressed, in "a white T-shirt, the same clothes he wore the night before, the brown pants, tennis shoes, his jacket, and [Alma] believe[d] he had his wallet, [and] his watch. *Id.* at 119. Alma remembered Albert did not have any money. *Id.* at 135. He was "broke" and unemployed. *Id.* at

---

[3] The prosecutor had used key informants belonging to the FCI Beaumont ring in previous cases and maintained relationships with them and their families, facilitating communications with, and use of, these informants in later cases.

118.  Guajardo needed to, but could not, pay his parole office the fee he owed, which was "about ten dollars." *Id.* at 136-37.  Alma said that as Guajardo left, he asked Alma to iron some clothes, but then said "I'll be back.  Don't iron my clothes now.  You can do it when I get back." *Id.* at 129.  Alma thought Guajardo "would be back in an hour or two." *Id.*  Alma remembered Guajardo drove away that morning with Freddie Hernandez in Hernandez's vehicle, leaving Guajardo's Chevy truck in the driveway. *Id.* at 131.  Around 10:00 a.m., Alma started paging Guajardo but discovered he had not taken his pager. *Id.* at 130.  Alma never saw Freddie Hernandez again, and she never saw her husband alive again. *Id.* at 132.  Nor did she hear anything about him, until Detective Curtis Brown came to her door to tell her Guajardo was dead. *Id.* at 124.

On January 9, 1995, Guajardo's body was found in North Houston in the 4900 block of Harmon Street.  The body was wrapped in a large, heavy, "room-size" rug.  3 RR 50.  A larger sheet of nylon reinforced plastic was wrapped around the rug. *Id.*  The whole package was bound by two lengths of thick rope, of the sort used to moor boats. *Id.*  The lengths of rope were each tied into complex knots with loops to serve as handles.  Ex. '7' (Photograph of knotted rope).  Carmalita Lugo testified that the package had lain in the ditch alongside the road for "a couple of days."  Deborah Guerrero told crime scene investigators that "the carpet had been there for four days."  Ex. '8' (Autopsy Report with Medical Examiner Investigator's Report attached).

Detective Brown said he "looked for physical evidence" around the partially unrolled, room-sized carpet, but did not find anything, no bloody shoe prints, or stains or drops.  3 RR 51-52.  When he completely unrolled the room-sized carpet, he saw "what appeared to be a Hispanic male laying [*sic*] face down," "dressed in a brown coat, brown pants, white belt, …, white socks" and what "appeared to be a light colored shirt." *Id.* at 52.  Brown noticed blood stains on the room-

6

sized carpet "most concentrated" "around the head area." *Id.* at 54.  Brown "turn[ed] the body over" and "saw what appeared to be a large gaping wound to the neck." *Id.*

On January 10, 1995, former Harris County Assistant Medical Examiner Dr. Tommy Brown performed an autopsy.[4]  Ex. '8'.  According to the autopsy report, Guajardo's "body was that of a well-developed, well-nourished Hispanic male, measuring 70 inches in length [5'10" tall] weighing 160 pounds.  *Id.* at 2.  The body was clothed but not shod, nor were shoes found at the scene.  Alma testified she thought Guajardo left that morning with his watch and wallet. 3 RR 119.  However, law enforcement recovered neither item.  3 RR 84-85.  Investigators also found shells, rocks, and pieces of cement, 3 RR 80, and a "leather work glove" inside the rug. 3 RR 58.  Several cans were recovered at the scene and fingerprinted.  3 RR 60.

Guajardo appeared to have been beaten and perhaps tortured before he died.  "A large area of contusions extend[ed] from the right upper chest and neck area down the right side of the chest into the mid to low abdominal area" and there were "multiple contusions of the mid back area that had mild discoloration."  Ex. '8' at 2.  The most serious injuries were to Guajardo's head and neck.  The injury that the medical examiner ruled had killed Guajardo was a "severe cutting wound" to the neck.  *Id.* at 4.  The wound was apparently made by a single slash with a knife.  The blade sliced from left to right through the cartilaginous covering of the thyroid, through the larynx and deep into the anterior surface of the fourth vertebral body.  *Id.*  On the right side of the neck, the blade severed the major vessels (the carotid artery and jugular vein), severed large neck muscles completely, and sliced into the lateral side of the fourth vertebra.  *Id.*  "Numerous lacerations extended from the right forehead into the right parietotemporal area to the occipital area then

---

[4] Dr. Brown performed the autopsy, and dictated Guajardo's autopsy report, but did not testify at trial.  Dr. Dwayne Wolf testified at trial, based on autopsy photos and Brown's autopsy report.  Dr. Wolfe drew a diagram depicting lacerations to Guajardo's scalp to assist his testimony at trial.  The diagram was not part of the original autopsy report.

crossed the midline into the left parietal area of the scalp." *Id.* at 1.  A diagram made from autopsy photos depicted nine lacerations (wounds caused when the skin splits and is torn, as opposed to a cutting wound) to Guajardo's scalp, several over an inch in length. 5 RR 66, 73.  However, "there were no epidural, subdural or subarachnoid hemorrhages" associated with these injuries.  *Id.* at 2.

Dr. Brown reported that there were no defensive knife wounds.  *Id.* at 2.  However, Dr. Brown reported "an area of contusions over the knuckles of the left hand that measured 3 by 1½ inches and had a small ¼ inch abrasion within the contused area."  *Id*.  Autopsy photos showed that blood had soaked Guajardo's upper garments, but blood was not reported nor photographed on Guajardo's white belt, brown pants, underwear, or white socks.

Fingerprints were taken at the morgue and run through AFIS, an identification system.  Because Guajardo had a criminal record, his prints were on file, and AFIS matched the morgue prints to them.  *Id*. at 62-63.  This enabled Detective Brown to identify Guajardo, to find his last address, and to interview witnesses at that address.  *Id.*  Detective Brown spoke first with Guajardo's mother, then with Alma.  *Id.* at 63-64.

Based on Alma's information, Detective Brown decided to contact Freddie Fernandez and Herrero, who, Detective Brown testified, were his only two suspects. 3 RR 67.  On cross examination, Detective Brown admitted that he had interviewed a young man named Pedro Morales (who died of leukemia before trial) about the Guajardo murder and investigated leads from this interview.  3 RR 88.  Pedro Morales gave a statement on January 9 or 10, 1995, in which he told how he had shouted at a shaggy blond haired man who was illegally dumping on Harmon Street four days before neighbors discovered Guajardo's body in the rug. Ex. '9' (January 9, 1995, Voluntary Statement of Pedro Raphael Morales).  Pedro Morales stated the man sped off in a small red car.  *Id.*  Brown also admitted that the Sheriff's Office also received several anonymous tips

8

that a man named Freddie Cevellos had killed Guajardo, *id.* at 93-95.  Freddie Hernandez, the last

person seen with Guajardo, "also was called Freddie Cevellos."  *Id.* at 103.

Lastly, Detective Brown met with Herrero "about two weeks" after Guajardo's body was

found.  *Id.* at 96.  Herrero signed "a consent to search form" and was "professional," "cooperative,"

and "pleasant."  *Id.*  So was his wife, Nancy.  *Id.* at 97.  Detective Brown did not even make an

office report reflecting his conversations with Herrero.  *Id.* at 95.  Detective Brown found nothing

connecting Mr. Herrero to the murder:

> **Q.** Did you find anything that connected Mr. Herrero to the death of Mr. Guajardo?
> **A.** No.
> **Q.** Nothing at all?
> **A**. No.

3 RR 97.  Detective Brown testified that at this point he hoped that he would one day receive

information or a tip.  3 RR 74.  After Herrero's interview, the Guajardo murder was "considered a

cold case," *id.* at 73, until Kelly Siegler, the prosecutor, decided not to wait for legitimate tips and

turned instead to a group of snitches, at least one of whom she had used before, who were now

operating in FCI Beaumont.

On March 3, 1996, Herrero was sentenced to 168 months (14 years) in FCI Beaumont

Medium for drug trafficking. *United States v. Herrero,* 4:95-cr-00231-3, (S.D. Tex. 1996).  Ex.

'10' (Docket Sheet Excerpt).  Herrero had finished five years of his sentence when Jesse Moreno

contacted the prosecutor.  Moreno had been assisting the prosecutor with cold cases as far back as

1997, when he testified for her against Jason Morales in a non-death capital murder case.  In return,

the State dismissed "a first degree felony case of aggravated robbery" against Moreno.  On April

4, 2001, Moreno went to the well again, writing the prosecutor that he had information on yet

another cold case murder.  Ex. '11'.  Moreno's mother also wrote the prosecutor on April 10, 2001, and lobbied for favors in return for her son's informant services.  Ex. '12'.

On July 3, 2001, Siegler conducted an audiotaped interview with Moreno, during which Moreno told her that Herrero had confessed to killing Guajardo not only to Moreno, but also, at the same time, **to Nathan Foreman and Raphael Dominguez.**  Ex. '13' (Transcription of Siegler/Moreno Interview).  Three days later, on July 6, 2001, the prosecutor had Herrero charged with Guajardo's murder.  Ex. '14' (Complaint).  By August 27, 2001, Herrero was indicted (Ex. '15') based Moreno's report of a confession, which contradicted the forensic evidence, contained blatant falsehoods, but was used to send Herrero to prison for life.

## CLAIMS FOR RELIEF

## CLAIM ONE

**THE CONVICTION AND SENTENCE OF HERMILO HERRERO VIOLATE THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT BECAUSE THE CONVICTION RESTS ON PERJURED TESTIMONY.**

The prosecutor asked Moreno to "[r]ecount for the jury the same story, using [Herrero's] words as best you can, that he told you then about what happened to Albert [Guajardo]."  5 RR 12-13.  Moreno responded as follows:

> **A.** He said him and a buddy of his got off work
> one day. They were in a work van. They pulled up to
> a club.
>
> *
> *
> *
>
> **A**. They were there for a minute.  He went to the bar.
> **Q**. Who is he?

**A.** Mr. Herrero.  Ran into Albert at the bar,

*

*

*

**A.** Yes, ma'am.

**Q.** Go ahead.

**A.** Him, the driver, and Albert got in a van.  Albert sat in the passenger seat.

**Q.** Front or back?

**A.** Front passenger seat.  Albert -- I mean, Herrero in the back. The driver drove. They got on the freeway.

*

*

*

**A** "before [Guajardo] could say anything," he [Herrero] grabbed him from the back and started to choke him.

**Q**. Choking him how?

**A**. Choking him.

**Q**. Okay. And you're demonstrating with your hands today. Back when this defendant told you the story, what was he doing, or was he doing anything with his hands?

**A**. That's what he did. He said he was choking him, and the driver didn't know what was going down.  He kept going. Apparently somewhere they were at, there was a dumpster. He told the driver, Pull-over to that dumpster up ahead. As he's choking Albert, he let go with one hand, pulled a knife out of his pocket, and slit his throat.

**Q**. How did -- what were the words that the defendant used, and did he do anything with his hands when he talked about that part?

**A**. Well, he said he had ahold of him. He reached in his pocket, pulled a knife, and slit his throat.

**Q**. You're using which arm to be the one he held him with?

**A**. The left.

**Q**. And he did what with his right arm again?

**A**. Put up a knife and slit his throat with the right.

**Q**. Then what?

**A**. He said by that time, the driver pulled up to the dumpster and dumped -- he was freaking out because he didn't know what was going on. So as he pulled up to the dumpster, he put the van in park, took off running, and left the door open and

11

everything. Herrero said by that time he was dragging Albert to the back of the van. He noticed he was still alive, so he laid him next to some rolls of carpet that were in the work van in the back, reached into a tool bag, got a hammer and started hitting him in the face and killed him. Then he rolled him into the carpet and drug him out next to the dumpster, and that was it.

Dominguez testified similarly that Herrero confessed that Guajardo and Herrero and "Herrero's boy" left a nightclub and,

> **A.** …all got into a van, and his boy was driving, Albert sat in the front seat, and Herrero sat in the back. And as they were riding --
>
> **Q**. Whose boy was driving?
>
> **A**. Herrero's boy.
>
> **Q.** Okay.
>
> **A.** And as they were driving, Herrero and Albert got into an argument about the money for the weed.
>
> **Q**. Did he ever say how much money it was?
>
> **A.** No, he did not.
>
> **Q**. Okay.
>
> **A.** Okay.  So they started arguing; so Herrero grabbed him from behind, pulled out a knife, and slit his throat. And he told his driver to pull over, and the driver pulled over and he freaked out and he took off running.
>
> **Q**. Okay. Stop.  At the point when Herrero told y'all that he slit his throat, did he do anything with his hands to show you how he did that?
>
> **A.** No, I don't recall no hand gestures.
>
> **Q.** Okay. Keep going.
>
> **A.** Okay. And his driver pulled over, and he took off running. And so when he went to pull Albert to the back of the van
>
> **Q.** When who?
>
> **A.** When Herrero went to pull Albert to the back of the van, Albert was still alive; so he reached for a hammer and he beat him to death.
>
> **Q**. Did he do anything with his hands when he talked about the hammer, the defendant?
>
>  **A**. No, I don't recall no hand gestures.
>
> **Q**. Did he tell you where all he hit him with a hammer?

**A**. No.

**Q.** He just said what again?

**A**. He just hit him till he was dead.

**Q**. Why did the defendant tell you he had to get the hammer?

**A.** Because he was still alive when he went to pull him to the back of the van.

5 RR 13-15.

A.    FORENSIC FACTS DEMONSTRATE THAT THE STATE'S INFORMANTS FABRICATED THE CONFESSION THAT THEY TESTIFIED HERRERO GAVE THEM.

1.    Autopsy evidence shows that the confession was a complete sham.

In her closing argument, the prosecutor insisted that her informants, Moreno and Dominguez, had provided testimony that was "completely consistent" "with the physical evidence." 6 RR 40. According to the prosecutor, this and the alleged fact that Moreno and Dominguez received information that supposedly only Herrero could have known, showed that the two informants were telling the truth. *Id.* at 39. However, the autopsy evidence contradicts Moreno's and Dominguez's testimony at every turn, and demonstrates their entire tale of a confession was a fabrication. Indeed, the June 6, 2015, Affidavit of the Assistant Medical Examiner, Dr. Tommy Brown, who performed the autopsy on Guajardo, proves beyond question that Moreno, Dominguez, and the State committed and suborned perjury. Ex. '1.'

**First**, Dr. Brown points out there was **no evidence** that Guajardo had been drinking at a club late into the night, because the level of alcohol in Guajardo's bile was only 0.39% and the alcohol detected in his urine was 0.00%. Ex. '1' ¶ 1. As Dr. Brown explains, "the level of alcohol detected [in bile] is attributable to fermentation that naturally occurs in decomposing bodies." Hence, "statements that Guajardo was drinking heavily or that he was inebriated around the time he was killed are contraindicated by the laboratory results in this case," and "the conclusion that Guajardo consumed any alcohol at all before his death cannot be drawn from the laboratory results." *Id.*

**Second**, the idea that someone could manually choke a young, adult male victim, who was not physically or mentally impaired, and then, with one hand, reach into a pocket for a knife capable of inflicting the devastating cutting wound to the neck seen in this case, without leaving a single defensive wound, is preposterous. As Dr. Brown states, "there is no evidence in the autopsy

14

report or photographs that Guajardo was strangled or choked.  Guajardo's hyoid bone was intact, and neither cornu of the thyroid cartilage was fractured, although one cornu was severed by the cutting wound to the neck.  These structures in the neck are frequently fractured during manual strangulation." *Id.* at ¶ 15(a).

As for testimony that the assailant slit Guajardo's throat with a knife while still holding him with his left hand, that, according to Dr. Brown, "raises several problems, among them are: how such an assailant would manage to control Guajardo, how such an assailant would manage not to inflict defensive wounds on Guajardo with the knife blade, and how such an assailant would be able to avoid injuring himself badly if he slit Guajardo's throat while holding him around the neck with one hand." *Id.* at ¶ 15(d).

**Third**, Moreno and Dominguez's tale also conflicts with the known facts because of what Moreno and Dominguez leave out.  According to Moreno and Dominguez's alleged retelling of the confession, Dr. Brown should have seen injuries limited to the head and neck, and limited to a single cutting wound and blows from a hammer delivered with the force of someone trying to cause death by blunt trauma.  However, at autopsy, Guajardo exhibited extensive injuries all over his torso, front and back and laterally, which shows that he was killed under completely different circumstances than those that Moreno and Dominguez said they learned about from Herrero.  In Dr. Brown's forensic opinion,

> Guajardo received numerous blunt trauma injuries before the cutting wound to the neck was administered. Testimony that Guajardo was only choked before he had his throat slit, and that the lacerating injuries seen on his scalp were inflicted after this mortal injury, cannot account for the significant trauma to the back, and front of Guajardo's torso seen in autopsy photos, nor is it consistent with pre-mortem lacerating injuries to Guajardo's lip, with abrasions to his shoulder, bruising to his face and neck, or with what appears to be a stab wound to the neck.

*Id.* at ¶ 16.  The autopsy evidence, therefore, "strongly indicates that Guajardo was badly beaten, and likely punched and stomped in the face and in the torso before he received the cutting wound to the neck…. [and] conflicts with trial testimony, according to which Guajardo was only choked before his throat was slit."  *Id.* at ¶ 15(a).

**Fourth**, according to the State, Moreno's and Dominguez's testimony that Guajardo was beaten with a hammer after he died conveyed new information that no one else had discovered before.  Furthermore, the State insisted that this information matched autopsy evidence (6 RR 39), proving, one, that it was accurate information, and two, that the information had to have come from Herrero.  This hackneyed maneuver – "the State's informants learned truths that only the killer would know" – was a fabrication.  The lacerating wounds seen on Guajardo's scalp and face provide no support for the piece of so-called "evidence" that the State trumpeted as certain proof that Herrero had confessed.  As Dr. Brown states:

> Autopsy photos and a diagram included with the report show lacerating wounds to the scalp. These wounds, even the curvilinear lacerations, could have been inflicted by any number of blunt instruments, including, but not only, a blackjack, a metal pipe, the edge of a board, butt of a gun, or a chunk of rock or concrete. The shape of the lacerations do not support a forensic conclusion that a hammer caused them rather than some other hard, blunt instrument.

Ex. '1' at ¶ 9.

Moreover, there are many insuperable problems with the hammer theory.  Among them, the shape of the lacerations seen on the skull in many instances do not conform to the shape of a hammer head.  Instead, the lacerations are linear and star-shaped.  Ex. '17' (Medical Examiner's diagram of lacerations).   Several are considerably more than an inch in length, including curvilinear ones.  *Id.*  If these large tearing wounds corresponded to a hammer, the hammer's head would have been very large and heavy.  But Dr. Brown points out "[s]kull fractures commonly

16

occur in victims who have been beaten on the cranium with the head of a hammer during an assault intended to be forceful enough to cause death." *Id.* at ¶ 9.  Since "no skull fractures were seen or reported during autopsy in this case," *id.*, the autopsy evidence is **in**consistent with the State's crucial piece of supposed evidence.

Finally, police also knew that Guajardo suffered blunt trauma injuries to the head, and the Houston Chronicle printed a short article containing this fact.  Ex. '16' (Houston Chronicle new-clippings).  Autopsy reports are available to the public and Alma obtained and read Guajardo's.  3 RR 124.  Hence, the autopsy evidence coincided with already published information stating that Herrero had been beaten, but contradicted Moreno's and Dominguez's testimony that a hammer was used.  Neither informant learned new facts.  They fabricated a story in return for the prosecutor's favors.

**Fifth**, Moreno's testimony was that Herrero laid Guajardo out in the back of a van and beat him **in the face** with a hammer in order to kill him and that he did this **after** slashing Guajardo's throat while Guajardo sat in the passenger seat of the van.  In Moreno's words,

> Herrero dragg[ed] Albert to the back of the van. He noticed he was still alive, so he laid him next to some rolls of carpet that were in the work van in the back, reached into a tool bag, got a hammer and started hitting him in the face and killed him.

3 RR 179-80.

However, the autopsy evidence shows that Guajardo took many blows to the face, but not *just* to the face; he also took blows to the back and both sides of his head, and to his torso, dorsally, ventrally and laterally, and neither the distribution nor nature of these blows fits the story of an assailant intent on beating someone to death with a hammer.  According to Dr. Brown,

> The numerous contusions and abrasions seen in frontal views of the face are the result of pre-mortem injuries, and not post-mortem defects or decompositional changes. The appearance of injuries in

17

autopsy photographs indicates that they were likely caused by punching with a fist or by kicking or stomping. Guajardo's dentition appears intact in photos and the autopsy report does not mention broken teeth. Fractures of the facial bones or separation or rupture of cartilaginous structures were also not noted during autopsy. Such injuries would be expected if an assailant had struck the victim in the face with the head of a hammer with force meant to kill the victim through blunt trauma.

Ex. '1' at ¶ 3.

Dr. Brown also concluded from that "the extent, nature and distribution of blunt trauma injuries - bruises, abrasion, and lacerations - seen in this case strongly indicates that Guajardo was severely beaten, and likely punched, kicked or stomped repeatedly in the front of the head, and side of the head **before** he was killed by the catastrophic cutting injury to the neck that is documented in autopsy photos and described in the autopsy report." *Id.* at ¶ 10.  Even the wounds seen in Guajardo's scalp, because of the "swelling … nature and distributions of these injuries," indicated that "Guajardo was struck by a hard, blunt instrument **before** his throat was slashed," not afterwards, as the State claimed based on Moreno's and Dominguez's testimony.

**Sixth,** at autopsy, Dr. Brown noted that the cutting wound was so severe that it completely transected Guajardo's windpipe, severed large neck muscles, and severed the right carotid artery and right jugular vein through and through.  Ex. '8' at 5.  In his 2015 Affidavit, Dr. Brown points out that the carotid is a major artery perfusing the brain with blood, which is under arterial pressure. Ex. '1' at ¶ 12.  The jugular vein is an equally large vein that brings blood back to the heart.  *Id.* When severed, blood from these large vessels sprays and pours out.  *Id.*  The catastrophic wound to the throat seen at autopsy, if inflicted on someone sitting in the front seat of a van, would have resulted in blood spurting all over the seat, console, and floor of the van.  *Id.* at ¶ 15(c).  Blood would also have poured all over the assailants' hands and arms if he had held on to Guajardo's neck with his left while slashing with a knife held in his right, as Moreno and Dominguez said.  *Id.*

The act of lifting a profusely bleeding victim, who was supposedly still alive, from the front seat and dragging him to the back in the bloody confines of a van would have resulted in more blood splattering, pouring, and smearing onto the victim, the assailant, and the floor of the van. *Id.* Beating a supposedly living, bleeding victim in the head with a hammer would have contaminated the actors and surroundings with even more blood.

It would be impossible, under such circumstances, for one person, working alone, to wrap a victim in a large rug, then wrap the rug with a large plastic sheet, and tie the whole package together with lengths of rope, without leaving bloody prints or smears of blood all over the plastic, the rope, the victim and the rug. *Id.* However, none of the blood evidence that would have necessarily been left if Guajardo had died as Moreno and Dominguez testified is seen in this case.

2. **Crime scene evidence cannot be reconciled with the description of events in the purported confession that Moreno and Dominguez recounted at trial.**

The State's crime scene investigators "looked for physical evidence" at the crime scene, but did not find a single drop of blood on the street, or on the surface of anything around where the rug was found in the ditch running along Harmon Street. Bloody prints and smears were not found on the sheet of plastic either, nor on the rope which was tied into a complex of multiple knots and fashioned into a loop. Such an immaculate taphonomic package could not possibly have been put together within the blood covered interior of a van, particularly by an assailant who was supposedly working alone to dispose of someone as large as Guajardo. The assailant would have had to maneuver and wrap the rug around a 160 lb., 5 foot, 10 inch man, and then get the larger piece of plastic around this heavy package. As Dr. Brown says, lifting and carrying an adult corpse is difficult for one person even in an autopsy suite. *Id.* at ¶ 15(c). Maneuvering a blood-soaked victim within the confines of a working van in which, according to the informants' retelling of

Herrero's alleged confession, there were bags of tools and rolled-up rugs would have been an infinitely more difficult ordeal.  Rather than death in a van, the crime scene and autopsy evidence shows that Guajardo died under different circumstances than those testified to at trial.  *Id.* at ¶ 17. As Dr. Brown concludes, Guajardo's body was likely wrapped in rugs and plastic and tied up somewhere else, by more than one person.  *Id.*

In closing, the prosecutor urged the jury to "[e]xamine the physical evidence," and declared that "[w]ell, we have [examined the physical evidence], and it's completely consistent with what Jesse and Raphael said."  6 RR 40.  This consistency, the prosecutor declared, is how she knew her informants were telling the truth:

> 4 And then the hammer comes up.  Jesse talks
> 5 about a hammer. Well, lo and behold, the bruises in
> 6 the autopsy report, the curve, a linear knock on the
> 7 skull, from the medical examiner, are completely
> 1 8 consistent with a hammer. How in the world would
> 9 Jesse Moreno know to say that? You know why? Because
> 10 it makes complete sense, because it is the truth. You
> 11 know, if Jesse was just going to lie and put it on the
> 12 wrong person, the word on the streets was his throat
> 13 was slit. Why didn't Jesse just stop there? Well,
> 14 they slit his throat, Kelly. But no, he didn't. But
> 15 no, he went on and said, and then beat him upside the
> 16 head with a hammer, because that's what this defendant
> 17 told him, because that is the truth.

6 RR 40.

However, examination of the physical evidence turns up one inconsistency and contradiction after another between the facts and the informants' stories.  Using the prosecutor's own rationale, the pervasive **in**consistency shows that Moreno and Dominguez fabricated Herrero's confession.

### 3.     The State solicited false, misleading, and incompetent police witness testimony about blood evidence.

Detective Curtis Brown testified that he arrived at Harmon Street around 6:20 p.m., unrolled the rug containing Guajardo's body, and saw a gaping wound to the neck area.  The prosecutor then asked an open question, to which Detective Brown gave a clearly rehearsed response intended to set up the State's argument that the crime scene evidence fit Herrero's alleged confession to slitting Guajardo's throat while Guajardo was sitting in the front seat of a van:

> 1 **Q.** Did you eventually turn the body over?
> 2 **A.** Yes, I did.
>      *
>      *
>      *
> 13 **Q**. What else did you see?
> 14 We saw that the blood, what appeared to be
> 15 blood, did not go past the waistline.
> 16 **Q**.  Okay. What do you mean?
> A. Which would indicate that the defendant was
> 18 probably cut while in the sitting position.
>      *
>      *
>      *
> 4 **Q.** Now you said that the blood didn't go any
> 5 further than where again?
> 6 **A**. Than the waistline.
> 7 **Q.** So was there blood from like his waistline
> 8 down to his feet?
> 9 **A**. No.
> 10 **Q.** Most of it was again where?
> 11 From the shoulder area to the midsection.
> 12 Consistent with what again?
> 12 MR. COGDELL:  Excuse me, Judge, asked and
> 14 answered.  Consistent with having been cut in the
> 15 seated position.
> 16 THE COURT: Asked and answered.
> 17 (BY MS. SIEGLER) Having been cut what,
> 18 MR. COGDELL: Excuse me, Judge.
> 19 THE COURT: I don't know if it's another
> 21 question or not. Rephrase it, please.
> 22 **Q**. (BY MS. SIEGLER) I skipped over what you
> 23 said earlier. You said consistent with what having

24 happened, Detective?
25 **A**. Defendant being cut while in a sitting position.
1 **Q**.Why do you say that?
2 **A**. Because the blood on it only went so far, to
4 the waistline, which means the lower portion of the
5 body was at an angle from the where the blood flowed.

3 RR 53-55.

Having orchestrated Detective Brown's testimony, the prosecutor argued at closing that

her informant had testified accurately about facts that the prosecutor maintained had to have come

from Herrero:

What about this compared to the evidence?
Raphael and Jesse said the defendant cut Albert while
he was sitting up in the front. First, the sitting
up, where did Curtis Brown tell you? All the blood
was up here, up here; so he was cut first while he was
sitting up. How did Jesse and Raphael know that?
Curtis Brown sure didn't tell them about his
investigation. They know that the defendant, that
they knew that Albert was sitting up in the van,
completely consistent with the way Curtis Brown said
the blood came on the carpet in the front.

6 RR 41.

However, as Dr. Brown states, severing the carotid artery and jugular vein, which happened

in this case, would have resulted in an extremely bloody crime scene, particularly in close quarters

like the cabin of a van. Ex. '1' at ¶ 15(c).  If Guajardo were sitting down when his throat was slit,

his lower garments, belt, and pants would have been covered with blood that sprayed and gushed

from major arteries and veins that were severed through and through in his neck.  *Id.*  The angle

created between torso and legs when sitting would make contamination of the clothing on the

lower half of the victim's body all the more inevitable, because blood would have gushed

unstaunched, from a gaping wound, directly above the victim's horizontal lower limbs.

Maneuvering and then dragging a bloody and profusely bleeding victim through the bloody scene

would have also resulted in blood getting on whatever the victim was clad in, including socks and

pants.  *Id.*  The fact that there was no blood on the pants, and particularly the seat of the pants,

shows that the prosecutor's additional assertion that the evidence is consistent with "tugging that

man from the front seat to the back of the van" by his feet was completely fabricated.  6 RR 42.

Once a competent, honest evaluation of the crime scene and autopsy evidence is

considered, the prosecutor's sleight of hand becomes evident.  The prosecutor created consistency

between two falsehoods:  her informants' false and misleading testimony and her police witness's

false and misleading testimony.  She then argued that the consistency between the two falsehoods

was a sign of veracity.  Because Herrero was convicted with false, misleading, and perjured trial

testimony that the prosecutor then misleadingly used in closing argument, habeas relief should be

ordered granted pursuant to *Ex parte Chabot* and the Due Process Clause of the Fourteenth

Amendment.

### B. CONFIDENTIAL BOP DOCUMENTS DEMONSTRATE THAT THE PROSECUTOR ELICITED FALSE TESTIMONY ABOUT THE RISKS AND MOTIVES THAT HER INFORMANTS HAD FOR TESTIFYING AGAINST HERRERO.

Both Moreno and Dominguez testified that Herrero was the leader of a prison organization

called the "All Houston Group."  3 RR 152.  According to Moreno, Herrero exercised control over

this Group:

> **Q**. What's Mr. Herrero like? What's his
> personality like?
> **A.** He's all right. Just when you get on his
> bad side, he just he wants everybody to come to him
> for problems. He wants to be No. 1. He wants to know
> this, know that.  If you don't tell him, he gets
> upset.

3 RR 153.

Moreno testified that a couple weeks after he arrived at FCI Beaumont, Herrero demanded to see

Moreno's Pre Sentence Investigation Report ("P.S.I."). *Id.* According to Moreno, Herrero wanted

to "see where we cooperated with the law, helping to bust somebody or something." *Id.* at 154.

Moreno claimed that he "didn't show [Herrero] my real copy of my P.S.I.," because his real P.S.I.

would have shown he had cooperated before with State and Federal authorities, *id.,* and explained

that he showed him a fake P.S.I. instead:

> 1. **Q**. Instead of showing the real P.S.I., you
> 2 showed what again?
> 3 **A**. I showed him another P.S.I. that we made up.
> 4 **Q**. That what?
> 5 **A.** Put together. Well, see, I pleaded. Then I
> 6 cooperated. So I showed him the P.S.I. where I didn't
> 7.cooperate.
> 8 **Q**.Why did you do that?
> 9. **A.** Why did I show him that P.S.I.?  Because when they
> 10 find that you're hot – we call it hot – they make you check
> 11 in or you get hit, ...
> *<br>*<br>*
> 23 **Q**. Why did you worry about being hot to this man?
> 24 **A**. Because [Herrero] would have had me hit or checked
> 25 in?
> 1 **Q.** What does that mean, he, this defendant, would have
> 2 had you hit?
> 3 **A**. Stabbed.
> *<br>*<br>*
> 22 **Q** How concerned was this defendant about this Houston
> 23 members having cooperated with law enforcement
> 24 before?
> 25 **A**. He did not allow it.

3 RR 155-57.

> 12 **Q.** And up until when was everything going okay
> 13 between you and the defendant?
> 14. **A.** To about 2000, July sometime.
> 15 **Q**. So we're talking about a time period of how

24

> 16 long that everything was fine between you and this
> 17 defendant?
> 18 **A.** About a year or so.
> 19 **Q**. Everything is cool?
> 20 **A**. Yes, ma'am.
> 21 **Q**. What happened? In which part of 2000 then
> 22 did things change?
> 23**A.** July.
> 24 **Q.** What happened in July of 2000?

3 RR 157-58.

Moreno testified that in July 2000, BOP placed him in the special housing unit ("SHU") at

FCI Beaumont because of the fight. *Id.* at 159. Moreno claimed that while he was in the SHU, he

found out that Herrero had gotten hold of his papers, meaning his P.S.I. *Id.* Moreno said that after

being placed in the SHU, he "tried to contact [the prosecutor] sometime in August, September,

October, somewhere around there of 2000." *Id.* Moreno said the prosecutor did not respond, so

he tried to contact her one more time by "ha[ving] my mom write [her] a letter." *Id.* Moreno also

testified he tried to call the prosecutor in "August, September, October, sometime around there, of

2000." 3 RR 162. Moreno claimed he "got ahold of [the prosecutor], it had to be about September

or October" of 2000 by telephone. *Id.* at 162-63.

Moreno testified that the reason he first wrote the prosecutor was because he "had a hit on

my life":

> 20 **Q**. (By MS. SIEGLER) Mr. Moreno, when you wrote
> 21 that first letter to me, were you in fear for your
> 22 life?
> 23**A.** Yes, ma'am.
> 24**Q.** Yes or no, had any circumstances changed in
> 25your life in prison when you wrote the letter to me
> 1compared to when you first entered the prison in
> 2 Beaumont?
> 3 **A**. Yes.
> 4 **Q**. Had you ever had a confrontation with this
> 5 defendant prior to writing the letter to me that made
> 6 y'all's relationship different?

7 **A**. Nope.

3 RR 162-64.

23 **Q.** What were you hoping my response would be to
24you when you contacted me about this case?
25**A.** I need your assistance. I need your help.
1 **Q**. For what reason?
2 **A.** Because I'm not going to make it alive out
3 of prison if I stay in prison.

3 RR 167-68.

According to Moreno, BOP kept him in the SHU for nearly a year, until May 16, 2001, when BOP transferred him to Liberty County. *Id*. at 160.  Moreno testified he did not request the transfer, but he said he "feared for my life." *Id*.  Moreno claimed that while he was in Liberty County, around June or July, he also "became worried for the safety of his family," all because of Herrero. *Id.* at 162.

In opening argument, the prosecutor had already planted the seeds so that the jury would draw the precise conclusions that (i) BOP had to protect Moreno from Herrero by keeping him in the SHU and eventually transferring him out of FCI Beaumont, and that (ii) Moreno turned State's witness in a desperate attempt to avoid being killed by Herrero or at Herrero's command.  The prosecutor also closed with reminders of the alleged peril Moreno faced from Herrero, because he came forward to testify against him:

> So Jesse Moreno showed his paper to this defendant [Herrero]. At first they were all in All Houston. Everything was going along fine until this defendant discovered that Jesse Moreno had before, in fact, testified for the authorities on two different occasions.  And when that happened, Jesse Moreno is going to tell you what happened is that he was put in what's called the hole in the Beaumont prison where they protect you even in prison from the other inmates.
>
> But things got so bad that they had to take him out of the prison completely and put him in the Liberty County Jail to protect Jesse Moreno. And he's going to tell you in the Liberty County Jail, it

wasn't until his family was threatened here in Houston that he decided to make contact with us about what he knew about this case. Jesse Moreno is going to tell you that he faced a decision of life [or death] on the inside of prison or taking his chances on the street when he got out; and that's when he made his call, he will tell you, to me. 3 RR 8 (*Opening Argument Guilt-Innocence*).

\*
\*
\*

And one thing you need to understand after you hear all the testimony up here, this defendant is not to be crossed. Jesse Moreno was walking that line by coming into this courtrooom.  3 RR 12 (*Opening Argument, Guilt-Innocence*).

\*
\*
\*

**Yo**u've got to believe he's in fear for his life based on what happened in this courtroom. All for what? A possible time cut.  And time cuts are all over the place. Y'all heard more about them in federal prison than you'll ever want to know. Do you think he's going to risk his life for that against this defendant just for the fun of it?

6 RR 36 (Closing Argument, Guilt-innocence).

However, Moreno's testimony, and the prosecutor's opening and closing remarks, were a monstrous lie.  Internal memoranda obtained in February 2014 from the Bureau of Prisons through a "*Touhy* action"[5] in another case (*Prible v. Stephens*, 4:09-cv-01896 (S.D. Tex.)(pending)) demonstrate that the entire story that the State elicited from Moreno and Dominguez about Herrero's alleged confession, the circumstances under which it was given, and the reasons Moreno and Dominguez decided to testify for the State were all fabricated.

---

[5] In *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951), the Supreme Court held that an agency employee could not be held in contempt for refusing to disclose agency records or information when following instructions of his or her supervisor regarding the disclosure that were issued pursuant to agency regulations.  In order to obtain documents from an agency that has deemed the documents privileged, the individual seeking the documents must follow *Touhy* regulations codified at 5 U.S.C § 301 *et seq.,* under which disclosure pursuant to a valid federal court order may be compelled.

      **1.**     **Internal BOP records demonstrate Moreno blatantly lied about threats from Herrero.**

BOP records dated March 28, 2001, April 17, 2001, and July 30, 2001, prove that Moreno perjured himself.  The March 28, 2001, and July 30, 2001, Memoranda are based on interviews that BOP investigators conducted with Moreno nearly a year earlier, on July 25, 2000, and again on March 21, 2000, respectively.  Ex. '2' at 1; Ex. '3' at 1.  The March 28, 2001, Memoranda indicates that Moreno's July 25, 2000, interview took place the day after BOP discovered that Moreno had been injured in a violent confrontation with another inmate named Mike Vallejo.  *Id.* at 2.  Moreno at first said the fight was a misunderstanding.  *Id.*  Then he changed his story and admitted that Vallejo was a member of a Hispanic prison gang called the Texas Syndicate ("TS").

**First**, contrary to Moreno's testimony, and to the State's argument, the reason that Moreno feared a hit was **not** because **Herrero** had learned from Moreno's P.S.I., or any other source, that Moreno had testified against another inmate.  Instead, on July 25, 2000, Moreno told BOP that a prison gang called the Texas Syndicate had put a "hit on him":

> During the interview with inmate Moreno, he stated he got into a little fight with inmate Val__ who associates with the "TS". He stated they argued first about some drugs went to restroom and started to fight. Moreno states inmate Val___ had a lock in his hand and, and he had nothing, he had just left the dining hall. He also states, Val__ associates with the "TS" and they have a hit on him.

Ex. '2' at 2.

**Second**, in two separate interviews with BOP investigators, which were memorialized in BOP Memoranda dated March 28, 2001, and July 30, 2001, Moreno admitted that he was smuggling drugs into FCI Beaumont for the Texas Syndicate, a prison gang.  Ex. '2' at 2; Ex. '3' at 2.  However, the prosecutor allowed Moreno to testify falsely that he had nothing to do with gangs.

**Third,** Moreno told BOP investigators that the Texas Syndicate had used transcripts of informant's testimony that Moreno had given in another case to blackmail Moreno into smuggling drugs into prison.  *Id.*  Furthermore, the confrontation with "Val___" came about because Moreno decided to stop smuggling drugs into FCI Beaumont for the Texas Syndicate, not because "Val____" was carrying out a hit that Herrero ordered after supposedly seeing Moreno's real P.S.I. The March 28, 2001, BOP memorandum reports that:

> Moreno states a lady by the name of Liz of Houston, Texas testified against him about his murder case. He states her son is at the FCI-Beaumont (Low), and he sent some papers over to the Medium and the whole compound found out about his case. Moreno states he cannot make it on this compound. He also states he got here to the FCI- Medium in March of 1999, and Val___s brother "Red Dog" (USP) wrote him a letter stating he had some transcripts on him, and since he (Moreno) is from Houston he can have some drugs brought in for him (Val____).  Moreno states he told him no at first but when he saw one of the papers he saw it was serious, and he participated in having someone bring in the drugs.

*Id.*

Moreno's testimony and the prosecutor's argument were therefore complete lies with regard to Herrero.

**Fourth,** contrary to Moreno's testimony, and contrary to the prosecutor's opening and closing arguments, BOP did **not** place Moreno in the SHU and then transfer Moreno out of FCI Beaumont to another BOP facility in the summer of 2001 to protect Moreno from Herrero.  The April 17, 2001, BOP document specifically addresses why BOP decided to remove Moreno from FCI Beaumont and redesignate him at another facility, and gives the following "RATIONALE FOR REDESIGNATION":

> Inmate Moreno has provided information to the Special Investigative Supervisor regarding the introduction of narcotics into the institution. His cooperation has resulted in the successful completion of several investigations.  In light of this, several inmates

within the general population believe inmate Moreno assisted the Special Investigative Supervisor and have threatened his safety.

In accordance with the recommendation of the Special Investigative Supervisor, we are requesting inmate Moreno be transferred to another facility commensurate with his security need. He remains confined within the Special Housing Unit pending transfer.

Ex. '4.'

In sum, Moreno's entire explanation at trial for why he finally decided to turn State's witness and inform against Herrero was perjured down to the last detail. Herrero did not demand to see Moreno's P.S.I., and Herrero did not discover that Moreno cooperated from Moreno's P.S.I. Herrero did not put a hit on Moreno, threaten Moreno's family, nor order anyone else to do so. Moreno was put in the SHU because he got in a fight over his drug smuggling activities and was threatened, not by Herrero but by the Texas Syndicate, which blackmailed him with Moreno's trial transcripts, not his P.S.I. And BOP transferred Moreno because FCI Beaumont prisoners may have learned that Moreno had assisted with BOP's investigation into drug smuggling.

This much is clear: Moreno simply substituted Herrero for the real threat and the real reasons that BOP put him in the SHU and transferred him to Liberty County. Moreno's contrary testimony, on all scores, was perjured, as were the prosecutor's false and misleading uses of Moreno's testimony in her jury arguments. Hence, Herrero deserves relief pursuant to *Ex parte Chabot.*

> **2.    Dominguez falsely testified that he doctored or forged his P.S.I. because he feared Herrero would find out he cooperated with the Government.**

Dominguez's testimony tracked Moreno's perjured testimony. Dominguez testified that he doctored his P.S.I. to prevent Herrero from putting a hit on him or forcing him to request segregated housing:

9  **Q**. Tell us exactly what you did to change your
10 paperwork, as far as your cooperation.
11 **A**. Well, I had to change Eddie Gomez's, also;
12 but he didn't get a 5KI. So, where it said like what
13 type of plea we entered, mine said I had a plea with
14 the government to cooperate and they would file a
15 motion for a 5KI. And he had the paperwork. His
16 didn't say that. All there was was no plea agreement.
17 So what I did, I made a copy of that part and I put it
18 on my P.S.I.
19 **Q**. Why did you go through all that trouble?
20 **A**. Well, it's either that or you get hit, or
21 else you got to go to the hole.
22 **Q**. Who did you do all that to try and fool?
23 **A**. Herrero.

4 RR 118.

6  **Q**. Where are you currently housed in the Harris
7 County Jail?
8 **A**. 1301.
9 **Q**. Where?
10 **A**. On the fifth floor under protective custody.
11 **Q**. Tell this jury your understanding of what
12 you receive in exchange for your testimony here today.
13 **A**. Well, I was promised protection against
14 Herrero's death threat against my life.

4 RR 123.

However, a review of Dominguez's P.S.I., which the State did not produce at trial, proves

that Dominguez falsely testified that he had to alter his P.S.I. to avoid Herrero's alleged violent

reach.  The United States Probation Department prepared Dominguez's P.S.I. on February 12,

1999.  *Id.* at 1, ¶ 1.  Dominguez's February 12, 1999, P.S.I. does **not** show that Dominguez

cooperated and does not show that the Probation Department recommended a 5K1 departure from

the sentencing guidelines (*i.e.,* a sentence lower than what a court following the guidelines would

impose).  The P.S.I. reported that Dominguez's plea agreement contained language stating that

"the defendant agrees to cooperate fully." *Id.* However, this is standard language in virtually all federal P.S.I.s.

Dominguez's P.S.I., in fact, indicates that Dominguez **refused** to cooperate, not that he did cooperate. The P.S.I. documents that Dominguez refused to grant an interview to probation officers and instead provided a written statement through his attorney which "was not specific … regarding his involvement." Ex. '18' (Dominguez' P.S.I. at 7, filed under seal). The P.S.I. states that Dominguez debriefed with agents of the Government on numerous occasions, *id.,* so the probation department went ahead and recommended a 3-point adjustment for accepting responsibility. *Id.* However, the February 12, 1999, P.S.I. concludes that the "**the probation office has no information which would warrant a departure from the prescribed sentencing guidelines**" for cooperation. *Id.*

The Probation Department also did not generate another P.S.I. mentioning cooperation or recommending a 5K.1 departure. Instead, on May 5, 1999, the probation department filed a Final P.S.I. Ex. '19' (*USA v. Dominguez* docket sheet). The P.S.I. filed on May 5, 1999, differs from the P.S.I. prepared earlier in February in that this Final P.S.I. includes an Addendum. Ex. '18'. This Addendum was prepared on May 4, 1999, and filed the next day, May 5, 1999, as an attachment to a copy of the February 12, 1999, P.S.I. Ex. '19.'[6] The Addendum does not mention cooperation and in fact expressly notes "**that absent a §5K1.1 motion there are no identified factors which would warrant a departure under the guidelines**" for cooperation. *Id.* (emphasis added).

---

[6] The first paragraph of the Addendum to Dominguez's P.S.I. states that "[t]he probation officer certifies that the Presentence Report (PSR), including any revisions thereof, have been disclosed or have been made available to the defendant, his attorney, and the counsel for the Government, on February 12, 1999, and that the content of the Addendum fairly states any objections they have made."

At trial, Dominguez, like Moreno, distanced himself from gangs and claimed he associated himself with the "All Houston Group" that he said Herrero led for safety.  As directed by the prosecutor, Dominguez testified as follows:

> 17 **Q.** Why not join up with a real gang, like
> 18 Mexican Mafia or Texas Syndicate?
> 19 **A.** I didn't want nothing to do with a gang.

4 RR 15 120-21.  However, Dominguez's P.S.I. falsifies this testimony also.  According to Dominguez's P.S.I., Dominguez **was the leader of a gang** called the "Posse" whose "members carried guns and were known to be violent."  Ex. '18' (Dominguez' P.S.I.) at 3.  Dominguez's business involved deadly force and a willingness to kill.  According to the P.S.I., Dominguez's gang was "known for doing 'kicks and rips.'"  *Id.*  As the P.S.I. explained, "kicks and rips" is a slang term for stealing guns and drugs from other drug dealers.  *Id.*  Dominguez and his "Posse" also provided protection to other drug dealers and engaged in pitched gun battles.  *Id.* at 5, ¶ 14.

Dominguez's testimony that he, too, turned to the prosecutor out of fear was also false.  Herrero was not a leader of a gang outside of prison or inside of prison.  On the other hand, several members of the violent "Posse" gang that Dominguez led were in FCI Beaumont with their leader, Dominguez.  *Id.* at ¶ 15.  Gomez belonged to the "Posse" gang, and was Dominguez's codefendant on the case that landed both in FCI Beaumont.  Ex. '19' (Docket sheet in *USA v. Dominguez*).  Gomez was also scheming with Dominguez and Moreno to testify against Herrero.  Mark Martinez was also a member of Dominguez's "Posse" gang, Ex. '18' at 5, ¶ 15, and Martinez was also scheming, along with Dominguez, to arrange a *quid pro quo* deal with prosecutor Siegler for testifying in a capital murder case that she was simultaneously bringing against another FCI Beaumont inmate named Ronald Jeffrey Prible.  Ex. '20' (Letter from Martinez to Siegler seeking *quid pro quo*).

Like Moreno, Dominguez lied in court about having to create fake copies of his P.S.I., lied about mortal threats from Herrero, lied about his reason for contacting the prosecutor, and lied when he testified that his "real P.S.I." showed that the Government would file a motion for a 5K.1 departure in exchange for Dominguez's cooperation.  This Court should therefore recommend relief pursuant to *Ex parte Chabot*.

### 3. BOP's Central Inmate Monitoring ("CIM") records prove beyond question that Moreno and Dominguez lied at trial about threats from Herrero.

BOP monitors and controls the transfer, temporary release (*e.g.,* on writ), and community activities of certain inmates who present special needs for management.  28 CFR 524.70.  Such inmates, known as CIM cases, require a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities.  *Id.* CIM cases are classified according to several "assignments," which include "witness security cases," "disruptive group cases," and "separation cases," which is for "[i]nmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future."  28 CFR 524.72.  Inmates can request separation from others, including requesting placement in special housing units known as the SHU.  BOP then makes a determination about whether a CIM assignment, placement in special housing, or transfer to a different unit to effect separation is necessary.

BOP periodically updates inmates' CIM classifications and assignments, since threats that inmates may face change.  BOP issues notices of CIM classifications and assignments to institutions to which inmates are temporarily or permanently redesignated.  Moreno had an extensive CIM classification history because of his cooperation with the Government.

Dominguez's records indicate that he did not have a CIM classification at all during the relevant time period that Herrero's case concerned. Review of Moreno's and Dominguez's CIM classification histories demonstrates that Moreno and Dominguez lied when they testified that Herrero threatened them, and that because of Herrero's alleged threat they sought, needed, or received protection and separation from Herrero.

A BOP "CIM Clearance and Separatee Data" sheet for Moreno dated July 27, 2001 (*i.e.,* three weeks after the prosecutor interviewed Moreno on July 3, 2001), shows that Moreno was being separated from twelve inmates. However, Herrero is **not** listed in this document as one of Moreno's separatees. Ex. '21'. Herrero's name does not appear on any previous "CIM Clearance or Separatee Data" sheets for Moreno. However, numerous prisoners do. *Id.*

It was not until the prosecutor herself sent BOP a letter on February 12, 2002 – requesting protection from Herrero for Moreno, Dominguez, and her non-testifying agents and informants, Foreman and Gomez – that BOP was ever concerned about Herrero's relationship to Moreno, Dominguez, or to anyone else. Ex. '22.' BOP documents do not indicate that Dominguez had a CIM classification recommending separation from any other inmates before the prosecutor sent her self-serving letter that falsely stated Herrero was a threat to her lying witnesses. In fact, Dominguez apparently did not receive a CIM classification separating him from Herrero until after trial and after the prosecutor sent a second letter dated May 7, 2002, asking BOP to protect Dominguez.

BOP memoranda issued in response to the prosecutor's February 12, 2002, letter confirms that apart from the prosecutor's February 12, 2002, letter, BOP did not have a reason to order Herrero separated from Moreno, Dominguez, Foreman, or Gomez. Furthermore, there are no known BOP documents indicating that any of the prosecutor's informants asked BOP to separate

them from Herrero or protect them from Herrero.  Instead, BOP documents indicate that BOP advised Dominguez and (non-testifying witness) Foreman of why they were being placed in the SHU precisely because neither one had requested separation.  Exs. '30' and '30A.'

Moreno's and Dominguez's CIM histories provide additional, carefully documented proof that the State solicited, and argued, false and misleading testimony.  Because this perjured testimony and accompanying false and misleading arguments were crucial to securing Herrero's conviction, relief should be recommended and granted pursuant to *Ex parte Chabot*.

### 4.   Comparison of Moreno's testimony to Dominguez's also proves that both informants perjured themselves.

Moreno and Dominguez repeatedly contradicted each other's testimony at Herrero's trial.  When Moreno described the circumstances under which Herrero confessed – the location, the persons present, and what those listeners were doing – Moreno stated that Herrero was "primarily talking" to "me, [Juan] Castillias, and Dominguez."  4 RR 62.  According to Moreno, Herrero was sitting on a bench with Moreno and Castillias.  Moreno said Dominguez was "on the floor, sitting on the cement, … facing us."  3 RR 183-184; 4 RR 63.  The alleged confession, according to Moreno's testimony (and according to his audiotaped statement of July 3, 2001), was not an incidental remark, but an extended account of how Herrero supposedly planned, carried out, and covered up the Guajardo murder.  The reason for the alleged confession, according to Moreno, was to show members of the so-called "All Houston Group" that they could trust Herrero because he was willing to entrust them with his confession to murder.

When Dominguez took the stand, he claimed that he was at the pre-riot meeting of the "All Houston Group" in November/December of 1999.  He could not confirm anything that Moreno testified Herrero confessed to:

Q. Do you remember a riot, Mr. Dominguez, that was supposedly going to happen in December of '99?

A. Yes.

Q. Do you remember kind of a pre-riot meeting?

A. Yes.

Q. Where you, Cevellos, Eddie Gomez, Mr. Moreno, and Mr. Herrero were supposedly there?

A. Yes.

Q. Did you hear Mr. Herrero talk about killing Albert then?

A. At that time, I didn't.

Q. Sir?

A. At that time I didn't.

Q. Not a word?

A. No, at that time I didn't.

4 RR 47.  Instead, Dominguez testified that he heard Herrero's alleged confession to the Guajardo murder for the first time in March of 2000, and that Moreno and Gomez were again present, along with Foreman, to whom Herrero specifically confided.  5 RR 10-11.

Dominguez also testified that Herrero confessed to Gomez and to him a third time in the summer of 2000.  5 RR 18.  Dominguez testified that on this last occasion, when Herrero allegedly described yet one more time how he had slit Guajardo's throat from ear to ear, Gomez reacted like he had never heard the story before.  *Id.*

Clearly, both Moreno and Dominguez were lying.  If, as Moreno testified, Dominguez really had been present at the alleged pre-riot meeting of the "All Houston Group," and had been sitting facing Herrero, the supposedly powerful leader that Dominguez said he feared, Dominguez

37

would surely have remembered Herrero confessing at length to a shocking murder.  Likewise, if Moreno had really been present, as Dominguez testified, when Herrero supposedly confessed at length again in March of 2000, Moreno would have mentioned this second confession at trial or in his July 3, 2001, taped interview.  However, Moreno does not mention this alleged second confession on either occasion.  Finally, if Gomez had been present at all three so-called confessions (in November/December 1999, as Moreno testified, and in March 2000 and the summer of 2000, as Dominguez testified), then (i) Gomez would have been the State's key witness, but he was not called to the stand, and (ii) Gomez would not have reacted to the third alleged retelling of the murder with surprise.  However, Dominguez testified that when Herrero supposedly retold the story of Guajardo's murder, Gomez reacted as if he had never heard the story before.

### C.   Sponsorship of Perjured Testimony Was Harmful Error Under *Ex Parte Parrot*, 396 S.W.3d 531, 534 (Tex. Crim. App. 2013) and under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

In *Ex parte Parrot*, 396 S.W.3d 531, 534 (Tex. Crim. App. 2013), the Texas Court of Criminal Appeals instructed that "the general rule is clear, however, that a Petitioner must show harm to obtain habeas relief," and "[a]n Petitioner demonstrates harm with proof 'by a preponderance of the evidence that the error contributed to his conviction or punishment.'"  *Id.* (citing *Ex parte Williams*, 65 S.W.3d 656, 658 (Tex. Crim. App. 2001).

The State's case rested entirely on the credibility of the prosecutor's two informants, and upon Moreno especially.  In her opening remarks, the prosecutor stated that:

> 25…**no one's trying to**
> 1 **hide from you the fact that Jesse Moreno is pretty**
> 2 **much the crux of this case.**

3 RR 7.

The importance of Moreno is also reflected in the letter the prosecutor wrote after trial to the AUSA who was handling Moreno in the federal system,

> Moreno told me initially of the possibility of other witnesses to admissions made by Herrero about his committing this murder in 1995.   Moreno and the other three witnesses have all been cooperative.  **It was however, Moreno whom I presented to the jury as being the "crux" of the case and it was almost entirely because of his testimony that the jury found Herrero guilty of Murder**.

Ex. '6' at 1 (emphasis added).

Because Moreno lied about the threat that Herrero posed, about his motive for coming forward, and about all the alleged facts confessed to him, the crux of the State's case was perjured and contributed significantly to a wrongful conviction.  Relief is therefore justified under Texas law.  Dominguez's false testimony, whether taken together with Moreno's testimony or taken separately, also contributed to the verdict, as did Detective Brown's false testimony.  Whether considered together or separately, the false testimony of Moreno, Dominguez, and Detective Brown also had "a substantial injurious effect" on the verdict.  *See Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946).  Any reasonable jurist would have grave doubts about the conviction.  *See O'Neal v. McAninch*, 513 U.S. 432 (1995).  Relief should therefore be recommended and granted.

## CLAIM TWO

**THE CONVICTION AND SENTENCE OF HERMILO HERRERO VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT BECAUSE THE CONVICTION RESTS ON TESTIMONY THAT THE STATE KNEW WAS FALSE AND MISLEADING.  *SEE NAPUE V. ILLINOIS,* 360 U.S. 264 (1959)*; GIGLIO V. U.S.*, 405 U.S. 150 (1972).**

### A.    THE PROSECUTOR SPONSORED, AND FAILED TO CORRECT, TESTIMONY THAT SHE KNEW WAS FALSE AND MISLEADING.

Demonstrating a violation of Due Process under *Napue v. Illinois,* 360 U.S. 264 (1959) or

*Giglio v. United States*, 405 U.S. 150 (1972), requires (i) a demonstration of a constitutional

violation and (ii) a showing that the violation was material.  An Petitioner must demonstrate both

prongs by a preponderance of the evidence.  *Ex parte Weinstein,* 421 S.W.3d 656, 665 (Tex. Crim.

App. 2014).  "[D]eliberate deception of a court and jurors by the presentation of known false

evidence is incompatible with rudimentary demands of justice.  *Giglio,* 405 U.S. at 154 (quoting

*Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  "The duty of a prosecutor, as the representative

of the sovereign in a criminal case, is 'not that it shall win a case, but that justice shall be done.'"

*Berger v. U.S.,* 295 U.S. 78, 88 (1935).  Regardless of intent, the prosecutor acts for the State and

bears "the mantle of public trust."  *Id.*  Failure to act in accordance with these high standards

undercuts the very basis of our system and implicates "the preservation of our civil liberties."  *Id.*

> **1.      Correspondence between the prosecutor and Moreno shows that the prosecutor solicited, and allowed to go uncorrected, false and misleading testimony from Moreno about when and why he decided to turn State's witness against Herrero.**

Moreno testified that he contacted the prosecutor because he feared that Herrero would kill

or seriously harm him and figured turning State's witness was his only way to save himself.  This

striking, incriminating testimony would ring hollow, however, if the defense could show that

Moreno contacted the prosecutor not when the threats supposedly materialized, but at least *a year*

*and a half* after Herrero's alleged November/December 1999 confession and *10 months or more*

after the alleged threats supposedly materialized in the summer of 2000.

The prosecutor was acutely aware from the start of the problem created by the timing of

Moreno's decision to contact her and report Herrero's alleged confession.  During the July 3, 2001,

tape-recorded interview with Moreno, the prosecutor specifically asked Moreno to explain why he

waited "almost two years" to come forward:

**KS:**   And, and explain to me how all that's made you decide to tell all this today, because you learned all this when, '90, '99?

**JM:**   '99.

**KS:**   '99.

**JM:**   '99 of, ah November.

**KS:**   And this is going on a year and a half later

**JM:**   Yeah.

**KS:**   when you first tell us about it.  So explain what made you decide to tell.

Ex. '13' at 21.

In reply Moreno stated that:

> **JM**: I wouldn't said nothing if he hadn't dug in my business, but then he threatened; I couldn't go nowhere; everyone in prison wanted to beat me up or stab me or somethin' cause of what he said. He's a snitch, Ooh! People that just came into prison know me, knew about me. Oh, you got a hit.

*Id.*  However, instead of becoming wary of Moreno's concocted, garbled explanation, which ducked the question of why so late in the day, and instead of questioning whether to try to convict Herrero using Moreno as a witness, the prosecutor set about remedying the hole in the State's case with false and misleading testimony.

At the prosecutor's direction, Moreno testified at trial that he contacted the prosecutor approximately in August or September of 2000 by letter and by phone:

> 6. A. I tried to contact you in August, September,
> 7 October, somewhere around there, of 2000.
> 8 Q. How did you first try to contact me?
> 9 A. I wrote you.
> 10 Q. A letter?
> 11 A. Yes, ma'am.
> 12 Q. Did I ever write you back?
> 13 A. No, ma'am.
> 14 Q. Did you try to contact me anymore after
> 15 that?

> 1 6 A. Yes, I had my mom write you a letter.
> 17 Q. Anything else?
> 18 A. I tried to call you
> 19 Q. When?
> 20 A. Around that time.
> 21 Q. What time?
> 22 A. August, October \ September, sometime around
> 23 there, 2000.
> 24 Q. 2000.  When was it that you and I first
> 25 spoke by telephone?  Do you remember?
> 1 A. Oh, it was sometime in 2000; but when I got
> 2 ahold of you, it had to be about September or October.
> 3 Q. Of 2000?
> 4 A. Yes, ma'am.

3 RR 162-63.

The State's file contains a letter to the prosecutor from Moreno dated April 4, 2001 (Ex. '11').  This letter disproved Moreno's testimony and, like the July 3, 2001, interview, shows that the prosecutor knew that her witnesses testified falsely.  The April 4, 2001, letter is dated a year and five months after the date of Herrero's alleged November/December 1999 confession and about 10 months after the date that Moreno testified Herrero began threatening his life and his family.  *Id.*  The contents of the April 4, 2001, letter show that this was the first time Moreno tried to communicate with the prosecutor since the time he testified in a case she brought against Jason Morales nearly five years before.  Moreno starts the letter asking the prosecutor if she remembers him.  *Id.*  Moreno states that he has some "info that can be helpful to you on a unsolved case," reminds her of her standing offer "telling me that if I needed any help you would help me," and complains about being "locked up for four years going on five."  *Id.*

The April 4, 2001, letter also proves that Moreno lied on direct examination and on cross examination about his motive for coming forward, but the prosecutor let his false responses go uncorrected.  Moreno testified that he decided to become a witness against Herrero because Herrero was allegedly threatening not only Moreno but Moreno's family.  However, Moreno did

42

not write in his April 4, 2001, letter that Herrero was threatening his family or him.  Furthermore, Moreno's mother sent the prosecutor a letter dated April 10, 2001. Ex. '12'.  Moreno's mother's letter does not mention any threats to the family either.  *Id.*  Instead, Moreno's mother complained that Moreno's attorney had not ensured that Moreno had gotten a deal for testifying against Jason Morales and lobbied the prosecutor to try to help Moreno this time.  *Id.*

Knowing all this – that Moreno first contacted her in April 2001, and mentioned no threats to himself or his family at this late date – the prosecutor nonetheless stated in opening arguments that BOP transferred Moreno to Liberty County Jail to save him from Herrero, and that only after Herrero threatened Moreno's family after the transfer did Moreno call on her.  3 RR 8-9.  However, the reason BOP transferred Moreno was because Moreno was assisting with an internal investigation into drug smuggling at FCI Beaumont (Ex. '11'), and Moreno's Admission and Release and Quarters records prove he was not transferred to Liberty County until May 15, 2001, six weeks after he wrote the prosecutor offering to provide his snitch services in return for her favors. Ex. '21(A)'.  The prosecutor knew Moreno was in FCI Beaumont when he contacted her, since Moreno's letter would not have passed through the FCI Beaumont mailroom with a false sending address, and Moreno's mother's April 10, 2001, follow-up letter asking for a quid pro quo on her son's behalf ends by providing the prosecutor Moreno's current location: "Jesse G. Moreno, Jr., #72731079, FCI Medium, P.O. Box 26040, Beaumont, Texas 77720-6040."  Ex. '12.'

**2.      Audiotape of the prosecutor's July 3, 2001, interview of Moreno demonstrates that the State knew Moreno was fabricating Herrero's alleged confession and the circumstances under which the confession was allegedly made.**

As an initial matter, the July 3, 2001, taped interview shows that Moreno could not even remember Albert Guajardo's name, even though Moreno claimed that this "Albert" was a friend of his, with whom he dealt drugs.  Moreno tells the prosecutor:

> Well, me and Herrero, we got kinda tight in prison, we just, you know, got real close and [UI] and, ah, like I said, ah, we shared a lot of things together, but, you know, what we did on the streets or whatever, and, ah, he started talking about this friend of mine we both had named **Albert Vargas** and, ah, I had knew got killed, you know, but we didn't know who did it or whatever, you know.

Ex. '13' at 5.

Moreno also told the prosecutor that Herrero told him that the night he allegedly killed Guajardo, he met Guajardo at a bar behind Almeda Mall and "stayed up till about 2 o'clock getting drunk."  Ex. '13' at 15.  According to Moreno, Herrero "sa[id] Albert was fucking drunk.  He was just drunk already, you know."  *Id.*  However, the prosecutor went over the autopsy report before trial, including the toxicology, and discovered that the level of alcohol in Guajardo's urine was absolutely ZERO, and the amount measured in his bile was 0.039%.  The prosecutor knew that Moreno was fabricating the confession, but instead of refusing to allow her witness to falsely incriminate Herrero, she had him modify his fabricated story as follows:

> **A**. Who is he?
> Mr. Herrero. Ran into Albert at the bar,
> started talking. He said Albert didn't – like, he
> didn't react like you know, when he seen him,
> didn't leave, like he didn't owe him no money.
> MR. COGDELL: Excuse me.
> **Q**. (BY MS. SIEGLER) Go ahead, sir.
> **A**. They started talking and drinking, him and
> Albert.  Herrero started drinking and talking.

44

> **Q.** Who is he?
> **A.** Herrero and Albert started drinking and
> talking, and Herrero told me he seen that was the
> opportunity to get him for what he owed him.

3 RR 177.

The prosecutor also had Moreno modify his testimony after she found he had lied to her about who was present when Herrero allegedly confessed to her.  The modifications only resulted in different, less obvious lies.  During the July 3, 2001, interview, Moreno tells the prosecutor that in late November or early December 1999, Hermilo Herrero confessed to killing Guajardo not only to Moreno, but to two other prisoners, Nathan Foreman and Rafael Dominguez.  On tape, Moreno does not say any other prisoners except Foreman and Dominguez were present:

> Q.     Who was there that day when [Herrero] said that to you.
> A.     Dominguez and Nathan Foreman.
>
> ***
>
> Q.     You tell me Dominguez is Rafael Dominguez.
> A.     Yeah, Rafael Dominguez
> Q      About how old is he
> A.     Thirty … he's about 27, 26
> Q.     And he heard all this stuff you were telling me just now?
> A.     Yeah.
> Q.     And who was the other guy there, Nathan Foreman.
> A.     Nathan Foreman.
> Q.     Is he from Houston.
> A.     Yeah, we're all from Houston.
>                  ***
> Q.     White guy or black guy.
> A.     Black guy
> Q.     How old is he.
> A.      34 years old.

Ex. '13' (Transc. July 3, 2001, Interview of Moreno).

Besides describing Foreman, Moreno explains on the July 3, 2001, tape why Herrero would confess to Foreman and Dominguez rather than just to Moreno.  According to Moreno, Dominguez

and Foreman were expecting a riot or disturbance at FCI Beaumont, and they wanted assurance that Herrero would help out if any one of them got caught in the violence:

> [Moreno]:  When he was telling me I was like, you want to tell me by yourself?  Why do you want to talk to me by these guys.  But the thing was we, everybody thought he wasn't going to back them.

Moreno also assures the prosecutor that Dominguez and Foreman heard everything Herrero supposedly confessed to in November/December of 1999:

> Q.  And he [Foreman] heard all this the same time you did?
>
> A.  Yeah.

*Id.*

Moreno's July 3, 2001, tape-recorded tale about Herrero's confession to Dominguez, Foreman, and himself was not only false, it was impossible.  Contrary to Moreno's taped statement, Herrero could not have confessed to Moreno and Foreman in November or December of 1999, because BOP records list **February 28, 2000,** as the date of Foreman's "admission and orientation" at FCI Beaumont.  Ex. '25' (BOP Inmate Quarters History for Nathan Foreman); Ex. '25(A)' (Admission and Orientation Sheet).  However, instead of refraining from calling a witness who she had caught lying, the prosecutor schemed to diffuse the anticipated impeachment (which never materialized).

At trial, the prosecutor asked Moreno who was present when, in November/December of 1999, Herrero allegedly described how he killed Albert.  3 RR 183.  This time Moreno testified that when Herrero supposedly confessed, Dominguez, Gomez, and "another guy" were also present.  *Id.*  The prosecutor asked if Foreman was also present, and Moreno said, "Well, '99, Nathan Foreman wasn't there."  *Id.* 173.  The prosecutor also had Moreno testify that Foreman did not get to FCI Beaumont until sometime in 2000.  *Id.* at 148.  However, there was no way for

46

Moreno to figure this out himself.  BOP moved Moreno from FCI Beaumont to the Liberty County Jail in May of 2001.  Ex. '21(A)' (Inmate Admission-Release and Quarters History for Jesse George Moreno).[7]  Moreno returned to FCI Beaumont for one week while in transit to Harris County to give testimony against Herrero. *Id.*  Instead, the State had to have discovered Moreno's July 3, 2001, taped fabrication after interviewing Foreman or after reviewing Foreman's prison records in preparation for trial.  But rather than questioning whether to seek a conviction based on the testimony of a witness who had obviously lied to her, the prosecutor instead had Moreno substitute Gomez for Foreman.[8]  The State also called Dominguez to falsely testify that Herrero confessed to him and Nathan Foreman sometime in March 2000, after Foreman got to FCI Beaumont Medium.

There are very strong indications that the State had a hand in selecting the March 2000 time frame within which Dominguez says Herrero confessed to him and to Foreman.  Foreman arrived at FCI Beaumont on February 28, 2000.  BOP inmate history and disciplinary records show that by March 23, 2000, Foreman was administratively detained and separated from the general population.  Ex. '23' (Foreman's SHU History, 3/23/00-4/15/00).[9]  Dominguez would not have been keeping track of Foreman's movement in 2000, two years before trial.  However, the State unquestionably discovered Moreno's blunder, namely, that Foreman was **not** at FCI Beaumont in 1999, contrary to Moreno's July 3, 2001, taped account of Herrero's alleged confession to him and

---

[7] On May 15, 2001, Moreno was removed from FCI Beaumont Medium ("BMM"). Ex. '21(A)' at HCDA000138. He was held in IN-TRANSIT facilities until March 29, 2002, when he returned to FCI Beaumont Medium under administrative detention. *Id.*  On April 5, 2002, Moreno was then released on a STATE WRIT to testify against Herrero. *Id.*

[8] However, there is no chance Moreno confused Gomez with Foreman.  Gomez is Hispanic and Foreman is African American.  Moreno knew Foreman from the Houston neighborhood they lived in.  Gomez was also a member of Dominguez's violent "Posse" gang and Moreno had been incarcerated with Gomez for at least a year before Foreman got to FCI Beaumont.

[9] According to BOP's Special Housing Policy, "Administrative detention status is an administrative status which removes you from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities."  *See*  http://www.bop.gov/policy/progstat/5270_010.pdf (last accessed August 8, 2015).

Foreman.  The State could not afford to have Dominguez make a similar, easily impeachable fabrication, so the State needed to supply Dominguez with a timeframe.

Moreno's false statements denying any gang affiliations also put the prosecutor on notice before trial that her witness was blatantly lying.  In the July 3, 2001, interview, the prosecutor asks Moreno:

> **KS:** Are you in any kind of gang in prison
>
> **JM:** No, no
>
> **KS:** or before you got to prison?
>
> **JM:** No, no.
>
> **KS:** None at all?
>
> **JM:** Not at all.
>
> **KS:** What about Herrero?
>
> **JM:** Well, he had, they said he might, he hangs around with a certain gang, I don't know what gang it is, and like I said, either where, either where I go, if he is, I'm, I'm hit wherever I go.
>
> **KS:** Okay.  What about Foreman or Dominguez?  Are they in any
>
> **JM:** No, no, no.
>
> **KS:** gang?  So none of this, none of you all's, um, when this riots about to happen and you all have each other's back, it's not because of a gang thing?
>
> **JM:** No, no, no.  It was just
>
> **KS:** Because you all are all from Houston.
>
> **JM:** Yeah.  We just make sure we take care of ourselves.
>
> **KS:** Okay.

However, in 1997, the prosecutor learned that Moreno was a gang member while preparing to try Jason Morales for the 1995 drive-by shooting of Juan Esparza.  Moreno was suspected of

carrying out numerous home invasions and armed robberies with Jason Morales.  The prosecutor's Jason Morales file contained HPD current information reports detailing Moreno's involvement in the invasions and armed robberies and states that "the suspects involved in this case are all active members of the 'little red' gang."  Ex. '26' (HPD Incident No. 138473396).  Moreno was the leader of this gang.  Follow-up HPD reports state that "little red" gang members "Jason Morales and Pac Man were Jesse [Moreno's] goons."  Ex. '27' (HPD Incident No. 126236696, p. 2.039).

The continuing report shows that HPD determined that Moreno was "ring leader" of the gang.  *Id.* at p. 2.054.  On at least one occasion, Moreno's gang beat victims with a hammer to get them to tell where they kept their valuables or drugs.  Ex. '28' (HPD Incident No. 135701896, pp. 1.008, 1.010, 1.011).  Jason Morales also gave a statement that the prosecutor not only had to have known about, but would have been obligated to disclose to Morales' defense attorney:  *i.e.,* that Morales said he had done some "licks" (*i.e.,* robberies) "for Jesse" Moreno and "running dope" for him.  Ex. '27' at p. 2.049.  In that statement, Jason Morales told HPD that "Jesse Moreno will give me directions to a house or a business with instructions to either drop off cocaine or pick up money…  Frankie and Pac Man have been doing this for a long time for Moreno.  They are his main worker.  By workers, I mean they move dope for Jesse and they will do the home invasions for him."  *Id.* at 2.064.  Law enforcement also suspected that the leader of the little red gang, Moreno, set up a capital murder that Frank Vasquez carried out.  *Id.*[10]  Finally, Moreno was involved in smuggling drugs into FCI Beaumont for the Texas Syndicate, which the prosecutor, in preparing for trial, would have found out about.

---

[10] It was this capital murder that Moreno referred to in the July 25, 2000, interview with BOP as "his murder case," and it was Vasquez who tried to get back at Moreno by sending in transcripts of Moreno's snitch testimony to FCI Beaumont, which Moreno said were used to blackmail him into running drugs into the institution for the Texas Syndicate.

Nonetheless, despite clear proof that her key witness had baldly lied to her pre-trial about his gang affiliation, the prosecutor solicited and failed to correct false and misleading testimony that Moreno was not involved with gangs and, in prison, was trying to defend his supposedly vulnerable self from gangs by associating with Herrero and the so called "All Houston Group."

> **Q.** Well, wait a minute. I thought you said you
> 2 guys weren't in a gang?
> 3 **A.** We're not, but we're just getting ourself
> 4 ready to take care of ourself in case something
> 5 happened with us.
> 6 **Q**. And even though there is a riot in the air
> 7 and y'all aren't involved in a gang, you're getting
> 8 ready to defend yourself against gangs?

3 RR 65.

Dominguez's P.S.I., which the prosecutor also had to have reviewed, also confirmed that he was a leader of a violent gang, and was in FCI Beaumont with at least two underlings belonging to that gang, namely, Gomez and Mark Martinez. Ex. '18.'  However, the prosecutor also solicited false and misleading testimony from Dominguez to the effect that he, like Moreno, avoided gangs.

> 17 **Q**. Why not join up with a real gang, like
> 18 Mexican Mafia or Texas Syndicate?
> 19 **A.** I didn't want nothing to do with a gang.

4 RR 120.

Suppression of Moreno's and Dominguez's gang affiliations was critical to the State's case. The State had to explain why Moreno's and Dominguez's decisions to turn State's witnesses came so late in the day.  The idea the State hit upon was to use the testimony that Herrero commanded the so-called All Houston Group and had found out that Moreno and Dominguez had cooperated in another case six to nine months after Herrero allegedly confessed to killing Guajardo. According to the State, Herrero then threatened Moreno and Dominguez (who were merely

Herrero's followers, unwise to the way of gangs and powerless before the alleged "group" leader, Herrero).  Evidence that Moreno and Dominguez were not only violent gangsters, but *leaders* of a gang, would have undermined this theory thoroughly, especially since the State did not have any evidence from law enforcement or BOP that Herrero was a gang member inside or outside of prison.  The false and misleading testimony violated *Ex part Chabot* and *Giglio v. United States*. Habeas relief should be recommended and granted.

> **3.      Crime scene and autopsy evidence that the prosecutor reviewed before trial provides solid proof that the prosecutor realized that the forensic facts falsified her informant's account of the murder and demonstrated they were fabricating Herrero's confession.**

The testimony of Moreno, especially, and Dominguez, also, formed the crux of the State's case for conviction.  Inspection of the trial transcripts shows that the prosecutor reviewed the autopsy and crime scene evidence and selected photographic and physical exhibits for trial.  The prosecutor was therefore keenly aware of crime scene and autopsy evidence that contradicted Moreno's and Dominguez's testimony.

An experienced felony prosecutor with numerous murder trials behind her, the prosecutor knew that the autopsy evidence demonstrated that Guajardo did not sustain injuries to his head and neck and nothing more, which was all that her informants' account of Herrero's alleged confession allowed for.  Instead, the autopsy photos documented extensive contusions, abrasions, and wounds on Guajardo's back, chest, and flank.  Ex. '29' (Autopsy photos).  The autopsy evidence also documented multiple cutting or stabbing wounds to Guajardo's head and neck.  Ex. '8,' p. 4; Ex. '29.'  The prosecutor therefore had to know that the autopsy evidence showed Guajardo was assaulted in a different manner and died under different circumstances than those to which Moreno and Dominguez testified.  Nonetheless, the prosecutor sponsored the false testimony of these informants.  She also argued that their testimony was consistent with the autopsy evidence and

crime scene evidence and, therefore, because of this alleged consistency, was true.  However, the prosecutor must have realized full-well that the crime scene and autopsy evidence flatly contradicted the confessions that her informants testified Herrero gave them.

Similarly, the prosecutor had to have known, from her experience prosecuting homicide cases, what happens when major arteries and veins are severed whether by bullets or knives.  In particular, this prosecutor unquestionably viewed countless police photos and medical examiner photos of blood-soaked scenes and victims.  The prosecutor therefore must have realized that if Guajardo's assailant had inflicted the slashing wound documented at autopsy, which severed his carotid artery and jugular vein, while Guajardo was in the passenger seat of a van, there would have been blood and gore all over the interior of the van, the victim, and the assailant.  However, the prosecutor knowingly sponsored testimony and argued to the jury that the *lack* of blood evidence on the victim's lower garments was consistent with the autopsy evidence, was consistent with her informants' testimony, too, and showed that the informants were telling the truth.  6 RR 41.

Closing argument indicates that the prosecutor was intent on misleading the jury no matter how crime scene and autopsy evidence compared to her witnesses' testimony.  In addition to falsely alleging (i) that autopsy evidence and informant testimony were consistent and (ii) that this supposed consistency proved that the informants were telling the truth, the prosecutor argued that implausible "add[itions]" to the tale of Guajardo's death proved her informants were telling the truth precisely because they were implausible.

> If [Moreno and Dominguez] were lying wouldn't you expect them to tell you he died from a cut throat?  I mean, you would think that that cut would have killed anybody right away.  If they were going to lie about it, why add more to it except for the fact what they told you is true.

7 RR 41.

Inconsistency and conflict with the evidence also proved her informants were telling the truth:

> Now don't you think you would have thought with the hammer marks on the head, if he didn't die right away, the hammer would have come first? And because he didn't die right away, then he would have slit his throat? That's what you would think, that this didn't work, so let's slit his throat. They didn't say that. **They said it really backwards, you would think backwards until you heard what Curtis Brown said.** We know that he was cut here first, because that's where most of the blood was on the carpet. See, that's consistent, too.

7 RR 42.

According to the prosecutor, Detective Brown's false testimony – that the blood splatter evidence indicated Guajardo's throat was slashed while he was in a sitting position – made her informants' "really backwards" testimony that Guajardo's throat was slit *before* he was beaten consistent with the autopsy evidence and therefore true.

No prosecutor inclined to seek justice rather than to just convict would have tried to make Moreno's, Dominguez's, and Brown's false testimony appear to be true.  The prosecutor's sponsorship of false and misleading testimony was exacerbated by her endeavor to package multiple falsehoods, which she coached from her witnesses, as the truth in her closing argument. Habeas relief should therefore be recommended and granted.

### 4.    The prosecutor knowingly manufactured misleading evidence.

The prosecutor argued that Herrero was such a threat that BOP placed her testifying witnesses – Moreno and Dominguez – in the SHU (or "in the hole") to protect them from Herrero. Siegler told the court that BOP took the same measures, for the same reasons, to protect non-

testifying witnesses Foreman and Gomez.  However, review of Dominguez's and Foreman's BOP records compels the conclusion that the prosecutor had BOP place her witnesses in the SHU so she could argue that Herrero was a threat.  In other words, she manufactured evidence of threats to her witness for use at trial.

BOP records prove that the only source of information that BOP had regarding the alleged threat that Herrero posed to the prosecutor's witnesses came from the prosecutor herself. Foreman's and Dominguez's BOP housing records document that on February 12, 2002, BOP placed Foreman and Dominguez into administrative segregation.  Ex. '25' (Admission Release and Quarters History for Foreman); Ex. '25(B)' (BOP Admission Release and Quarters History for Dominguez).  BOP memoranda completed two days later, on February 14, 2002, discussed the reasons BOP placed Dominguez and Foreman in the SHU, and states that "Lieutenant Clark received written notification on February 12, 2002, from the Kelly Siegler, District Attorney for Harris County in Houston, Texas, indicating you [Foreman] needed to be protected to ensure your safety and well-being."  Ex. '30' (BOP Memoranda dated February 14, 2002).  According to the February 14, 2002, Memoranda, Siegler reported to BOP that she had interviewed Foreman, and that Foreman, during the interview, "admitted that [he was] afraid that a death threat would be made against [his] life."  *Id.*  Siegler also told BOP "that due to Inmate Herrero's past history and behavior, this defendant does not make idle threats."  *Id.*  However, the Memoranda do not refer to any other source of information justifying the decision to place Foreman and Dominguez in the SHU other than the February 12, 2002, notification from Siegler.

BOP requires careful documentation of reasons for placing persons in administrative detention, but neither the February 14, 2002, Memoranda nor any other known BOP records corroborate a "history" of serious threats that Siegler said existed.  The  fact  that  Foreman  and

Dominguez were immediately administratively detained (placed in the SHU) the very same day Siegler sent BOP written notification that Herrero allegedly posed a danger to her informant witnesses, along with the fact that the BOP Memoranda do not mention the results of any investigation into Herrero and do not mention any other corroborating sources, means that BOP acted immediately and exclusively on Siegler's notification.

The February 14, 2002, Memoranda confirms that neither Dominguez nor Foreman reported a threat from Herrero, did not request that BOP separate either one from Herrero, and did not ask BOP to place either one in the SHU for protection from Herrero.  To the contrary, the February 14, 2002, Memoranda shows that BOP had to follow protocols for advising prisoners who were being placed in the SHU involuntarily.  The Memoranda state as follows:

> In accordance with P.S. 5270.07, chapter 9, page 10, which states: "Inmates who are placed in administrative detention for protection, but not at their own request …, are entitled to a hearing, no later than seven days from the time of their admission…" [A] DHO hearing [is] tentatively scheduled for February 15, 2002.

Ex. '30.'

Foreman, in fact, appears to have resisted being placed in the SHU.  On February 28, 2002, BOP surveyed Foreman regarding his segregated housing status, and Foreman told BOP that he saw no reason why he should not be in the general population.[11]

---

[11]  The statement in the Memorandum that Herrero has made death threats against witnesses planning to testify against him does not refer to a different source, is not supported by any other documents that BOP disclosed, and was not endorsed by the prosecutor's witnesses.  Hence, the only reasonable explanation for what looks like a naked assertion confirming the prosecutor's fears for her witnesses is that the BOP investigator reported what the prosecutor said, but neglected to make a clarifying attribution of this sentence to her.

This same pattern of misrepresentations continued after trial.  On May 1, 2002, the prosecutor wrote BOP another letter in which she re-alleged false statements she made on February 14, 2002 (namely, that Moreno, Dominguez, Foreman, or Gomez were in danger and needed protection), and informed BOP anew that:

> It is my request that these four witnesses/inmates be redesignated and moved to separate facilities from Herrero for the following reasons.  The evidence against Herrero only became known because of the information brought to our attention by these witnesses, especially Moreno.  Herrero realized this while he was still incarcerated at your facility and took measures to put out a hit on Moreno and Dominguez there already.  Those in your facility were made aware of this threat in February of 2002 and kept the four witnesses in individual segregation or in "the hole" once they learned of it.  The situation was bad even before the trial began. Now that the defendant has sat through an entire trial and knows everything that these witnesses had to say against him, the situation has only worsened.

Ex. '31.'  The fact that it is Siegler who tells BOP in her May 1, 2002, letter when BOP was made aware of the danger, and it is Siegler who identifies the time BOP was "made aware of this threat" as "February of 2002," confirms that Siegler's February 12, 2002, written notification was the sole source BOP had for a story in which Herrero allegedly made threats to witnesses against him.  As happened after Siegler filed the February 12, 2002, written notification that Herrero was a mortal threat to her informants, Foreman disagrees with the same representation in her May 1, 2002, letter. On May 13, 2002, Foreman again told BOP that there is no reason why he should not be placed in the general population. Ex. '32.'

Arguments that the risk informants were taking showed they were credible were improper to begin with and demonstrably false in the end.  The prosecutor misled BOP in order to manufacture evidence that she then used to mislead and misinform the jury.  This intentional

56

misconduct trampled Herrero's Fourteenth Amendment Due Process rights.  Habeas relief should therefore be recommended and ultimately granted.

    **B.**    **TESTIMONY AND ARGUMENT THAT THE STATE REALIZED WAS FALSE AND MISLEADING WAS MATERIAL AND HARMED HERRERO.**

        **1.**    **Harm surpasses Texas' harm standards.**

Argument and evidence that perjured testimony "contributed to the verdict" under *Ex parte Parrot,* as alleged in Claim One, section 'C', is re-alleged and incorporated by reference as if fully set forth herein.

        **2.**    **Harm surpassed federal standards.**

Testimony that the prosecutor realized was false and misleading caused substantial and injurious harm under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), as alleged in Claim One, Section 'C,' the evidence and argument for which is incorporated by reference as if fully set forth herein.

## CLAIM THREE

**THE STATE KNOWINGLY EXPLOITED FALSE AND MISLEADING INFORMATION DURING OPENING AND CLOSING REMARKS IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.  *See Napue v. Illinois,* 360 U.S. 264 (1959); *Giglio v. U.S.*, 405 U.S. 150 (1972).**

The constitutional violation may occur in any number of circumstances, as where the prosecution knowingly sponsors materially false or misleading testimony at trial, or fails to step forward and make known the falsity of testimony that the prosecution knows to be false or misleading, or knowingly exploits false testimony in arguments to the jury.  *See Brown v. Wainwright*, 785 F.2d 1457, 1458 (11th Cir. 1986) (citing *Giglio,* 405 U.S. at 150.).  In *United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979), the United States Court of Appeals for the Fifth Circuit recognized that *Giglio* does not require a lie, but is implicated when testimony creates a false impression by conveying "something other than the truth."  "Capitalization upon" such

"misleading testimony by the State clearly runs afoul of *Napue* and *Giglio*." *Tassin v. Cain*, 482 F. Supp. 2d 764, 773 (E.D. La. 2007) (citing *U.S. v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977).

Under the Texas Court of Criminal Appeals' interpretation of Due Process rights established in *Napue* and *Giglio*, knowledge of perjured testimony is imputable to the prosecution where such knowledge is possessed by anyone on the "prosecution team," which includes both investigative and prosecutorial personnel. *Ex parte Adams*, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989). Sponsorship or exploitation of testimony, the falsity of which is imputable to the prosecution team, is material if there is "a reasonable likelihood that it affected the judgment of the jury" or was "reasonably likely to influence the judgment of the jury." *See Ex parte Weinstein*, 421 S.W.3d at 665.

### A. THE PROSECUTOR'S FALSE AND MISLEADING OPENING REMARKS VIOLATED PETITIONER'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS.

**1. The prosecutor falsely and misleadingly told the jury that Herrero was a mobster against whom her informants desperately decided to testify in order to save their own lives and those of their family members.**

In opening remarks the prosecutor misinformed the jury that Petitioner was the leader of a gang or group that she identified as the "All Houston Group." The prosecutor also falsely stated that Petitioner was a Mafioso-type who led the so-called "All Houston Group," as follows:

> 19. You'll hear from the testimony that the
>
> 20 leader of the All Houston Group was this defendant.
>
> 21 You're also going to hear that this defendant is very,
>
> 22 very proud; and he very much likes for all those
>
> 23 people in prison to look up to him, to admire him.
>
> 2 4 You're also going to hear that he considers himself
>
> 25 sort of like a Godfather, a John Ghatti (*sic*.)-type person.

3 RR 7.

According to the prosecutor, "Petitioner has formidable contacts in that prison" and Petitioner used his power as a prison gang leader and "Godfather, John Ghatti"-type person to threaten Moreno and Dominguez.  The prosecutor impressed on the jury that the Federal Bureau of Prisons had to take action in order to prevent Moreno from being harmed or killed on Petitioner's orders.  Specifically the prosecutor stated that because of Petitioner's threats against Moreno, Moreno was placed in

> 21 what's called the hole in the Beaumont prison where
> 22 they protect you even in prison from the other
> 23 inmates.
> 25  But things got so bad that they had to take
> 25 him out of the prison completely and put him in the
> 1  Liberty County Jail to protect Jesse Moreno.

3 RR 8-9.

In order to explain why Moreno belatedly contacted her offering to testify in the face of these threats, the prosecutor fabricated a story to the effect that sometime in the summer of 2000, Herrero threatened Moreno's family:

> 3  it wasn't until his family was threatened here in Houston
> 4  that he decided to make contact with us about what he
> 5  knew about this case.

*Id.* at 9.  At that point, so the prosecutor said, Moreno thought he had to testify against Herrero in order to keep Herrero from killing him or having him killed:

> Jesse Moreno is going to tell
> you that he faced a decision of life on the inside of
> prison or taking his chances on the street when he got
> out; and that's when he made his call, he will tell

you, to me.

3 RR 9.  The prosecutor repeated that Moreno was testifying out of desperation and fear for his

life, 3 RR 12, and ended her remarks by comparing the fate Moreno was risking to the fate that

Guajardo had met.  According to the prosecutor, "Jesse Moreno was walking that line by coming

into this courtroom, and Albert Guajardo already walked that line against this defendant and paid

for his life."  *Id.*

However, as alleged in Claims One and Two, above, the arguments and evidence for which

are re-alleged as if fully set forth herein, BOP Memoranda, Central Inmate Monitoring records,

and other BOP records prove that Herrero did not threaten Moreno or Dominguez, and that BOP

did not protect Moreno or Dominguez from Herrero, until the prosecutor falsely reported that

Herrero posed a danger to her informants.  Instead, Moreno sought protection from the Texas

Syndicate, not from Herrero.  BOP placed Moreno in the SHU to protect him from Texas Syndicate

members who had obtained transcripts showing Moreno was a State's witness and had used them

to blackmail Moreno into running drugs into FCI Beaumont.  BOP separated Moreno from other

inmates, but not from Herrero.  And Moreno, as well as Dominguez, were leaders outside of prison

of violent criminal gangs, while Herrero was not.

### 2. The prosecutor made misleading and recklessly false statements about the *quid pro quo* arrangement for testimony made with Moreno and Dominguez.

The prosecution also misled the jury about the *quid pro quo* arrangements for cooperation

that the State made in return for Moreno's and Dominguez's incriminating testimony against

Herrero.  The prosecutor misled the jury into believing that Rule 35 proceedings are a shot in the

dark, involving nothing more than a letter to a three-judge panel that makes a decision based on a

scrap of paper without allowing any other advocacy through motions or through arguments at a

hearing.  According to the prosecutor, all Moreno could expect was for her:

> to write a letter to his old former Assistant United States Attorney
> who handled Jesse Moreno's case that put him in prison in the first
> place, and that after I write that letter, his Assistant United States
> Attorney will take that letter and forward it to a panel of three
> judges. Now that letter is to say, depending on my opinion of how
> he testifies, truthfully and completely and completely forthcoming
> to you.  My letter goes to his A.U.S.A., to a panel of three judges,
> and within sixty days Jesse Moreno will be notified by mail whether
> or not he gets any kind of time cut. It's called a Rule 35 under the
> federal system.
>
>         ***
>
> So Jesse Moreno will tell you that in exchange for confronting this
> defendant, running all the risks that he already has, he doesn't
> know what may or may not happen. It's completely up to three
> federal judges that he'll never see face-to-face.

However, Rule 35 proceedings are initiated by motions and resolved at hearings in which

an Assistant United States Attorney presents evidence and argument justifying a reduction in

sentence to a United States District Court Judge.  The federal judge is almost always familiar with

the case, having imposed sentence in the first place.  Moreno was familiar with this process since

he had taken advantage of the Rule 35 process in the past and had received a sentence reduction

for previous assistance in another case.  The prosecutor's misrepresentation of the Rule 35 process

as a *pro forma,* bureaucratic affair conducted on paper minimized the influence that she and the

AUSAs working on Rule 35 reductions with her wielded.  The misrepresentation, however, was

necessary to shore up the credibility of her informants.  The misrepresentations were therefore

material and violated Herrero's due process rights.

3.      **The prosecutor made false statements claiming that Moreno and Dominguez provided her with non-public information that could only have come from Herrero.**

In opening remarks, the prosecutor set the stage for effective argument that (i) Moreno and Dominguez related details he could not have learned from any source other than the defendant, and that (ii) these details matched and were corroborated by the physical evidence.  In particular, the prosecutor argued that "the interesting thing about the evidence you will hear is that up until that point, until Jesse Moreno said the word 'hammer' to me" during the interview taped on July 3, 2001, "it had never been mentioned before."  3 RR 11.  At trial, the prosecutor asked Moreno and Dominguez if they had heard this information "on the street" to strengthen the impression that Herrero had to have been the source of this story.  3 RR 180-81; 5 RR 14.  The two informants denied they had.  *Id.*

However, the physical evidence did not corroborate Moreno's and Dominguez's hammer tale.  All that can be inferred from the wounds was that a hard blunt instrument caused the lacerations.  *See* Ex. '1.'  Furthermore, HCSO told the press that Guajardo was found with his throat slit and his head beaten, and the Chronicle published the following blurb based on HCSO information:

> A passer-by checking out a discarded rolled up carpet in northeast Harris County Monday afternoon discovered the body of a man inside.  Sheriff's Sgt. Bruce Williams said the victim, we, whose identification was withheld pending notification of kin had apparently been slugged with a blunt object and his throat cut.
>
> A witness said he saw a man dump the carpet roll along the 2900 block of Harmon on Thursday. The witness yelled at the man to stop the illegal dumping and the man fled in a small red car.

Ex. '16.'  Guajardo's wife also quickly obtained and read the autopsy report, 3 RR 124, which describes in detail the lacerations seen on Guajardo's scalp.  This basic information therefore was public.

In closing the prosecutor nonetheless used the supposed corroboration between the weapon

that Moreno and Dominguez testified Herrero told them he used to finish Guajardo off and the

wounds to Guajardo's head to falsely and misleadingly bolster her witness as follows:

> 15 How would Jesse
> 16 Moreno have known about a hammer unless it were the
> 17 truth? And why would he pick this defendant?

6 RR 35.

> And then the hammer comes up. Jesse talks
> 5 about a hammer. Well, lo and behold, the bruises in
> 6 the autopsy report, the curve, a linear knock on the
> 7 skull, from the medical examiner, are completely
> 8 consistent with a hammer.

6 RR 39.

## A. ARGUMENT.

**1. The prosecutor's statements to the jury were false and misleading and were made with the knowledge that they were false and misleading, all in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).**

### a. BOP documents demonstrate that the prosecutor's opening statements to the jury impressing on them the threat Moreno faced from Herrero were false.

The prosecutor's statements that Petitioner threatened Moreno, and put a "hit" on Moreno's

life because of testimony that Moreno gave in another case, were blatantly false and misleading.

The prosecutor's assertions that BOP took protective action to prevent Herrero from threatening

and harming Moreno were also false.  Contrary to the prosecutor's jury speech, BOP did not place

Moreno in segregation, or "in the hole," in order to protect Moreno from Herrero, nor did BOP

transfer Moreno to another facility to protect Moreno from Herrero.   Instead, BOP records

demonstrate that Moreno was threatened by other inmates with no known connection to Herrero, and that BOP took steps to segregate Moreno from these inmates.

BOP records specifically demonstrate that Moreno himself reported that inmates *other than Herrero* had put a hit on his life (threatened to murder him in prison) and had blackmailed him because of his testimony in a murder trial.   BOP records further demonstrate that these other inmates, but not Herrero, were members of a prison gang called the Texas Syndicate and that the prosecutor's claim that Herrero was using his alleged position as a crime boss over a prison organization to threaten Moreno's life and his family was a pure fabrication.

The "Memorandum for Jonathan Dobre, Warden" of FCI Beaumont dated **March 28, 2001**, on the subject of "Protective Custody Case Moreno, Jesse G., Reg. No. 72731-079, shows that BOP investigators interviewed Moreno on July 25, 2000, after Moreno was found injured in the prison bathroom.   The memorandum described Moreno's injuries as follows:

> Inmate Moreno sustained two bruises by his right eye, back of head swollen to the right side, right shoulder bruised, abrasion to the right hand (palm side), left side of the back with redden[ed] areas, left knee with redden[ed] areas, left eye with outside abrasion, left ear bruised and left elbow abrasion.

Exh. '2' ("March 28, 2001, BOP Memorandum").

Moreno told BOP investigators on July 25, 2000, that he "got into a little fight" with an inmate named "Vall___," who associates with "TS" (Texas Syndicate) and that "they," namely, "TS", "had a hit on him."  *Id.*  Moreno blamed the danger he was in on another inmate named Vas___ who had obtained transcripts of Moreno's testimony against him and had managed to get the transcripts to other prisoners in Beaumont Medium where Moreno was housed.  *Id.*  Moreno told investigators that he "cannot make it on this compound," and for this reason BOP investigators

"recommended inmate Moreno be transferred to another facility which meets his security needs."
*Id.*

During the July 25, 2000, interview, Moreno mentions Herrero once. In the lone statement, Moreno accuses Herrero, along with another inmate, of being involved in smuggling drugs into FCI Beaumont. However, this reference underscores the falsity of the prosecutor's opening statement. Moreno did not say during the July 25, 2000, interview that Herrero threatened him, nor did he inform investigators that Herrero is associated with any gang, association, or group that was threatening him. No other known BOP records identify Herrero as a gang leader or group leader, and there is no reference to a group called the "All Houston Group" operating out of FCI Beaumont or any other BOP facility in any available BOP record. BOP records show that officials placed Moreno in the segregated housing unit ("SHU") the very next day, July 26, 2000, but as **discipline** for his admitted role in drug smuggling and possible threats from other inmates. Ex. '2.' Contrary to the prosecution's false testimony, BOP did not place Moreno in "the hole" because of any threats Herrero posed.

A second BOP Memorandum dated **July 30, 2001,** makes recommendations based on a second interview with Moreno dated **March 21, 2001**, "concerning his Protective Custody needs." Ex. '3' *("*July 30, 2001, BOP Memorandum"). BOP conducted the second interview inside the Special Housing Unit to which Moreno was transferred on July 26, 2000. According to the July 30, 2001, Memorandum, "during this second interview Moreno clarified that he had testified against Vas___ in a murder trial." This is why Vas_____ had transcripts of Moreno's testimony. Moreno also confirmed that he had been pressured by Vasquez's brother, an inmate named Vallejo, to smuggle drugs into FCI Beaumont. Once again, Moreno told BOP investigators that:

> "Due to inmate Vallejo's association with the Texas Syndicate
> prison gang, there is also a copy of the transcripts at FCC
> Beaumont (USP), Texas, and a "HIT" has been place on his life."

*Id.*  Moreno does not identify Herrero as a person threatening him in the second interview

conducted March 21, 2001, nor did he claim that Herrero is part of a group, association, or gang

that was threatening him.  Herrero is not mentioned at all in the July 30, 2001, report.  Instead,

BOP investigators

> recommend that inmate Moreno …. is given a CIM assignment of
> SEPARATION from the following inmates, Val_____ … and
> Vas_____ and all other Texas Syndicate Inmates and further
> recommend that because of the threats from Val___ and Vas____
> that "Moreno be transferred to an institution commensurate with
> his Security needs."

Ex. '3.'

**b. Letters to the prosecutor from Moreno and his family prove that the prosecutor's inflammatory opening statements, to the effect that Moreno had come forward because Herrero had threatened Moreno's family and Moreno's life, were fabricated, and the prosecutor knew it.**

The argument and evidence alleged in Claim Two, Subsection A.1., is hereby re-alleged

and incorporated by reference as if full set forth herein.

**c. The prosecution's minimizations regarding the Rule 35 *quid pro quo* that Moreno could expect were false and misleading.**

The prosecution's representations about the nature of the proceedings and the level of

advocacy involved were blatantly false.  A simple glance at the statute governing "reducing a

sentence for substantial assistance," Fed. R. Crim. P. 35(b), shows that the prosecutor misled the

jury into thinking that Moreno had only the faintest hope of being rewarded for his testimony with

a reduced sentence.  Contrary to the prosecution's misleading statements, Rule 35 proceedings are

not initiated by a letter, nor do they go before a three-judge panel that will never see the prisoner

seeking a Rule 35 reduction.  Instead, by statute, a Rule 35 request is initiated by a motion

submitted by the Government.  Because Federal Rules of Criminal Procedure govern, the case has to be heard at the level of the federal district court.  The judge who hears the Rule 35 motion, moreover, is not some faceless panel.  Normally it is the judge who imposed the federal sentence and who continues to oversee the execution of that sentence.  A hearing before the federal district court is normally scheduled.  At the hearing, the defendant seeking the Rule 35 reduction may be present and oral argument and other evidence may be presented.

Moreno was familiar with the Rule 35 process.  The following excerpt from the U.S. District Court, Western District of Louisiana (Lake Charles), in case number 2:96-cr-20037-RTH-MEM, shows that Moreno received a Rule 35 reduction in the past.  He was aware, therefore, that the Government takes an active role.  In 1998, after obtaining one reduction, the Government filed a motion for rehearing seeking additional time-cuts.

| 09/02/1998 | 227 | MOTION by USA as to Jesse George Moreno Jr to Modify Sentence Pursuant to Rule 35 of Federal Rules of Criminal Procedure; Motion referred to Judge John M Shaw (Williams, C) (Entered: 09/14/1998) |
| --- | --- | --- |
| 09/10/1998 | 228 | ORDER re: [227-1] Motion to Modify Sentence Pursuant to Rule 35 of Federal Rules of Criminal Procedure as to Jesse George Moreno (5); notation made on Order to "File Unsigned as per JMS" NOE by cw (Williams, C) (Entered: 09/14/1998) |
| 09/14/1998 | 229 | ORDER granting [227-1] Motion to Modify Sentence Pursuant to Rule 35 of Federal Rules of Criminal Procedure as to Jesse George Moreno (5). Ordered, Adjudged and Decreed that the government's motion is granted and defendant's sentence is modified and reduced to 150 months' imprisonment in the custody of Bureau of Prisons, rather than 210 months' imprisonment, as previously ordered. Further ordered that all other provisions of defendant's original sentence remain in full force and effect. (Signed by Judge John M Shaw) NOE by gb/cw (Williams, C) (Entered: 09/15/1998) |
| 10/05/1998 | 230 | MOTION by Jesse George Moreno Jr for Rehearing to Modify Sentence; Motion referred to Judge John M Shaw (Williams, C) (Entered: 10/05/1998) |

| 05/13/1999 | 231 | ORDER denying [230-1] motion for Rehearing to Modify Sentence as to Jesse George Moreno (5) (Signed by Judge John M Shaw) NOE by gb (Reeves, T) (Entered: 05/14/1999) |
|---|---|---|

### d.  The prosecution knew that her opening and closing statements were false.

#### i.  The prosecutor and investigators had access to information that falsifies opening and closing arguments.

Reviewing the prison records of informants that the State intends to call as witnesses at trial is a basic prosecutorial task.  The prosecutor was high up in the felony division of the Harris County District Attorney's office and was known for her attention to detail and thorough preparation; she unquestionably gathered important records related to her witnesses or instructed the investigators working for her to review Moreno's, Dominguez's, Foreman's, Gomez's, and Herrero's state and federal prison records and to interview these witnesses.  Among the most basic and most important records are the State's witnesses' disciplinary records and criminal records, including records of gang affiliations.  The prosecution team undoubtedly was aware of the disciplinary and criminal histories of the State's intended jailhouse witnesses.  The prosecution team unquestionably would have sought and reviewed the BOP documents listed above.  However, the State failed to turn over any of these documents, all of which completely discredited their key witnesses and exculpated Herrero.

#### ii.  Information known to BOP and U.S. Attorneys should be imputed to the prosecution.

Federal prosecutors, agents, and BOP personnel functioned as part of the team prosecuting Herrero.  Assistant attorneys, U.S. Marshals, and BOP counselors and administrators facilitated the production of witnesses for interview, facilitated communications with informants, and provided the *quid pro quo* benefits that induced Moreno and Dominguez to testify for the State.

BOP was aware that a ring of informants was vying to incriminate Herrero and another prisoner named Ronald Jeffrey Prible (in a separate murder case) during the same time period. Ex. '38' (Affidavit of JJ Gradoni re: interview with Beckcom). When prisoners place phone calls, they normally must do so from designated phone lines that run through a digital system that tracks the time, date, person contacted and records the conversation. However, BOP counselors permitted informants against Herrero and Prible to use the counselors' phone lines to communicate with the prosecutor, and thereby, to bypass the recording system. The State and its informants could therefore communicate freely without fear that the defense would impeach State witnesses with inconsistent statements or with the intimacy that a phone record of frequent communications.

The U.S. Marshals Service facilitated the July 3, 2001, interview between Moreno and the prosecutor that resulted in Herrero's indictment. When Moreno was transferred to Liberty County the day after BOP discovered that Moreno was involved in smuggling contraband on behalf of the Texas Syndicate, he was taken to a transit unit within the federal system. In order to speak with Moreno at the federal facility, the prosecutor would ordinarily have had to have made arrangements through the BOP. Instead, U.S. Marshals facilitated the State's clandestine efforts to develop informant testimony by making Moreno available at the federal courthouse in Beaumont, Texas. 3 RR 171. Three days later, the State charged Herrero based on Moreno's false July 3, 2001, statements.

The prosecutor contacted the Assistant United States Attorneys in charge of the federal cases against Moreno and Dominguez. 3 RR 12. She obtained assurances from the respective AUSAs that each would present to a federal judge the State's representations regarding the substantial assistance in investigating and prosecution Herrero that Moreno and Dominguez provided. *Id.* The reward that the Government could deliver would be a reduction in Moreno's

and Dominguez's federal sentence. *Id.* The Government and its agencies were therefore involved in the State's investigation and prosecution of Herrero, and their possession and knowledge of information falsifying Moreno's and Dominguez's testimony must be imputed to State prosecutors.

**e. The prosecutor realized that her opening and closing remarks asserting that forensic evidence corroborated her informants was false and misleading.**

The argument and evidence alleged in Claim Two, Subsection A.3, is re-alleged and incorporated by reference as if fully set forth herein.

## CLAIM FOUR

### IN VIOLATION OF HERRERO'S DUE PROCESS RIGHTS, THE STATE SUPPRESSED INFORMATION FAVORABLE AND MATERIAL TO THE DEFENSE. *Brady v. Maryland*, 372 U.S. 82 (1962).

**A.    LEGAL STANDARDS.**

"Suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 84-85, 87 (1963).  Few constitutional principles are more firmly established by Supreme Court precedent.  *See Banks v. Dretke*, 540 U.S. 668, 691 (2004).  In this regard, the Supreme Court has consistently held that the prosecution's duty to disclose evidence material to either guilt or punishment, …, applies even when there has been no request by the accused.  *Banks v. Dretke*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *U.S. v. Agurs*, 427 U.S. 97, 107 (1976).  This duty also applies to impeachment evidence.  *Greene,* 527 U.S. at 280; *U.S. v. Bagley*, 473 U.S. 667, 676, 685 (1985).  The *Brady* rule encompasses evidence known to the prosecution team even if it is not personally known by the prosecutor.  *Greene*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."  *Id.* at 437.

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim:  (1) the evidence must have been suppressed by the State, either willfully or inadvertently;

(2) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; and (3) the evidence must be "material," *i.e.,* prejudice must have ensued from its nondisclosure. *Banks*, 540 U.S. at 691. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed, the result at trial would have been different. *Id.* at 698-99. The Supreme Court has further emphasized four aspects of the Brady materiality inquiry. **First**, a showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668, 104 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). **Second**, the materiality standard is not a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. **Third,** once materiality is established, harmless error analysis has no application. *Id.* at 435-36. **Fourth**, materiality must be assessed collectively, not item by item. *Id.* at 436-37.

### B.   BACKGROUND FACTS.

The prosecutor argued to the jury and sponsored testimony to the effect that in the summer of 2000, Herrero had threatened Moreno and Dominguez and had used his influence with other inmates as leader of a prison "gang" that the prosecutor called the "All Houston Group" to put out a hit on Herrero. The prosecutor likened Herrero's control to that of mafia mobster John Ghati [*sic* Gotti]. The prosecutor told the jury that Herrero was retaliating against Moreno and Dominguez because Herrero had discovered Moreno had turned State's witness in another case. The prosecutor told the jury that BOP had to take protective measures during this summer 2000 period to prevent Herrero from harming Moreno, first by placing Moreno "in the hole," i.e., FCI

Beaumont's Segregated Housing Unit ("SHU") and second by transferring Moreno to Liberty County, Texas.

The prosecutor sponsored testimony through Moreno and Dominguez that paralleled her jury argument on each point. Moreno testified that Herrero was the leader of a prison organization that Moreno called the "All Houston Group," and testified that Herrero controlled the "All Houston Group," did not tolerate informants. 3 RR 156-157. According to Moreno, Herrero made him show his P.S.I. to see if he had cooperated with law enforcement. 3 RR 154-155. Moreno testified further that had a fake P.S.I. made that deleted reference to his cooperation with State and Federal prosecutors to keep Herrero from putting a hit on him. *Id.* at 155-156. Moreno said that his relationship with Herrero was good until the Summer of 2000 when he got into a fight with Herrero's cellmate named "Mike". *Id.* Moreno suggested Herrero had sent Mike to attack him. *Id.* According to Moreno, the fight with Mike got him sent to the SHU. *Id.* While in the SHU, Moreno said he learned that Herrero had seen his "papers," meaning his real P.S.I. *Id.* Moreno said this made him fear for his life, *id.* at 161, and for the life of his family. *Id.* at 162. Moreno testified he wrote a letter to the prosecutor after being sent to the SHU, as early as August or September of 2000, *id.* at 162; *and* 4 RR 37. Moreno also said that he spoke with the prosecutor by telephone in September or October of 2000. *Id.* Moreno testified that he reached out to the prosecutor because Herrero had put a hit on his life. *Id.* at 164. Moreno testified that he "would not make it alive … if [he] stay[ed] in prison." *Id.* He figure that was the only way to save his life. *Id.*

Dominguez's testimony tracked Moreno's testimony. Dominguez testified that Herrero was the leader of the "All Houston Group," 4 RR 121, and that Herrero made Dominguez show him a P.S.I. to see if Dominguez was an informant. 4 RR 117. Dominguez testified that Herrero compelled Eddie Gomez to give Herrero a P.S.I. as well. *Id.* at 118. Dominguez testified that he

gave Herrero a fake P.S.I. from which he deleted passages "where it says [he] cooperated."  *Id.* at

11.  Dominguez testified that Gomez did not get a 5K1 departure for cooperation, but that he,

Dominguez, received a promise for a downward departure for his cooperation.  *Id.* at 118.

Dominguez said he had to delete this section to keep Herrero from putting a hit on him or forcing

him into "the hole" for protection.  *Id.* at 118-19.

Dominguez also testified that he did not join a real gang.  Instead, he said he joined the

"All Houston Group" that he said Herrero ran because he needed some protection in prison.

Dominguez testified that in exchange for his testimony, he was "promised protection against

Herrero's death threat against my life," *id.* at 123, and said that the prosecutor had also promised

to write the AUSA but only if he testified truthfully.

C.     ARGUMENT.

    1.   **The State suppressed evidence that key witnesses lied about Herrero's gangster powers and affiliations, and lied about threats against their lives.**

        a.   **The State failed to disclose U.S. Government documents.**

The State failed to provide the defense with documents demonstrating that the witness on

whom the State said its case hinged was blatantly lying about Herrero.  The State also suppressed

evidence that secondary witness Dominguez was lying about Herrero.  The suppressed documents

include the following:

      i.     Two BOP memoranda dated March 28, 2001, and July 30, 2001, based on interviews of Moreno that:

- confirm Moreno was engaged in drug smuggling for the Texas Syndicate and requested to be segregated from the general population because he feared retaliation for testifying from inmates who were **not** associated with Herrero;

- prove Moreno was transferred from FCI Beaumont to a federal facility in Liberty County **not** because of Herrero but because

Moreno informed on members of the Texas Syndicate who were now threatening him;

- show that contrary to Moreno's testimony, Herrero did not obtain a copy of Moreno's P.S.I. showing cooperation, and instead prove that Moreno knew that the Texas Syndicate, not Herrero, had obtained transcripts of his trial testimony against one of their members (or against a brother of one the Texas Syndicate's members);

- show that Moreno never told BOP that he feared Herrero and needed be segregated from Herrero;

- show that Moreno was put in the SHU for drug smuggling and fighting an inmate named "V___," not for fighting Herrero's cellmate named Mike as he claimed at trial.

ii.    BOP disciplinary records demonstrating that Dominguez and Moreno, unlike Herrero, were leaders of violent gangs.

iii.   BOP records documenting that Dominguez was a member of a violent drug smuggling gang known as the Posse.

iv.    Letters from the prosecutor to BOP requesting that the State's testifying witnesses (Moreno and Dominguez) and non-testifying witnesses (Foreman and Gomez) be placed in insolation and segregated from Herrero.   *See* Ex. '30' (referring to February 12, 2002, written notification sent by Siegler to BOP).

v.     BOP memoranda showing that neither Moreno, Dominguez, Foreman, nor Gomez asked to be placed in the SHU pending Herrero's trial, and that the BOP placed the four informants in the SHU only because of the prosecutor's false claims that Herrero had threatened their lives.

vi.    BOP documents confirming that Herrero was not a member of any gang or a leader of any group.

vii.   P.S.I. showing that Moreno was a member of a drug smuggling gang, and memoranda (dated May 26, 1998) confirming that Moreno was a "leader of a drug organization."  BOP Prot., *FOIA Exempt File* #1, at 45.

viii.  P.S.I. of Dominguez showing that Dominguez and Gomez were members of the Posse who stole guns and drugs from other drug dealers.

ix.     P.S.I. of Dominguez showing that there is no reference to cooperation or assistance to the Government and an explicit finding by the Probation Department that Dominguez had not provided any information justifying a departure from Sentencing Guideline ranges for cooperation or assistance.

x.      Inmate letters to the prosecutor identifying Dominguez as one of a group of informants angling to provide testimony against another FCI Beaumont inmate named Ronald Jeffrey Prible, whom the prosecutor was simultaneously prosecuting.

xi.     Phone records demonstrating multiple contacts with FCI Beaumont informants all angling to provide jailhouse informant testimony on a *quid pro quo* basis against defendants the prosecutor was prosecuting.

xii.    Nor did the prosecutor reveal verbal agreements with Foreman and Gomez to seek Rule 35 reductions on their behalves for their efforts to incriminate Herrero, whether or not those informants testified at all.

**b. Possession and knowledge of U.S. Government documents should be imputed to the State.**

In *United States v. Ben Laden,* 397 F. Supp. 2d 465 (S.D.N.Y. 2005), the federal district court found agents of the United States Marshals Service's Witness Security Program were members of the prosecution team because, at the prosecutors' request, the agents installed and operated video-teleconference equipment "in order to further the Government's investigation." Assistant United States Attorneys, BOP personnel, and U.S. Marshals were just as important to the State's investigation and prosecution of Herrero as agents of the Marshal Service were in the *Ben Laden* case.  AUSAs agreed to consider the State's representations about assistance and cooperation that FCI Beaumont informants (Moreno, Dominguez, Foreman, Gomez, and others) provided and to take necessary steps to present the evidence to federal judges so as to secure Rule 35 reductions in the informants' federal sentences.  On several occasions (the last time, during the week before trial), Moreno contacted the AUSA who would handle his motion for a sentence

reduction for assurance that he had a *quid pro quo* arrangement for testimony against Herrero. *Id.* at 77. The AUSA told Herrero that a decision would be made "after everything is done" and the value of Moreno's testimony was apparent. *Id.* at 77. Involvement of the AUSAs was therefore integral to the State's efforts to secure the federal jailhouse informant testimony upon which its case against Herrero depended.[12]

BOP also played an essential role in the investigation. BOP counselors facilitated communications between informants and the State. BOP transferred witnesses to in transit facilities, enabling the State to interview informants clandestinely, and segregated informants from the general population and from specific inmates in order to ensure the informants could testify without fear of retaliation. U.S. Marshals produced Moreno for interview at the federal courthouse, which permitted clandestine, untraceable access to the witness and obviated any need for a state writ to move Moreno.

The State also manipulated BOP into segregating and transferring State's witnesses, such as Moreno and Dominguez. Herrero did not pose a threat to either Moreno or Dominguez, nor to non-testifying witnesses Foreman and Gomez. None of these informants requested isolation from the prison population or segregation for themselves. Based solely on the prosecution's representations, BOP isolated these four inmates and ordered them segregated from Herrero. This was calculated to create the false appearance of witnesses bravely testifying in the face of danger and against their self-interest, as opposed to testifying out of pure *quid pro quo* opportunism. The prosecution's manipulation of BOP demonstrates involvement with the State clearly substantial

---

[12] Because the condition for a *quid pro quo* was that the informants provide truthful testimony in return for efforts on the AUSAs' part to secure Rule 35 reductions, the U.S. Attorney's Office and the Harris County District Attorney had an additional reason to fulfill obligations imposed by *Brady* to inquire into and disclose exculpatory or impeachment evidence that either office could access.

enough to trigger a *Brady* obligation.  BOP's role creating evidence vital to the State's portrayal

of Herrero as a ruthless mobster made BOP integral to the prosecution and investigation of Herrero.

The State was therefore obligated to seek out and disclose *Brady* and *Giglio* information in

possession of U.S. Attorneys for the Southern and Eastern District of Texas, the Bureau of Prisons,

and the U.S. Marshals service.

### 2. The suppressed evidence was favorable and material.

#### a. Suppressed evidence completely discredits the witness, Moreno, on whom, the State openly admitted, the State's entire case depended.

Moreno was the crux of the State's case, and critical aspects of  Moreno's testimony were

(i) his allegations that Herrero tightly ran a prison organization; (ii) that things between Herrero

and him began to change in the summer of 2000 when Herrero supposedly found out that Moreno

had been a witness for the State in two other cases; (iii) that Herrero threatened Moreno's life,

forcing BOP to put Moreno into the SHU at FCI Beaumont; (iv) that "things got so bad" that BOP

had to transfer Moreno out of FCI Beaumont; and (v) that Moreno contacted the prosecutor in late

summer/early fall of 2000 because Herrero had threatened Moreno's family and because he hoped

the prosecutor would use her power to protect him from Herrero.  In closing and opening argument,

the State argued the foregoing allegations in order to convince the jury that Moreno had come

forward because of ongoing threats and the face of future threats from Herrero.

Since Moreno contacted the prosecutor from the SHU long after he claimed Herrero

confessed, Moreno's testimony, and the State's argument, summarized above, was critical to

establishing Moreno's credibility.  Moreno bartered testimony against Herrero for the prosecutor's

assistance in obtaining a Rule 35 reduction in his federal sentence.  Because of Moreno's crucial

importance, the State had to dispel the otherwise unavoidable conclusion that Moreno had concocted a confession in order to escape his dire prison conditions.

The suppressed evidence is favorable and material, because it flatly disproves each and every one of the foregoing propositions.  The suppressed evidence not only undermines the State's key witness completely, it demonstrates that a central theory of the case was founded on perjured testimony, since the suppressed evidence shows, *inter alia,* that:

- Moreno, when interviewed about the July 25, 2000, fight with inmate "Val" that resulted in Moreno being sent to the SHU the following day, did not say that he feared Herrero.  Ex. '2', Ex. '3.'

- Moreno reported to BOP that other inmates, not Herrero, had put a hit on him.  *Id.*

-  Moreno reported to BOP that other inmates, not Herrero, had planned to retaliate against Moreno for turning State's witness.  *Id.*

-  The inmates who Moreno informed BOP had put a hit on him were members of the Texas Syndicate.  *Id.*

- BOP investigators did not report that Herrero belonged to a prison gang or organization.  *Id.*

- Moreno was segregated from other inmates, not from Herrero.  Ex. 21.

- The prosecution was the only source claiming that Herrero had threatened any witness.  Ex. '30.'

- BOP took steps to separate the prosecutor's informant witnesses from Herrero in February of 2002 based entirely on the prosecutor's representations and not on the results of a BOP investigation.  *Id.*

- Moreno and Dominguez were members of violent gangs inside and outside the prison.

- Herrero had no gang affiliations, according to available BOP records.  Ex. 18, Ex. 26.

### b.  Suppressed BOP and U.S. Government documents completely discredited Dominguez.

Suppressed  BOP  and  U.S.  Probation  Department  documents  (Dominguez's  P.S.R.)

contradict Dominguez's testimony that he joined a so-called "All Houston Group" for protection

and contradict Dominguez's testimony that Herrero demanded his PSR and threatened his life.

B.O.P. documents show that:

1.  Dominguez was a leader of a violent gang called the Posse, which was known for stealing guns and drugs from other drug dealers.

2.  Dominguez had underlings from the Posse gang in FCI Beaumont (Eddie Gomez and Mark Martinez) with whom Dominguez was in close contact.

3.  Dominguez was, in fact, working with Posse underlings Gomez and Martinez to make cases for the prosecutor against Herrero and Prible.

4.  Dominguez did not have to edit his or Gomez's P.S.I.s, as he testified, to hide evidence of cooperation, because neither one cooperated.  Ex. '18.'

5.  Dominguez was not separated from Herrero until the prosecutor gave BOP written notification, on February 12, 2002, that she wanted her informant witnesses separated from Herrero.  Ex. '30A.'

6.  Dominguez did not request separation from Herrero at any time.  Ex. '30A.'

Dominguez's PSI shows that he was not offered a 5K.1 departure.  Dominguez's P.S.I.

states, instead, that there was no reason for the Probation Department to conclude that Dominguez

deserved a recommendation for downward departure.  The only reference to cooperation in the

P.S.I. is made indirectly.  The P.S.I. references a plea agreement containing boilerplate language

that the defendant would cooperate fully with the Government.  Ex. '30A.'  That language is

standard in federal plea agreements whether cooperation is forthcoming or not.  The inclusion in

the P.S.I. of a reference to boilerplate language in another document would not cause a reaction in

federal prison.

### c.  A Competent Attorney Armed with the Suppressed Evidence would Have Gutted the State's theory that Herrero Was Capable of Single-handedly Executing Guajardo.

Herrero was serving time in FCI Beaumont Medium for a drug conviction.  Herrero was not physically imposing or known for manhandling other inmates, nor was he affiliated with violent gangs inside or outside of prison.  However, the State's theory of the murder was that Herrero overpowered Alberto Guajardo by holding the struggling man with one arm in a moving vehicle, while slitting his throat from ear-to-ear with a knife held in his free hand.  Because of the multiple lacerations and abrasions Guajardo sustained, the State also had to convince the jury that Herrero then bludgeoned Guajardo with a hammer before single-handedly rolling him up in a heavy carpet and then casting the load onto the side of road.

The prosecution's arguments to the jury, followed by Moreno's and Dominguez's testimony, that Herrero was a feared leader of a prison organization called the "All Houston Group," who could put hits on other inmates, including carrying out death threats, and could command other inmates to do his bidding, was essential to the State's theory that Herrero single-handedly slaughtered, bludgeoned, and disposed of Guajardo.  Referring to the group photo that she knew her informants had staged in order to create the impression that Herrero was a commanding figure, the prosecutor argued:

> 13 You know [Herrero's] a man to be
> 14 feared. Look at this picture; Don't think he's
> 15 significant at all that he's posed in the middle of
> 16 all of his Houston Group? Don't think this man wants
> 17 to be admired? Don't think he's a man to be feared?
> 18 I guess we can't really ask Albert Guajardo that, can
> 19 we? Don't cross Hermilio Herrero, Jr., a man who's
> 20 capable of -- have you thought about this – taking a
> 21 knife and slicing someone's head almost off and
> 22 calling it a smile? That's what kind of man this
> 23 defendant is. And if that's not enough, take a hammer
> 24 and grab a hammer when it's your friend laying there

> 25 in your arms bleeding to death, gurgling and gasping
> 1 for air as he dies, taking a hammer and beating him
> 2 repeatedly upside the head with that hammer. That's
> 3 what kind of man this defendant is.

6 RR 45-46.

However, BOP documents demonstrate that Moreno and Dominguez were blatantly lying about Herrero's power, Herrero's homicidal intentions towards them, and the mortal danger this put them in.  BOP documents prove that Dominguez, not Herrero, led a violent gang.  Ex. '18'. Police reports in the prosecutor's Jason Morales file confirm that Moreno was a leader of a violent gang as well.  Ex. '26'.  Undisclosed BOP internal investigation records show that Moreno had a history of violent conduct in the prison system.  Exs. '2,' '3.'  Undisclosed BOP documents demonstrate that neither Moreno nor Dominguez requested that BOP isolate or separate him from Herrero.  *Id.*  In the case of Moreno, BOP records show the isolation, transfers, and separations were for other reasons, including threats from different inmates unconnected with Herrero.  Exs. '2,' '3.'  These same BOP documents demonstrate that the State manufactured facts in order to mislead the jury into thinking that BOP had to take extraordinary steps to save Moreno and Dominguez from mortal danger posed by Herrero.  (*See* Claim Two, Section A.4, the argument and evidence of which is incorporated by reference as if fully set forth herein).  BOP documents therefore completely undermine the integrity of the State's investigation and prosecution.  A competent attorney armed with the undisclosed BOP documents would have demolished the credibility of the State's key witnesses by demonstrating that they were abject liars who lied specifically about Herrero's criminal activity, his powers, and his homicidal intentions.  Hence, the suppressed documents were favorable and material.  Suppression therefore contributed to the verdict under Texas law, *see Ex parte Parrot,* and satisfied *Brecht,* as well.

### d. Suppressing the evidence was crucial to the success of the State's efforts to explain why Moreno delayed reporting Herrero's alleged confession.

Moreno claimed that Herrero confessed in late November or early December of 1999. However, Moreno did not immediately contact the prosecutor. The State, in fact, had to explain why Moreno sat on the confession many months before contacting the State in order to protect Moreno from cross examination. Moreno's testimony that Herrero was a powerful prison gang leader of the All Houston Group who exacted revenge on jailhouse informants was used to explain why he remained silent in the general population. The State then had to put on evidence that Moreno contacted the prosecutor when he was put in isolation and therefore safe from the threats that the State was falsely telling the jury Herrero posed. To this end, the State had Moreno testify that he tried to contact the prosecutor in August of 2000, only a couple weeks after the July 26, 2000, date he was put in FCI Beaumont's Segregated Housing Unit.

The suppressed documents showing that BOP placed Moreno in the SHU because of his drug smuggling, and because of threats from different inmates, completely discredit Moreno's claim that he contacted the prosecutor because Herrero threatened him and his family. A competent attorney could easily have demonstrated that Moreno was lying about his motives for turning State's witness, could have soundly refuted the State's inflammatory portrayal of Herrero as a violent mobster capable of single handedly carrying out bloody murders, and would have put the State's in a completely different light, namely, a light that revealed rampant perjury.

The suppressed April 4, 2001, letter (Ex. '11'), moreover, would demonstrate that Moreno lied about contacting the prosecutor from the SHU in August of 2000 as soon as he safely could, and that the State knew he was lying. Furthermore, this was not a matter of failing to correct false testimony. The prosecutor's questions were designed to *elicit* false testimony that was specifically intended to support the State's theory that Moreno was threatened by Herrero and reached out as

soon as he thought he could do so.  Needless to say, a competent defense attorney, armed with BOP documents demonstrating that Moreno lied about the timing and reasons for contacting the prosecutor, would completely undermine the credibility of the State's key witness.  Armed with Moreno's April 4, 2001, letter, a competent attorney would have been able to prove to the jury and the Court that the State was fabricating evidence and purposely eliciting false testimony in order to send an innocent defendant to prison for life.  No reasonable jury would have convicted if the State had not suppressed evidence demonstrating that the State's key witness lied in this manner and that the prosecutor conspired with him to manufacture false testimony.  The suppressed letters refuting Moreno's tale of when and why he contacted the prosecutor were therefore favorable and material; clearly contributed to the verdict under *Ex parte Parrot;* and caused injurious and substantial harm under *Brecht.*

## CLAIM FIVE

**IN VIOLATION OF DUE PROCESS, THE STATE SUPPRESSED FAVORABLE, MATERIAL EVIDENCE THAT THE PROSECUTOR WAS UTILIZING A RING OF INFORMANTS, WHO WERE COMPETING FOR *QUID PRO QUO* BENEFITS IN RETURN FOR FALSELY INCRIMINATING HERRERO.**

### A.   THE STATE SUPPRESSED THE EXISTENCE OF THE INFORMANT'S RING.

From 1999 through the date of Herrero's trial in April of 2002, Carl Walker, Jr. was incarcerated in the same cell block or area that housed Herrero, Moreno, Foreman, and Gomez.  In 2009, Carl Walker, Jr. granted a telephonic interview to an investigator working on the case of Ronald Jeffrey Prible, who was incarcerated at FCI Beaumont along with Herrero, Dominguez, Moreno, Foreman, and Gomez.   The State investigated Prible's case simultaneously with Herrero's, utilizing FCI Beaumont informants who employed the same methods for manufacturing incriminating evidence on each.  This included (i) staging photographs with each defendant to show familiarity and confidence between defendant and informant, (ii) *quid pro quo* arrangements

84

for testimony whereby the prosecutor lobbied the informants' AUSAs for Rule 35 productions, (iii) telephone contact and interviews with the prosecutor, and (iv) ultimately, the coordinated fabrication of confessions, purportedly made by Herrero and Prible, to cold case murders that the prosecutor was investigating.

On August 26, 2010, Walker provided a taped statement.  Ex. '33'.  Both interviews resulted in detailed, fact-specific statements regarding, *inter alia,* the following:  (i) the existence of the informants' ring, its approximate size, and its mode of operation; (ii) how and when Walker was recruited to be part of the ring of informants; (iii) the frequent contact, means of communication, and close working relationship between the prosecutor and leading members of the ring, whom Walker identified as Michael Beckcom, Foreman, and a man nick-named "Cat" who turned out to be Rafael  Dominguez; and (iv) the fact that members of the ring were angling for favors from the prosecutor by providing false testimony against Prible and against Herrero.

In the August 26, 2010 interview, Walker also referred to letters from members of the ring to the prosecutor that he said were written as part of the conspiracy to obtain State favors for falsely testifying that Herrero and Prible had confessed to murder.  During 2011 proceedings in the Prible case, the State produced letters from FCI Beaumont inmates that named Beckcom, Foreman, and other informants used by the prosecutor.  Ex. '34.'  The letters also conveyed the inmates' offers to provide testimony against Prible.  *Id.*

Review of Herrero's file showed, further, that the prosecutor wrote AUSAs immediately after Herrero's conviction, urging reductions in the sentences of all the FCI Beaumont informants in exchange for their assistance in securing the conviction.  Among the known beneficiaries of the prosecutor's influence were Moreno, Foreman, Rafael Dominguez, and Eddie Gomez.  Ex. '6.'

The State was in communication with each of the FCI Beaumont inmates, Moreno, Dominguez, Foreman, and Beckcom, who listed the prosecutor on their phone contact lists. Ex. '35' (BOP inmate phone lists). Collectively and individually, these informants placed numerous phone calls to the prosecutor and met with the prosecution team face to face at FCI Beaumont and other federal and state facilities in order to further schemes for obtaining convictions in the cold case murders. Ex. '36' (TruFone records for Beckcom and Dominguez). Members of the ring also contacted the prosecutor through family members. Moreno's family members transmitted Moreno's requests to the prosecutor, as did the family of Oscar and Felix Gonzalez. Ex. '12', Ex. '37' (September 15, 2002, BOP Memorandum discussing witnesses against R. Prible).

However, the State did not disclose Dominguez's, Moreno's, Gomez's, or Foreman's involvement in the ring, nor the frequent contacts between members of the ring and the State. Nor did the State disclose Foreman's similar operational role in the State's efforts to convict Herrero and Prible using jailhouse confessions. The State also failed to disclose documents confirming the existence of the ring that would have identified witnesses for the defense and provided grounds for cross examining state witnesses. The State also failed to disclose evidence that the State intended seek *quid pro quo* benefits for FCI Beaumont informants whether they testified or not.

### B.     SUPPRESSED INFORMATION WAS FAVORABLE AND MATERIAL.

At trial, the prosecution repeatedly elicited testimony from Moreno and Dominguez according to which each contacted the prosecutor and offered to provide evidence against Herrero in order to save themselves from Herrero.  In order to give credence to the death threats that the informants testified they faced from Herrero, the prosecutor elicited testimony that Herrero controlled a prison organization that Moreno and Dominguez called the "All Houston Group."  In order to downplay the importance of the *quid pro quo*s for testimony, the prosecutor, in opening and closing remarks, emphasized the risks that Moreno and Dominguez allegedly took.  But for the suppressed evidence, the State would not have been able to present a narrative of danger and risk from the powerful head of a prison organization.  Instead, armed with the identities of the informants comprising the FCI Beaumont ring, and armed with records of these informants' communications with the prosecutor, a competent defense attorney would have been able to demonstrate to the jury that the "All Houston Group" was, in reality, a ring of snitches that stayed in close and frequent contact with the prosecutor, and was ***not*** a prison organization led by Herrero through which he exerted power over Moreno, Dominguez, Foreman, and Gomez.

In sum, with suppressed evidence confirming the existence of an informants' ring, a competent attorney would have been able to easily and conclusively portray the State's case in an entirely different light.  *See Kyles*, 514 U.S. at 435.  A competent attorney would have (i) discredited the State's portrayal of Herrero as a gang leader who used his power to terrorize informants and obstruct justice, and (ii) demonstrated that Herrero was the victim of a concerted effort by a group of prisoners, all known to the prosecution and to each other, who were conspiring to incriminate Herrero in return for State favors.  Confidence in the verdict simply cannot be maintained in view of withheld evidence undermining the State's theory of the case, discrediting

its key witnesses and demonstrating that the prosecutor misled the jury in opening and closing remarks and throughout the State's case in chief.  The suppressed evidence, which proves the so-called "All Houston Group" was in reality a ring of informants that the prosecutor was managing and utilizing in order to secure convictions in cold cases, is material under *Brady*, it also satisfies state and federal harm standards applicable in habeas proceedings.

## CLAIM SIX

**PROSECUTOR'S MISCONDUCT
RENDERED TRIAL FUNDAMENTALLY UNFAIR IN
VIOLATION OF THE FOURTEENTH AMENDMENT.
U.S. CONST., AMEND. XIV; *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).**

In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Supreme Court explained that a prosecutor's improper comments during closing argument will be held to violate the Constitution only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 181 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).

A.  **THE PROSECUTOR'S ASSERTION THAT THE JURY MUST TAKE INTO ACCOUNT THE DANGER THAT MORENO AND DOMINGUEZ FACED UPON RETURN TO THE FEDERAL PRISON SYSTEM BECAUSE THEY TESTIFIED AGAINST HERRERO VIOLATED DUE PROCESS.**

In closing, the prosecutor argued that in deliberating on whether to convict Herrero, the jury should seriously consider what might happen to Moreno and Dominguez upon their return to federal prison.  According to the prosecutor, jurors were under an oath to do so:

> 5 Good citizens are on juries. Not so good
> 6 citizens are the defendants. And in this case it's
> 7 okay for you to think that. But what you cannot do
> 8 when you go back behind that door to deliberate in a
> 9 few minutes is you cannot allow yourselves the luxury
> 10 of pretending like you don't have to deal with that
> 11 life. Because for today, while you're under this oath
> 12 as a juror today, you do have to deal with it **and you**
> **13 have to deal with the reality of what happens to Jesse**

14 **Moreno and what happens to Rafael Dominguez when they**
15 **go back to prison after having testified.**
MS. COGDELL: Excuse me, Judge. That's a
17 misstatement of the charge. That is not what they
18 have to deal with, Your Honor.
19 THE COURT: Rephrase it, please.
20 MS. SIEGLER: **You have to deal** with the
21 **reality of what they have to deal** with when **they go**
22 **back to prison.**
23 MS. COGDELL: I object to that being an
24 improper argument. There is nothing this jury is
25 going to do –
1  THE COURT: It's overruled.
2 MS. COGDELL: that affects what happens
3 when he goes back. Thank you.
4 MS. SIEGLER: You can't kid yourselves into
5 thinking, Then I don't want to think about it;
6 They're all bad, despicable people, and I don't want
7 to think about it. They are bad, despicable people;
8 but **you still have to figure out and** think **about there**
9 **motivations and why they would put themselves through**
10 **all of this to go back to that world. You** can't just
11 **pretend like you don't want to** think about it, not
12 **while you're under this oath as a juror here today.**

6 RR 25-26.

There was no basis in the record for the prosecutor's suggestion that Moreno and Dominguez faced any sort of peril upon return to the prison system.  How BOP would handle Moreno and Dominguez, whether they would be transferred to safer or better accommodations at low security (as in need for security) institutions, or whether they would be given substantial time cuts for cooperation and released, was not known.  Furthermore, Moreno's and Dominguez's future difficulties within the prison, if any, were completely irrelevant and entirely inflammatory. Their fates had nothing to do with whether or not Herrero killed Guajardo, which was the only thing that the jury was empaneled to consider.

Reviewing courts should also evaluate the prosecutor's improper demand, namely, that the jury consider her witnesses' perils or well-being in deciding whether to convict Herrero, in light

of the context the prosecutor set for these remarks.  The State had already sponsored (objectionable and false) testimony that Moreno and Dominguez would be eligible for a Rule 35 reduction only if they testified truthfully, and the State sponsored (false) testimony that the two had come forward hoping that by getting a Rule 35 reduction they would escape Herrero's supposedly deadly powers within the prison system.  The prosecutors' closing argument, replete as it was with warnings that the jury did "not have the luxury" of ignoring the two informants' fate, created the impression that the jury's verdict, since it would be a referendum on her informants' veracity, would determine whether they received a Rule 35 reduction that would enable the informants to escape Herrero.  In other words, the prosecutor planted the notion in the minds of the jurors that if they acquitted Herrero, they would be sealing a violent and deadly fate for the State's witnesses.  This clearly is such a graphic violation of due process that relief must be recommended and granted.

Finally, the prosecutor also violated Rule 608 by commenting on Herrero's character.  The prosecutor's assertion that everyone in prison are all bad, despicable people, was meant to sweep in Herrero specifically.  No such character evidence had been introduced at trial, nor could it be, since Rule 608 limits character evidence to evidence of "truthfulness or untruthfulness."  The tactic, furthermore, was grotesquely cynical in that the prosecutor was trying to convict a man who was innocent of Guajardo's murder using informants she realized had lied to her and were lying to the jury.  The misconduct, because it was intentional, further supports a finding that the prosecutor violated due process.

### B.    THE PROSECUTOR'S FALSE ACCUSATIONS AT CLOSING THAT HERRERO HAD PUT HITS ON MORENO AND DOMINGUEZ VIOLATED DUE PROCESS.

Trial counsel file a motion pursuant to Texas Rule of Evidence 404(b) demanding disclosure of any offensive conduct extrinsic to the 1995 murder that the State intended to sponsor. The State disclosed nothing.  Then, in opening remarks, the prosecutor announced that Moreno had turned State's witness because Herrero had threatened his life in prison upon finding that he had testified in another case.  This was a complete ruse, falsified by letters in the State's file, which showed Moreno contacted the prosecutor for *quid pro quo* favors and that alleged threats against his person and family had nothing to do with it.  *See* Claim Two, Section A.1., above, the argument and evidence for which is incorporated by reference as if fully set forth herein.

During the presentation of evidence, the State sponsored testimony from Moreno that Herrero and he had become close, and that Moreno, Dominguez, and Herrero formed a group within the prison system for the purpose of staving off violence at the hands of other gangs.  The arguments that Herrero had engaged in extraneous conduct amounting to obstruction of justice and terroristic threats against persons to whom he once was close were so inflammatory and prejudicial that they violated due process.  Through these arguments, the State created an indelible misimpression that Herrero was a powerful mobster-type figure who would think nothing of slitting the throat of a friend.  The State created this false inflammatory impression even after Dominguez testified that the All Houston Group had voted Herrero out and allegedly replaced him with a new fearless leader.

The prosecutor's improper argument therefore contributed to the verdict under *Ex parte Parrot.*  It also satisfies federal harm standards for relief by creating grave doubts about the verdict. Habeas relief should therefore be recommended and granted.

### C. THE PROSECUTOR'S ARGUMENT COMPARING HERRERO TO THE GODFATHER AND TO JOHN GOTTI SPECIFICALLY WAS AN INFLAMMATORY VIOLATION OF HERRERO'S CONSTITUTIONAL RIGHTS.

At the very beginning of trial, the prosecutor teed up her inflammatory closing remarks with a highly improper opening remark. The prosecutor stated that:

> 19 You'll hear from the testimony that the
> 20 leader of the All Houston Group was this defendant.
> 21 You're also going to hear that this defendant is very,
> 22 very proud; and he very much likes for all those
> 23 people in prison to look up to him, to admire him.
> 2 4 You're also going to hear that he considers himself
> 25 sort of like a Godfather, a John Ghatti-type [sic "Gotti"] person.

3 RR 7.  However, the so-called "All Houston Group" that Herrero allegedly led was not even a prison gang, let alone an organized criminal mob on the order of the Mafia.  Herrero certainly did not exercise mobster control.  Dominguez testified that Herrero was "voted out" of the All Houston Group in June of 2001:

> 3 **Q**. (BY MR. COGDELL) When do you claim there
> 4 was a change in Houston?
> 5 **A**. In the summer, last summer.
> 6 **Q.** When?
> 7 **A.** Maybe around June.
> 8 **Q.** June of 2001.
> 9 **A**. Correct.
> 10 **Q**. That change, according to you, occurred how?
> 11 Why was there a change?
> 12 **A**. Everybody from Houston voted him out.
> 13 **Q**. Everybody from Houston voted Herrero out?
> 14 **A**. Yes.
> 15 **Q**. Herrero was still there in Beaumont at the
> 16 time this change occurred?
> 17 **A**. Yes.

4 RR 129.

The State did not establish that Herrero had any other gang or mobster affiliations.  The prosecutor's opening remarks that Herrero was a Godfather and a mobster figure in the mold of

John Gotti, therefore, not only were inflammatory, they were false.  The prosecutor's qualification, "you'll hear testimony that Herrero **considered himself** a Godfather or John Gotti figure," was also false.  No such testimony was forthcoming.  Testimony that Herrero wanted to know what others were doing, and inspected fellow "All Houston Group" members P.S.I.'s for cooperation, even if they were not demonstrably false, would not have justified the comparison to major criminal organizations and figures.  Because the prosecutor's opening remarks involved a calculated, constructed plot to violate Herrero's Fourteenth Amendment Due Process rights, relief should be recommended and granted.

At times, the prosecutor, in a single breath, violated Herrero's rights many times over. For example, the prosecutor asserted that:

> 24 What I said was, how do you
> 25 think the Guajardo family would feel if I said to
> 1 them, I'm sorry, I'm not going to prosecute your son's
> 2 case even though there is a witness who is believable,
> 3 but he's in federal prison? Well, Kelly, what do you
> 4 mean, he's believable but you're not going to
> 5 prosecute it? Why? Because my son's a dope dealer?
> 6 Why? Because he's poor and he's not important? Why?
> 7 Because it happened in 1995?

In this one passage, the prosecutor improperly vouched for her witnesses' truthfulness, by asserting they were believable.  She also improperly insinuated that her decision to prosecute was necessary and correct, and she simultaneously and improperly invited the jury to take into consideration, during its deliberation on guilt or innocence, the impact on the victims if she had elected not to prosecute Herrero.

### D. THE PROSECUTOR'S OPENING REMARKS, CASE IN CHIEF AND CLOSING ARGUMENT WERE CONSTRUCTED TO IMPROPERLY BOLSTER THE CREDIBILITY OF, AND MISLEAD THE JURY ABOUT, HER LYING INFORMANTS.

During opening remarks the prosecutor asserted that her informants had to provide testimony she determined was truthful in order for her to use her influence to help secure a Rule 35 sentence reduction:

> You're also going to hear Jesse tell you about this deal that he cut with me. Because understand, y'all get to hear all of it. Jesse will tell you that in exchange for his testimony from that chair to you later today or tomorrow, this is his understanding of what will happen for him: I am to write a letter to his old former Assistant United States Attorney who handled Jesse Moreno's case that put him in prison in the first place, and that after I write that letter, his Assistant United States Attorney will take that letter and forward it to a panel of three judges. Now that letter is to say, depending on my opinion of how he testifies, truthfully and completely and completely forthcoming to you.

3 RR 12 (Opening Remarks).

During the State's case in chief, the prosecutor elicited testimony that her informants had to provide truthful testimony or else the prosecutor would not recommend a Rule 35 reduction:

#### *Moreno*

> **Q.** What's that called in federal lingo, these letters, time reductions?
> **A**. It's just, they give you a reduction in time.
> **Q**. Have you ever heard the phrase, Rule 35?
> **A.** Yes.
> **Q**. Under this Rule 35, if you testify truthfully and completely, your understanding, sitting here today, is that I would write you a letter saying that to your federal prosecutor?
> **A**. Yes, ma'am.
> **Q**. What happens, Mr. Moreno, if after you get all done here, I feel like you lied?
> **A**. I don't get nothing.
> **Q**. Why not?

A. If you feel like I lie, I getting nothing.
Q Because I ain't writing the letter, right?

3 RR 169.

### *Dominguez*

Q. Mr. Dominguez, getting back to where we left
off yesterday, in light of the current federal
sentence that you're serving, describe for the jury
your understanding of the deal or agreement that you
and I have for your testimony here today .
A. That if I cooperate fully with the State and
truthfully, you would write a letter to my prosecutor
and Federal Judge saying what I have done in
cooperation with Herrero, and then they decide if I
get a reduction of sentence or not.
Q. What does that mean, if you cooperate
truthfully?
A. Yeah, that everything I say here today is
the truth and I cooperate fully.
Q. And what's the difference between truthfully
and fully?
A. That I not withhold any type of information.
Q. And the first step in my part of the deal is
that I do what, sir?
A. That you write a letter.
Q. And if it's my opinion that you haven't been
completely forthcoming with all you know, what
happens?
A. You do not write a letter.
Q. And if it's my opinion you're not telling
the complete truth about what you're asked, what
happens?
A. You do not write a letter.

5 RR 8-9.

In closing, the prosecutor argued that successful prosecution in other cases in which

Moreno and Dominguez sought Rule 35 reductions in return for testimony meant that they had

testified truthfully.  The prosecutor asked the jury:

> But did you see him one time have any
> evidence of any cooperation, in all the cooperation
> that Jesse Moreno gave to Tennessee and to Louisiana
> and to me back in 1998, or from Rafael Dominguez and
> the cooperation he gave, any evidence from any of
> those people that they cooperated that they ever lied?
> Do you think that cops will continue to use informants
> in Tennessee against five different defendants, in
> Louisiana against five different defendants, in a case
> prosecuted in Harris County where a Desert Storm
> victim was shot on the freeway if he was a liar? Do
> you think it helps law enforcement to try and convict
> the wrong people by using the testimony of liars just
> for fun?

6 RR 31-32.

> 13 Cooperation. When you agree to cooperate,
> 14 understand this: First of all, you have to accept
> 15 responsibility. This is my part of it. This is what
> 16 I did. And then the cops interview you, and other
> 17 agencies get to come talk to you, and you have to do
> 18 every little thing and jump through all the hoops that
> 19 law enforcement tells you to do; Go ahead and give
> 20 the dope to the next guy up the line. Tell me
> 21 everything your girlfriend did. Tell me everything
> 22 your cousin did. You might have testified here and
> 23 here and here. You do whatever law enforcement says.
> 24 You don't get to say, Never mind. I don't want to do
> 25 that part.

6 RR 33.

The particular form that the prosecutor's bolstering took (*i.e.,* suggesting that other prosecuting authorities for whom her informants had testified found that their *quid pro quo* testimony for Rule 35 reductions was accurate testimony) makes federal authority highly instructive. In *United States v. Rudberg*, 122 F.3d 1199 (9th Cir. 1997), a federal court found that the combination of testimony and jury argument, such as that which took place in Herrero's case, combined to result in improper "vouching in a very powerful form." *Id.* at 1204. As in Herrero's

case, the defense did not object, and the trial court did not give curative instructions.  Applying plain error standards, the *Rudberg* court nonetheless reversed.  *Id.* at 1206.

The *Rudberg* court placed special emphasis on "the prosecutor's statements and the testimony he elicited [that] implied that the government possessed extra-record knowledge and the capacity to monitor the truthfulness of the testimony given by all of the witnesses who had received or hoped to receive a benefit under Rule 35."  *Id.*  Like Herrero's prosecutor, the Assistant United States Attorney in *Rudberg* "explained the mechanism by which testimony is checked for accuracy," and how demanding the Government is when "investigat[ing] and evaluat[ing] a [cooperating] witness' credibility."  *Id.*  The AUSA in *Rudberg* also erroneously elicited testimony implying that if a cooperating witness did not testify truthfully the Government would detect it and the witness would not see the benefits of a Rule 35 sentence reduction.  In Herrero, the prosecutor elicited similarly objectionable testimony that she would not use her influence to secure her witness Rule 35 benefits unless they testified truthfully.  Finally, the *Rudberg* courts, citing *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993), stressed that the AUSA had stressed the rigor of the Rule 35 process, which is precisely what Herrero's prosecutor did. *See* 6 RR 33.

In finding plain error, the *Rudberg* court looked at factors that are present, as well, in Herrero's case.  In *Rudberg*, as in Herrero's case, the vouched for witnesses were critical and the prosecutor repeatedly bolstered their testimony by reference to the Rule 35 process. *Id.* at 1205-1206.  As did Herrero's prosecutor, the AUSA impressed the jury with the idea that government informants had been vetted and tested by law enforcement. *Id.* at 1206.  And, as in the instant case, the testimony against Rudberg was entirely dependent upon to the testimony of vouched for witnesses. *Id.*  Even though error was not preserved at trial, this Court also should recommend relief because the harm was so great in Herrero's case that it satisfied "fundamental error"

standards, "contributed to the verdict," as understood in "*Ex parte Parrot*," and caused injurious and substantial harm under *Brecht.*

### E. PROSECUTOR'S MISLEADING REPRESENTATION ABOUT THE EVIDENCE BY WHICH THE STATE HAD TO PROVE ITS CASE VIOLATED DUE PROCESS.

Belief beyond a reasonable doubt is meant to encompass an objective standard that refers to quality and quantity of evidence.  Although there is a subjective component, the certainty or confidence the reasonable doubt standard calls for is supposed to be a product of rationale evaluation of the evidence.  The standard cannot be equated with a subjective, emotional feeling. The prosecutor's argument that jurors could and must convict if they "felt in their heart" (6 RR 28) that the State had proven each element of the offense misstated the standard and encouraged decisions based on emotions and intuition, rather than careful consideration of and deductions from the evidence.  Furthermore, in summing up what the jury was tasked with finding, the prosecutor elided reference to reasonable doubt and told the jury that "all the law required" was whether they believed her one more of her informants enough "to make you think the defendant was guilty."

> One witness testimony, whether that one witness, Jesse Moreno or Raphael Dominguez, if any of you believed all of Jesse's, all of Rafael's, or maybe a combination of both, enough to make you think this defendant is guilty of murder, that's all the law requires. Nothing more than that. And that's why y'all were sitting on those chairs.

6 RR 29.

The prosecutor's remarks were calculated to lessen her burden of proof and induce the jury to convict based on beliefs that were not tethered to a reasonable doubt standard.  Relief should therefore be recommended and granted.

### F. PROSECUTOR IMPROPERLY ARGUED AT CLOSING THAT HER SNITCHES WERE TELLING THE TRUTH BECAUSE OF RISK OF PROSECUTION AND PERSECUTION THEY FACED.

Prosecutor violated due process in closing argument by vouching for her witness, by arguing that State's informants would face aggravated perjury charges if he lied, 6 RR 35-36, by insisting State's informants would face 'the wrath of the prosecutor for setting up a thing that didn't turn out to be true," *id.*, and by arguing that he would face the "wrath of other inmates in prison who find out you're a snitch." *Id*. The prosecutor's arguments, individually and collectively, were improper and violated the Fourteenth Amendment's guarantee of due process. They were also false and misleading. The prosecutor rewarded and intended to reward informant witnesses whether they testified truthfully or not, so long as the jury convicted Herrero. The prosecutor's jury argument therefore violated Darden and Giglio.

### G.   PROSECUTOR'S CUMULATIVE MISCONDUCT VIOLATED DUE PROCESS AND PREJUDICED HERRERO.

The misconduct set forth in sections A-E occurred incessantly throughout all phases of trial. The pervasiveness of this misconduct clearly satisfied *Darden v. Wainwright.* The misconduct was directed, too, at bolstering the State's two informants, Moreno and Dominguez, by convincing the jury these witnesses had been vetted and approved in other cases, but that they were coming forward in teeth of danger posed by Herrero's supposed mobster influence within the federal prison system. By the State's own admission, Moreno was the crux of the state's case. The misconduct therefore "contributed to verdict" under *Ex parte Parrot,* and caused substantial and injurious harm under *Brecht v. Abrahamson*. Relief should therefore be recommended and granted.

## CLAIM SEVEN

**PETITIONER WAS DENIED RIGHTS TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.** *Strickland v. Washington,* **466 U.S. 688 (1984).**

**A.    TRIAL COUNSEL FAILED TO CONDUCT EFFECTIVE CROSS EXAMINATIONS OF STATE WITNESSES.**

**1.    Trial counsel's cross of Moreno was ineffective.**

Trial counsel failed to impeach Moreno with his extensive criminal history, and particular failed to impeach Moreno with the fact that Moreno was a gang leader.  Trial counsel also failed to cross examine Moreno about his history of administrative detention at FCI Beaumont or the reasons why he was administratively detained, placed in the SHU and transferred.

Trial counsel failed to impeach Moreno with the most important inconsistencies between his taped statement and his trial testimony.  Trial counsel failed, in particular, to impeach him with the fact that he told the prosecutor on July 3, 2001, that Nathan Foreman heard Herrero's confession in late November or early December 1999, and told the prosecutor that Foreman heard everything that Herrero said.

Trial counsel failed to impeach Moreno with his April 4, 2001, letter, which exhibits no fear of Herrero and expresses no concern for the safety of Moreno's family.  Trial counsel also failed to impeach Moreno with the April 10, 2001, letter Moreno said his mother wrote the prosecutor on his behalf, which likewise does not express concern about Herrero.  Because trial counsel did not utilize Moreno's or his mother's letter, trial counsel failed to impeach Moreno's false testimony that he contacted the prosecutor in "August, September, October" of 2000, when in reality he waited for nine more months, and failed, in general, to impeach Moreno's professed motive for testifying.

### 2.    Trial counsel's cross of Dominguez was ineffective.

Trial counsel failed to obtain Dominguez's P.S.I. with which he could have impeached Dominguez's testimony not to have dealing with gangs, his testimony that his P.S.I. showed he cooperated, his testimony that he had to modify his P.S.I. to expunge cooperation, and his testimony that he had to expunge his purported record of cooperating with the U.S. Government from his P.S.I. so Herrero would not put a hit on him or force him to take refuge in the SHU.

Counsel also failed to cross examine Dominguez about Dominguez's gangster relations with non-testifying witness Gomez or his disciplinary history in FCI Beaumont.  He also failed to impeach him with Dominguez's related history of administrative detentions, none of which were imposed in order to protect Dominguez from Herrero.

### 3.    Trial counsel's failure to exclude or effectively rebut Detective Brown's opinion testimony resulted in ineffective assistance of counsel.

Detective Brown's opinion that Guajardo was in a sitting position when his assailant slit his throat was inadmissible under Rule 701 as layperson opinion.  Detective Brown's opinion was not the result of personal knowledge, nor required to clarify his other testimony, as required by Rule 701.  However, trial counsel failed to raise a Rule 701 objection.

Detective Brown was also not qualified to provide an expert opinion regarding the significance of blood or blood splatter evidence.  His opinion, based on blood stain evidence, that Guajardo's throat was slit while Guajardo was in a sitting position was inadmissible as expert testimony under Texas Rule of Evidence 702, inadmissible under *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992) and inadmissible under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Trial counsel had the right and duty to invoke TRE 705(b), but he did not.  TRE 705(b) requires the trial court to hold a hearing outside the presence of the jury to determine what expert theories a party in a criminal case intends to offer and whether those theories are admissible under TRE 702 and *Kelly*.  *Kelly* instructs that the proponent of an expert opinion or theory should establish (1) general acceptance of the theory and technique by the relevant scientific community; (2) the expert's qualifications; (3) the existence of literature supporting or rejecting the theory; (4) the technique's potential rate of error; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the theory or technique can be explained to the trial court; and (7) the experience and skill of the person who applied the technique on the occasion in question.  Detective Brown did not meet the most fundamental of these criteria, namely, the second.  Detective Brown had no qualifications.  Detective Brown had no training in anatomy, in fluid dynamics or in any other field that might allow him to render an opinion about the blood evidence.

Trial counsel also should have impeached and rebutted Detective Brown's opinion with the testimony of a medical expert.  As shown by the 2015 affidavit of Dr. Tommy Brown, any physician familiar with blood pressure and basic anatomy could have refuted Detective Brown's absurd testimony, since blood from major vessels in the neck severed through in through would have sprayed and gushed all over the clothing the victim's belt and pants if the victim's throat was slashed while the victim was in a sitting position.  Ex. '1.'

Since the prosecutor failed to notify Herrero that she was introducing Brown's opinion testimony, trial counsel should have, but failed to, request a continuance to retain an expert to rebut Detective Brown and the State's theory that Guajardo had his throat slit while sitting in the passenger seat of a van.  However, trial counsel failed to request a continuance.

**B.**    **TRIAL COUNSEL'S FAILURE TO OBJECT TO THE PROSECUTOR'S IMPROPER OPENING AND CLOSING ARGUMENTS WAS INEFFECTIVE.**

Trial counsel did not object or renew objections to closing remarks, testimony or closing argument complained about in Claim Six above, the argument and evidence for which is incorporated by reference as if fully set forth herein.  Failure to object was ineffective and prejudiced Herrero for reasons set forth in Claim Six, subsections 'A-F.'  *See Strickland,* 466 U.S. at 992 (errors are such that they prove by a preponderance of the evidence that for their occurrence the outcome of trial would have been different).

**C.**    **TRIAL COUNSEL'S FAILURE TO ARGUE OR BRIEF HERRERO'S DUE PROCESS AND SIXTH AMENDMENT RIGHT TO SPONSOR HEARSAY TESTIMONY THAT EXCULPATED HIM WAS INEFFECTIVE.**

The day that law enforcement discovered Guajardo's body, law enforcement interviewed Pedro Raphael Morales, who told law enforcement that

> On Thursday, January 5th, 1995 at about 9:00 or 9:30 PM, I had just gotten out of the shower at my house.  I heard the dogs barking and I went outside to see what they were barking about.  As I walked outside. I looked down the street and saw a small red colored car parked on the side of the road by the ditch. I could not see real well because it was dark and the only lights on were at the neighbor's house that were shining a little bit on the car.

> I could see someone over by the car moving around and I thought that they were dumping trash out there. I yelled at the person by the car "Hey don't throw that shit out here." When I yelled at him he slammed the trunk of the car and then got into the car and took off with his lights off.

> The only thing I could remember about the car is that it was a small red colored car.  I know that it was a small car by the sound of the motor.  The person I saw that was standing behind the car was a white guy about 20 to 30 years old.  He had kind of blond shaggy type hair, it looked kind of like it was layered and about collar length.  The guy looked stocky but I could not tell much else about him.

> I did not really think much about him being there because people
> always dump trash and dead dogs and things like that on our street.
> I walked by the rug that the body was in several times over the next
> couple of days but never dreamed that a body would be inside it.  I
> found out today when my mother and the detective came and picked
> me up that there was a body inside the rug.

Ex. '9.'

Before trial, Pedro Morales died of leukemia.  Trial counsel sought to admit Pedro Morales's

statement, but the trial court sustained the State's hearsay objection.

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court held that State

evidentiary rules that permit the courts to exclude evidence must give way to due process concerns

when evidence excludable under the rules is highly exculpatory.  *See also Douglass v. Alabama,*

380 U.S. 415 (1956).  In *Chambers*, a third party confessed orally under circumstances that bore

substantial assurance of trustworthiness, but the third party was not available for trial.  *Id.* at 289.

The Supreme Court ruled that exclusion of the testimony under hearsay rules deprived the

defendant of a fair trial.  *Id.* at 298-299.

The hearsay testimony of Pedro Raphael Morales bore substantial assurance of

trustworthiness.  Pedro Morales gave a voluntary sworn statement to police describing the time,

place, vehicle and person he had seen dump what turned out to be the rug encasing the body of

Guajardo within.  Pedro Morales had no motive to lie.  He gave his statement under oath, and he

described with particularity what he had seen.  He also accurately remembered the date he saw a

person driving a small red vehicle dumping on Harmon Street, which date coincided with Herrero's

disappearance and death, as established by other evidence.  Pedro Morales' statement was highly

exculpatory because it completely confounded critical details in the purported confession that

Moreno and Dominguez testified Herrero gave.  Pedro Morales' statements meant that Moreno

and Dominguez testified to the wrong time, the wrong vehicle, wrong perpetrator and the wrong circumstances for the assault that resulted in Guajardo's death.

Trial counsel did not urge Herrero's due process right to have Pedro Morales' statement admitted (or object on due process grounds to its exclusion) despite the existence of long established Supreme Court law requiring admission of this type of evidence.  For this reason, counsel performed deficiently.  *See Strickland,* 466 U.S. at 690.  Counsel deficient performance also prejudiced Herrero.  *Id.* at 692.  It is reasonably probable that a jury would have acquitted Herrero if apprised of eye-witness testimony refuting every aspect of the supposed confession Moreno and Dominguez's relayed.  A reasonable jury surely would have concluded that the two informants were fabricating evidence in order to receive quid pro quo benefits from the prosecutor.

### D.  TRIAL COUNSEL'S FAILURE TO RETAIN A MEDICAL EXPERT WAS INEFFECTIVE.

The evidence and argument in Claim One, Section 'A' regarding the importance of Dr. Tommy Brown's 2015 Affidavit (Ex. '1') is hereby re-alleged and incorporated by reference as if set out fully herein.  Had defense counsel retained a medical expert, he could have refuted the State's case completely, by demonstrating that the purported confession Moreno and Dominguez claimed they heard conflicted completely with the forensic evidence.  However, in violation of *Strickland's* deficiency prong, counsel failed to retain such an expert.  Trial counsel's failure prejudiced Herrero under *Strickland* since Moreno and Dominguez were the crux and entirety of the State's case.

### E.   TRIAL COUNSEL INTRODUCED EVIDENCE THAT ALLOWED PROSECUTOR TO VOUCH FOR HER WITNESSES' CREDIBILITY.

Trial counsel only needed to impeach Moreno and Dominguez with their past cooperation with law enforcement.  By focusing on their quid pro quo motives, trial counsel would not have opened the door to vouching.  However, trial counsel went beyond questioning motives to actually introducing letters that offered quid pro quos for truthful testimony.  The letters favored the State in that they created the impression that the State could detect and would only reward truthful testimony.  The State could not have introduced these letters, which were not admissible under any exception to hearsay or permissible under any other rule.

Because trial counsel erroneously introduced the letter vouching for Moreno's testimony in another case, trial counsel was powerless to prevent the following closing argument by the prosecutor.

> 23 This letter that Mr. Cogdell introduced that
> 24 I wrote back in 1997, what does it say? I says, I'm
> 25 the chief felony prosecutor in the 228th Court. I
> 1 recently tried a defendant for the murder of a Desert
> 2 storm veteran which happened here on the freeways of
> 3 Houston. That ' s the trial that Jesse Moreno testified
> 4 in before. My trial was a very circumstantial case.
> 5 That means he was important in that case.
> 6 I tell all of this to you to put in
> 7 perspective how important the testimony of Jesse
> 8 Moreno was to my case. He also provided assistance to
> 9 H.P. D. I believe his testimony and cooperation were
> 10 critical in obtaiing a conviction and a life
> 11 sentence .
> 12 That jury sure believed him, and he was an
> 13 important witness in a very critical case.

6 RR 33.

Introducing evidence supporting the State's crucial witnesses was deficient under Strickland.  It also prejudiced Herrero under Strickland because it allowed the State to vouch for

otherwise highly compromised witnesses who were crucial to the State's case. The fact that the State, not the defense, argued this evidence is substantial proof that introducing this evidence deprived Herrero of his Sixth Amendment right to effective assistance of counsel.

### F. COUNSEL'S CUMULATIVE ERRORS RESULTED IN DEFICIENT REPRESENTATION AND PREJUDICED HERRERO.

Moreno was the crux of the State's case. Moreno's and Dominguez's testimony was the State's entire case. As shown in Sections A-E above, trial counsel failed, by not making the proper objection, to prevent the prosecutor from: (i) vouching for her witnesses, (ii) introducing extraneous offenses, and (iii) excluding exculpatory evidence. In addition, counsel failed to retain expert assistance, which would have completely undermined the credibility of Moreno's and Dominguez's recounting of Herrero's alleged confession. The State would have had no case, if counsel had not failed in any single respect identified above. The cumulative effect of the errors was therefore overwhelmingly prejudicial. Relief should therefore be recommended and granted on Herrero's IAC claims.

## CLAIM EIGHT

**PETITIONER WAS DENIED RIGHTS TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.** *Evitts v. Lucey,* **469 U.S. 387 (1985).**

Counsel for Petitioner on Direct Appeal raised four claims for relief as follows:

> (1) Is the evidence sufficient to establish the corpus delicti of murder independent of appellant's extrajudicial confession?

> (2) Is the evidence legally sufficient to support appellant's murder conviction?

> (3) Is the evidence factually sufficient to support appellant's murder conviction?

> (4) Was appellant entitled to a mistrial because a witness improperly testified that he was promised protection from appellant's death threat in exchange for his testimony?

*Herrero v. State,* No. 14-02-00534-CR (Tex. App. – Houston [14th] 2009, no. pet.) at 2.

A. **COUNSEL FAILED TO RAISE A CLAIM CHALLENGING HE TRIAL COURT'S RULING PERMITTING THE STATE TO ARGUE IN CLOSING THAT JURORS MUST TAKE INTO CONSIDERATION "WHAT HAPPENS" TO HER INFORMANTS, MORENO AND DOMINGUEZ, "WHEN THEY GO BACK TO PRISON AFTER HAVING TESTIFIED."**

Trial counsel objected to the prosecutor's closing remarks, as follows:

> 5 Good citizens are on juries. Not so good
> 6 citizens are the defendants. And in this case it's
> 7 okay for you to think that. But what you cannot do
> 8 when you go back behind that door to deliberate in a
> 9 few minutes is you cannot allow yourselves the luxury
> 10 of pretending like you don't have to deal with that
> 11 life. Because for today, while you're under this oath
> 12 as a juror today, you do have to deal with it and you
> 13 have to deal with the reality of what happens to Jesse
> 14 Moreno and what happens to Rafael Dominguez when they
> 15 go back to prison after having testified.
> **MS. COGDELL: Excuse me, Judge. That's a**
> **17 misstatement of the charge. That is not what they**
> **18 have to deal with, Your Honor.**
> 19 THE COURT: Rephrase it, please.
> 20 MS. SIEGLER: You have to deal with the
> 21 reality of what they have to deal with when they go
> 22 back to prison.
> **23 MS. COGDELL: I object to that being an**
> **24 improper argument. There is nothing this jury is**
> **25 going to do –**
> 1  THE COURT: It's overruled.
> 2 MS. COGDELL: that affects what happens
> 3 when he goes back. Thank you.
> 4 MS . SIEGLER: You can't kid yourselves into
> 5 thinking, Then I don't want to think about it;
> 6 They're all bad, despicable people, and I don't want
> 7 to think about it. They are bad, despicable people;
> 8 but you still have to figure out and think about there
> 9 motivations and why they would put themselves through
> 10 all of this to go back to that world. You can't just
> 11 pretend like you don't want to think about it, not
> 12 while you're under this oath as a juror here today.

6 RR 25-26.

Trial counsel timely objected, and the court overruled him without allowing an explanation for the objection.  Trial counsel preserved error.  However, appellate counsel unreasonably failed to raise an obviously meritorious claim.

Should reviewing court's find that trial counsel should have voiced a due process objection in addition to an objection alleging that the argument was improper, reversal is still in order because the error was fundamental error for reasons stated in Claim Six, Section 'A', the evidence and argument for, which is re-alleged and incorporated by reference as if fully set forth herein.

**B.**   **APPELLATE COUNSEL FAILED TO RAISE CLAIMS ALLEGING PROSECUTORIAL MISCONDUCT, INCLUDING VOUCHING AND BOLSTERING INFORMANT WITNESSES.**

The argument and evidence alleged in Claim Six, Sections B-F, is incorporated by referenced as if fully set forth herein.  Although trial counsel did not object, the error was fundamental.  However, appellate counsel failed to raise these important, easily ascertainable claims.

**C.**   **APPELLATE COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S COMPARISON OF HERRERO TO MOBSTERS, TO THE GODFATHER AND TO JOHN GOTTI, IN PARTICULAR, IN HER OPENING REMARKS.**

The prosecutorial misconduct identified in Claim Six, Subsection C, is re-alleged and incorporated by reference herein.  The error was fundamental.

**D.**   **APPELLATE COUNSEL FAILED TO RAISE A CLAIM BASED ON THE TRIAL COURT'S ERRONEOUS DECISION TO SUSTAIN THE STATE'S HEARSAY OBJECTION TO THE ADMISSION OF PEDRO RAPHAEL MORALES'S STATEMENT TO LAW ENFORCEMENT.**

The argument and evidence alleged in Claim Seven, Subsection C, is re-alleged and incorporated by reference as if fully set forth herein.

**E.   APPELLATE COUNSEL DID NOT HAVE A STRATEGIC REASON FOR NOT RAISING THE CLAIMS REFERRED TO IN SECTIONS A-C ABOVE.**

Except for the fourth claim for relief raised on direct appeal, appellate counsel otherwise raised meritless claims.  The first claim -- State did not establish a corpus delicti – is only the most obviously meritless.  Police recovered the body of Guajardo.  Guajardo had obviously been beaten and his throat slit by someone.  Texas law requires no more, and often far less, to establish a corpus delicti. *See Gribble v. State*, 808 S.W.2d 65, 70 (Tex. Crim. App. 1990) (plurality opinion) (stating that "[t]he corpus delicti of a crime—any crime—simply consists of the fact that the crime in question has been committed by someone.").  Nor would raising the claims Herrero says appellate counsel unreasonably omitted conflict with, or detract from, any of the legitimate arguments that appellate counsel made.

**F.   DEFICIENT PERFORMANCE ALLEGED IN SECTION A-C SEPARATELY AND CUMULATIVELY PREJUDICED HERRERO.**

Effective assistance of appellate counsel does not mean counsel will raise every available nonfrivolous ground for appeal. *See Evitts,* 469 U.S. at 394; *West v. Johnson*, 92 F.3d 1385, 1396 (5th Cir. 1996).  Rather, it means, as it does at trial, that counsel performs in a reasonably effective manner. *See Evitts*, 469 U.S. at 394.  To show prejudice, Herrero must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones v. Jone*s, 163 F.3d 285, 302 (quoting *Strickland*, 466 U.S. at 694).

Appellate counsel did not raise an obviously meritorious claim that the trial court erred when it allowed the prosecution to argue that the jury, in considering whether Herrero was guilty of murder, must consider the dangers her informant/witnesses faced post-trial for testifying for the State.  The appellate claim was meritorious for reasons stated in  Subsection A of the Sixth Claim for relief briefed in this Application, the evidence and argument for which is incorporated by

reference as if fully set forth herein.  Had counsel raised this claim, it is reasonably likely the Court of Appeals would have reversed.

Appellate counsel also did not raise a meritorious claim complaining that the prosecutor's comparison of Herrero to a mobster figure, to the Godfather and to John Gotti, in particular, resulted in fundamental error.  The merits are set forth in Claim Six, Subsection 'C,' the arguments and evidence for which are incorporated by reference herein.   Reversal would have been reasonably likely since the harm of being compared to murderous organizations and fictional and real life mobster figures was extremely prejudicial.  *See United States v. Steinkoetter*, 633 F.2d 719, 720 (6th Cir. 1980) (prosecutor's references to Pontius Pilate and Judas constituted reversible error); *Mathis v. United States*, 513 A.2d 1344, 1348 (D.C. 1986) (finding prosecutorial misconduct in prosecutor's repeated use of the terms "Godfather" and "self-proclaimed Godfather" to describe defendant).

Appellate counsel also was ineffective in that he did not allege that the prosecutor's pervasive vouching for her informant witnesses was fundamental error or violated due process, alleged in Subsection D of the Sixth Claim for relief in this Application, the evidence and argument demonstrating the merits of which is incorporated by reference as if fully set forth herein.  As shown in that subsection a federal court confronting the identical issue of vouching in relation to Rule 35 proceedings found plain error under similar standards of review. *See Cerna v. State,* 441 S.W.3d 860, 868 n.1 (Tex. App. – Houston [14th Dist.] 2014, pet. ref'd)("In Texas criminal procedure, there is no plain-error rule, so we construe appellant's argument to refer to "fundamental error," which is the term in Texas criminal procedure that corresponds to the term "plain error" in federal procedure.").  It is therefore reasonably likely that the Court of appeals would have reversed and remanded resulting in a different outcome, as require for relief under *Evitts* and *Strickland.*

Finally, appellate counsel was ineffective for not raising a *Chambers* claim, the merits of which are set forth in Claim Six, Subsection E, and incorporated by reference herein.  Reversal would have been reasonably likely since the excluded evidence would have exonerated Herrero, making exclusion of same fundamental error.  For the foregoing reasons, habeas relief is therefore warranted pursuant to *Evitts* and *Strickland.*

## CLAIM NINE

### THE CONVICTION AND SENTENCE IMPOSED ON HERMILO HERRERO VIOLATES DUE PROCESS AND THE EIGHTH AMENDMENT BECAUSE HE IS ACTUALLY INNOCENT

**A.**     **THE EVIDENCE REFUTING THE STATE'S INFORMANTS IS PRECISELY THE TYPE OF EVIDENCE THAT THE SUPREME COURT INDICATED IN *CALDERON V. THOMPSON,* 523 U.S. 538 (1998), WOULD ESTABLISH ACTUAL INNOCENCE.**

Evidence and argument in Claims One, Two, Three and Four are re-alleged and incorporated by reference as if fully set forth herein.

Thompson was convicted of raping and murdering a woman and challenged his death sentence by attacking the felony rape conviction.  To do so, Thompson moved to reopen judgment based on evidence he maintained disproved the rape conviction that "[fell] into two categories," as follows:

> Thompson presented additional evidence to impeach the credibility of Fink and Del Frate, the jailhouse informants who testified Thompson confessed the rape and murder to them. In the case of Fink, Thompson presented additional evidence of Fink's history as an informant and of law enforcement favors for Fink. Thompson also presented statements by law enforcement officials to the effect that Fink was an unreliable witness. In the case of Del Frate, Thompson presented evidence that law enforcement officials and certain members of Del Frate's family regarded Del Frate as dishonest, that Del Frate shared a jail cell with David Leitch prior to meeting Thompson, that Del Frate's statements to police tracked newspaper accounts of the crime, and that Del Frate neglected to

mention at trial his prior convictions for grand theft and distribution of hallucinogens without a license.

*Id.* at 562-563.

The Supreme Court ruled that "this impeachment evidence provides no basis for finding a miscarriage of justice," *id.* at 563, because "the evidence is a step removed from evidence pertaining to the crime itself," and because "it tends only to impeach the credibility of Fink and Del Frate." *Id.* The Supreme Court then described two circumstances in which this type of evidence, although removed from the crime and tending only to impeach, may nonetheless demonstrate a miscarriage of justice. To find that the matters in all probability would have altered the outcome of Thompson's trial, the Supreme Court said,

> we should have to assume, first that there was little evidence of rape apart from the informants' testimony, and second, that the jury accepted the informants' testimony without reservation. The former assumption is belied by the evidence recited above. The latter one is belied by the substantial impeachment evidence Thompson's attorney did introduce.

*Id.*

The evidence that Herrero advances in order to demonstrate a miscarriage of justice is many times stronger than Thompson's. The case against Herrero that the State presented at trial is also many times weaker than the state's case against Thompson. Furthermore, the evidence that undermines the crucial testimony of Moreno and Dominguez is not removed from the crime. Instead, it comes directly from the crime, namely, from Dr. Tommy Brown's thorough, expert analysis of crime scene and autopsy evidence. Ex. '1.' Government records also thoroughly refute the State's informants' testimony as to their motive for turning State's witness, demonstrating that the State's entire case is based on perjury and suborned perjury.

**B.  OTHER FCI BEAUMONT INMATES FAMILIAR WITH THE RING OF INFORMANTS THE STATE UTILIZED IN FCI BEAUMONT CONFIRM THAT MORENO'S AND DOMINGUEZ FRAMED HERRERO.**

Through Moreno, the State introduced a photograph taken at FCI Beaumont showing Herrero "in the middle of [a] group." 3 RR 190 (State's Exhibit 34).  Also depicted were Moreno, "Delgado, Dominguez, Sanchez, and Arrogeen (phonetic)."  They used the photo to help confirm the impression that Herrero was a leader of the "All Houston Group."  However, undersigned counsel located and interviewed Delgado.  According to Delgado, Herrero did not lead anything on the street or in prison.  Delgado affirmed that Herrero certainly was not a powerful or dangerous person within FCI Beaumont.  Furthermore, Delgado knew of Moreno's and Dominguez's plans to frame Herrero.  Another FCI Beaumont named Michael Beckcom told undersigned counsel's investigator that he was aware of a group of informants, including Moreno and Dominguez, angling to testify against Herrero.  Beckcom stated that these informants were lying.  Ex. 38' (Affidavits of JJ Gradoni).  Finally, Carl Walker, Jr., provided a lengthy statement on August 26, 2010, describing how the ring of informants operated and how Moreno, Dominguez and Foreman conspired to frame Herrero. Ex. '33.'

**C.  CREDIBLE EYE-WITNESS TESTIMONY OF PEDRO RAPHAEL MORALES REFUTES MORENO AND DOMINGUEZ AND PROVES ANOTHER PERSON, NOT HERRERO, KILLED AND DISPOSED OF GUAJARDO'S BODY.**

On January 9, 1995, the day that neighbors on Harmon Street discovered Guajardo's body wrapped in the plastic and rug, Pedro Morales gave policed a detailed voluntary statement that entails Herrero is innocent.  Ex. '9.'  Pedro Morales' statement also confirms Dr. Brown's conclusion that Guajardo was killed under completely different circumstances than described in the purported confession Moreno and Dominguez relayed to the jury. Ex. '1,' ¶ 15.  Whoever assaulted Guajardo pummeled him and slashed his throat somewhere else, but not Harmon Street.

His assailants also rolled Guajardo's body in rugs and plastic at some other location, then transported the body to Harmon Street for disposal.  Guajardo was not killed in the middle of the night after the bars closed, but earlier in the day on January 5, 1995, and he was neither killed, nor transported to Harmon Street, in a van.  Pedro Morales' statement therefore proves that the State sponsored false testimony and fabricated the case against Herrero.  Pursuant to *Ex parte Elizonde,* relief should be recommended and granted.

### D.   JAIME ELIZALDE'S ADMISSION TO KILLING GUAJARDO SUPPORTS HERRERO'S ACTUAL INNOCENCE.

In 2006, Jaime Elizalde confessed to killing Guajardo and provided Herrero's habeas attorney, Norman Silverman, an affidavit describing how he, Elizalde, committed the murder.  Ex. '39' ("Death Row Answers May Not Be What Court Hopes to Hear," Houston Chronicle, January 14, 2006).  This Court scheduled a hearing to take testimony from Elizalde.  However, Elizalde's attorney, Danny Easterling, advised Elizalde to assert his Fifth Amendment right, even though Elizalde had already incriminated himself in his affidavit and had repeated his confession to the press.  Elizalde told the Chronicle "that he knew both Guajardo and Herrero when he was out "in the world." *Id.* Elizalde said Guajardo "made the mistake of threatening my family." *Id.*  Elizalde explained that his motive for killing Guajardo was that Guajardo had "just killed two men," and was now threatening Elizalde and Elizalde's family.  The threats apparently had to do with the fact that Elizalde was suspected of the dual homicide he claimed Guajardo committed and Guajardo was trying to silence Elizalde.

Elizalde's several confessions bear indicia of reliability.  Elizalde provided a statement under oath, and he publicly proclaimed his guilt against the advice of his attorneys.  The manner by which Elizalde said he killed Guajardo is far more plausible than Moreno's and Dominguez's demonstrably fabricated tale.  Elizalde confessed to bludgeoning Guajardo before slitting his

throat, which fits the crime scene and autopsy evidence.  Elizalde also did not recant, but instead asserted his Fifth Amendment right, upon advice of counsel, against incriminating himself in the Guajardo murder.  Elizalde was not invoking his Fifth Amendment right in his own criminal proceedings, but in Herrero's habeas cause of action.  Elizalde's assertion of his Fifth Amendment right therefore can and should be held against him.  Because of the foregoing indicia of reliability, Elizalde's confession, despite being hearsay, should be treated as reliable, admissible exculpatory evidence in assessing Herrero's actual innocence claim. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284 (1973), as well as in assessing whether Guajardo's application, if it's deemed a second application, meets Article 11.07 § 4 criteria.  Under federal standards, from which 11.07 § 4 derives, even if Elizalde's confession is deemed inadmissible, reviewing courts still must take it into consideration. *See Schlup v. Delo*, 513 U.S. 298, 327-328 (1995)(clarifying that the habeas court must consider "'all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial.").

Two jailhouse informants, Jesse Moreno and Rafael Dominguez, Jr., were sources of false testimony upon which Herrero's conviction rests.  Both informants testified that while they were in FCI Beaumont, they heard Herrero confess, on two separate occasions, to murdering Guajardo. 3 RR 175-177; 5 RR 13-15.  Each informant stated that another FCI Beaumont named **Nathan Foreman** was present when Herrero supposedly described in detail how he abducted and killed Guajardo. Dominguez not only testified that **Foreman** was present when Herrero supposedly confessed a second time in March of 2000, Dominguez testified that **Foreman** actively questioned Herrero about how he committed the crime. 5 RR 11.  During a taped interview on July 3, 2001, Moreno also told the prosecutor that **Foreman** was present, and heard everything Moreno did,

116

when Herrero supposedly confessed for the first time in late November or early December of 1999. Ex. '13' (transcript of July 3, 2001, taped statement).  However, Moreno did not repeat this testimony about **Foreman** at trial.

Each informant maintained, as well, that Herrero was a leader of prison organization and that he forced them to disclose sensitive privileged information about their own federal criminal cases. 3 RR 155-57; 4 RR 118.  Moreno testified that Herrero threatened his life and his family when Herrero learned that Moreno had served as a State's witness in another murder case. *Id.* at 25 (citing 3 RR 162). Dominguez and Moreno both testified that after Herrero learned they would be testifying at Herrero's April 2002 trial, that Herrero threatened each of them. *Id.* at 30 (quoting 3 RR 162-64, 167-68; 4 RR 123).  Both testified that Herrero had power within the prison system to cause them bodily harm or death.  *Id.* Each testified that he contacted the prosecutor and offered to testify in the hope that the prosecutor would protect them from Herrero. *Id.*

Documentary evidence demonstrates that Dominguez and Moreno lied repeatedly.  Exs. '1'-'39'.  Now, the very witness who Dominguez and Moreno testified heard everything they did from Herrero about the Guajardo murder has come forward, and he has confirmed Herrero's allegations of perjured testimony and prosecutorial misconduct.  On January 11, 2016, **Nathan Foreman** gave sworn statements substantiating Herrero's existing proof that  (i) Moreno and Dominguez manufactured a confession, and lied about their motives for testifying, and that (ii) the State intentionally solicited Moreno and Dominguez's false testimony. *See* Exhibit '40'.  Relief in the form of acquittal or new trial should therefore be recommended and granted on the First, Second, Third, Fifth and Ninth Claims in Herrero's § 11.07 application for a writ of habeas corpus.

**ADDITIONAL BRIEFING IN SUPPORT OF HABEAS CLAIMS ONE, TWO, THREE, FIVE AND NINE.**

**A.**    **Foreman's sworn statement proves the confessional scenes Moreno and Dominguez described were complete fabrications; hence, relief should be recommended and granted on Count One, Two, Three, Five and Nine.**

The descriptions Moreno and Dominguez gave of the circumstances under which Herrero confessed were integral aspects of their testimony.  Each purported to recall the audience, why the audience assembled, where various persons stood or sat – next to or across from Herrero –  and how individuals reacted to the account Herrero purportedly gave of the Guajardo murder. According to a taped statement, which Moreno gave to the prosecutor on July 3, 2001, the audience consisted in inmates from Houston who hung out together because of their common neighborhood or street background.   *Ex.* '13' at 20.  At Herrero's April 2002 trial, Moreno claimed that the Houston inmates formed an "All Houston Group," that Herrero led this group and that Herrero demanded loyalty and fidelity to inmate rules, especially rules against cooperating with law enforcement. *Id.* (citing 3 RR 153, 155-157)  However, on this occasion, which Moreno said took place in November or December of 1999, Herrero was not making demands, but rather, by supposedly confessing to an unsolved murder, Herrero was trying to show his loyalty to the "All Houston Group"  through his willingness to entrust them with information that could lead to conviction for murder.  3 RR 174.

On tape, and at trial, Moreno testified that members of the so called All Houston Group had assembled in late November or early December 1999, in order to plan for each other's safety ahead of a fight or riot that they anticipated would take place between rival prison gangs. *Id.*; *and see* Ex. '13' at 20. According to Moreno, the assembly was sizeable – up to twenty prisoners. 3 RR 174.   However, Moreno identified only a handful of "All Houston Group" members, who, along with himself, were privy to Herrero's confession. *Id.*  In this respect Moreno's July 3, 2001

taped statement and Moreno's April 2002 trial testimony diverged.  On tape Moreno tells the prosecutor that **Foreman** heard Herrero's supposed November/December 1999 confession along with Dominguez.   Ex. '13' at 13. At trial, Moreno change this part of the story.  Instead, of **Foreman** being present, Moreno testified that Eddie Gomez heard Herrero confess along with an inmate with the last name of Cevallos or Castillias (*sic*.). 3 RR 183-184; 4 RR 63.

As explained in the September 30, 2015  Moreno replaced **Foreman** with Gomez in order to avoid impeachment that would have undermined the State's case, because Foreman's records show he was not admitted to FCI Beaumont until February 28, 2000, three months after the alleged November/December 1999 confession.  *See*  Ex. '25' (BOP Quarters History for **Foreman**). However, this switch in audience members does not absolve Moreno of perjury.  First, it just proves the State found out Moreno lied about **Foreman**, and then contrived to insulate his perjurious testimony from impeachment.   Second, the rest of Moreno's testimony about the circumstances of Herrero's confession was blatantly false. There was no organization called the "All Houston Group."  Exhibit '40' at 2. Herrero was not the leader of this so called group, or of any other prison group, and no riot was in the works.  As **Foreman** puts it in his January 11, 2016, statement,

> I've heard that he State put on evidence that Herrero was the head of a prison gang or prison organization called "All Houston" or the "All Houston Group," and that he confessed to show he could be counted on in case there was a riot.  Not to my knowledge, he didn't. I never heard of an organization or group by those names at FCI Beaumont.  Herrero wasn't the head of anything, as far as I knew. And, to my knowledge, no riot was about to happen.

**Exhibit '1'** at 2.

The State still kept Foreman in the story through Dominguez's testimony, resulting in another thick layer of perjury.  Dominguez testified that Herrero confessed again sometime in

March of 2000, after Foreman arrived at FCI Beaumont.  According to Dominguez, Moreno and

**Foreman** were present at the second confession. 5 RR 11. Dominguez vividly recounted

**Foreman's** reaction upon allegedly hearing Herrero confess to killing Guajardo, as follows:

> 13 [DOMINGUEZ] We were talking about our war stories and
> 14 stuff, our past crimes we've done. And **Foreman**, he
> 15 had just finished telling a story how he had been
> 16 kidnapped and tortured. And when he finished, Herrero
> 17 made the comment of saying, You guys haven't put in no
> 18 real work. And **Foreman** is like, 'What do you mean by
> 19 real work?' And he goes, Do you know Albert from the
> 20 neighborhood? And **Foreman's** like, No, I don't know
> 21 him.  He's like, Well, I killed him. And **Foreman** is
> 22 like, Oh, for real? And he's like, Cat and Jay know.

5 RR 11.

According to Dominguez, it was Foreman who prodded Herrero into describing the murder.

> 3 **A**. Okay. And then **Foreman** asked him, Well,
> 4 what happened? And he said that Albert had jacked him
> 5 out of some weed, and he didn't want to pay so ….

5 RR 12.

Every word Dominguez uttered at trial was false.  **Foreman** did not react and did not ask

questions.  **Foreman** did not speak to Herrero at all and Herrero never said anything to **Foreman.**

As **Foreman** explained in his January 11, 2016 sworn statement,

> I've heard that one witness against Mr. Herrero told the prosecutor
> that Herrero confessed to me and some other FCI Beaumont
> prisoners in November or December of 1999. I was not even at
> FCI Beaumont until February 28, 2000, so that's impossible. I also
> heard that someone testified at Herrero's trial that Herrero
> confessed to me in March of 2000. That did not happen either.
>
>  I had never heard of Herrero outside prison. I only recall seeing
> Herrero maybe one time in FCI Beaumont. I do not recall Herrero
> being on my Unit. I can't remember ever speaking to the man, not
> even once. There was no reason for me to talk to him or for him to
> talk to me.

Exhibit '1' at 1.

B.   **Foreman's sworn statement shows that Moreno's and Dominguez's explanations for turning State's evidence were pure lies, which justifies relief on Counts One, Two, Three, Five, and Nine.**

Both Moreno and Dominguez testified that Herrero, utilizing his supposed powers as the head of the "All Houston Group," compelled Moreno, Dominguez and other FCI Beaumont prisoners to disclose their P.S.I.s (federal Pre-Sentence Investigation Reports) in order to determine if the prisoners had cooperated with law enforcement.  3 RR 153; 4 RR 118. To try to escape Herrero's wrath, Moreno and Dominguez claimed they had to forge a PSI that omitted any reference to cooperation. *Id.* However, Moreno claimed that Herrero eventually learned he had cooperated against another inmate and decided to "put a hit" on Moreno for turning State's witness. 3 RR 164; 4 RR 123.  Moreno testified that BOP separated him from the general population and ultimately transferred him out of Beaumont FCI because of this deadly threat from Herrero.  3 RR 160. Moreno also testified that Herrero threatened his family. 3 RR 162.  Dominguez likewise testified that Herrero threatened to kill him when he learned that Dominguez would be a witness at Herrero's trial.  4 RR 118-19.

Dominguez and Moreno testified further that they turned State's witness in the hope that they could escape Herrero's deadly reach within the prison system by securing an early release through cooperation.  Each testified that a second reason for contacting the prosecutor was that they hoped that the lead prosecutor would use her power to protect them from Herrero in return for testimony against him. 3 RR 164; 4 RR 123.

Testimony that Herrero wielded deadly powers within FCI Beaumont was essential. Without it, Moreno could explain why he waited for over a year after the alleged November/December 1999 confession to turn State's witness.  The testimony about Herrero's

supposed mobster powers (the prosecutor compared Herrero to mafioso, John Gotti (3 RR 7)) and alleged homicidal inclinations also fed into jury arguments that Herrero, who did not have a record of homicidal conduct (unlike Moreno and Dominguez who were both known to have used and orchestrated deadly force), could single handedly carry out a gruesome slashing murder.  6 RR 45-46.

**Foreman's** January 11, 2016, statement confirms what BOP and the U.S. Probation Department documents already make clear; namely, that Moreno and Dominguez blatantly lied about Herrero's powers in the prison system and about the reasons why BOP placed the two of them in the SHU.  **Foreman** was from Houston and hung out in FCI Beaumont with Moreno, Dominguez and other prisoners from Houston.  Prison photos show **Foreman** with Dominguez and other FCI inmates from Houston that Moreno and Dominguez said formed the so called "All Houston Group."  Exhibit '42'.  However, as **Foreman** states, Herrero was not a leader of a called "All Houston Group."  Exhibit '40' at 2.  **Foreman** saw Herrero maybe once, if at all.  *Id.*  Hence, Herrero obviously could not have been an important or even casual acquaintance of the Houston inmates with whom Foreman, Dominguez and Moreno associated.  Nor did Herrero wield deadly power in the federal prison system.  *Id.*  Instead, testimony regarding deadly threats from Herrero was fabricated with the help of the prosecutor, as shown below.

> **C.**    **Foreman's sworn statement confirms that the prosecutor helped manufacture evidence of threats against her witnesses; relief should be granted on Claims One, Two, Three, Four, Five and Nine.**

Moreno testified that in July 2000, BOP placed him in the Special Housing Unit ("SHU", also called "the hole") at FCI Beaumont because of a fight with another inmate.  3 RR 159.  Moreno claimed that while he was in the SHU, he found out that Herrero had gotten hold of his papers, meaning his P.S.I.  *Id.*  Moreno said that after being placed in the SHU, he "tried to contact [the prosecutor] sometime in August, September, October, somewhere around there" of 2000, *id.,*

because Herrero had "put a hit" on him, i.e., ordered other inmates to kill Moreno for cooperating

with law enforcement. *Id.* (citing 3 RR 167-68).   According to Moreno, BOP kept him in the SHU

for nearly a year, until May 16, 2001, when BOP transferred him to Liberty County.  *Id*. (citing 3

RR 160).   Moreno testified he did not request the transfer, but he said he "feared for my life"

because of Herrero's deadly influence in prison.  *Id.*  Moreno claimed that while he was in Liberty

County, around June or July, he also "became worried for the safety of his family," all because of

Herrero. *Id.* (citing 3 RR 162).

The prosecutor obviously had rehearsed Moreno's false testimony.  Opening argument

anticipates exactly what Moreno later said on the stand about threats from Herrero.  The prosecutor

argued at the beginning of trial that,

> Jesse Moreno showed his paper to this defendant [Herrero]. At first
> they were all in All Houston. Everything was going along fine until
> this defendant discovered that Jesse Moreno had before, in fact,
> testified for the authorities on two different occasions.  And when
> that happened, Jesse Moreno is going to tell you what happened is
> that he was put in what's called the hole in the Beaumont prison
> where they protect you even in prison from the other inmates.
>
> But things got so bad that they had to take him out of the prison
> completely and put him in the Liberty County Jail to protect Jesse
> Moreno. And he's going to tell you in the Liberty County Jail, it
> wasn't until his family was threatened here in Houston that he
> decided to make contact with us about what he knew about this case.
> Jesse Moreno is going to tell you that he faced a decision of life [or
> death] on the inside of prison or taking his chances on the street
> when he got out; and that's when he made his call, he will tell you,
> to me.

*Id.* (quoting 3 RR 8 (Opening Argument Guilt-Innocence)).

BOP documents prove Moreno's testimony and the prosecutors opening remarks were

monstrous lies.  **BOP placed Morenon in the SHU for smuggling drugs into FCI Beaumont**

**for the Texas Syndicate**. Exs. '2', '3' and '4'.  **BOP transferred Moreno to the Liberty County**

**Jail because other inmates, not Herrero, suspected he was now cooperating with BOP's investigation into drug smuggling**. *Id.,* Ex. '4'.   Moreno also complained that other Texas Syndicate members in FCI Beaumont, but not Herrero, who was not a member of "TS", had found transcripts of testimony in another case in which he he turned State's evidence and were threatening him.  *Id.*, Ex. '2', '3'.

**Foreman's** January 11, 2016, sworn statement confirms that Moreno committed prejury and that the prosecutor capitalized on it.  Moreno was not concerned in the least about supposed threats from Herrero.  Moreno's sole motive for testifying against Herrero was to reduce his lengthy sentence.   As Foreman states,

> The reason I found bout the Guajardo murder was because Jesse Moreno was in the hole at the same time. Jesse did not tell me Herrero threatened him or was the head of some group that was threatening him. As I remember, Jesse was in the hole for the same reason I was, which was contraband.
>
> Jesse and I were from the same neighborhood, and he was tight with Herrero's prosecutor, Kelly Siegler. I believe Jesse told me that he had even been over to Siegler's house. Jesse knew about the Guajardo murder, and told me how the man got killed, but Jesse did not tell me that Herero confessed to him. I only had three years to do. Jesse faced a lot of time, unless he found a way to shorten his sentence.

Exhibit '40' at 2.

Besides rehearsing false testimony, the prosecutor created facts on the ground, elicited false testimony based on the evidence she manufactured, and argued the falsehoods in closing.  On or about February 12, 2002, three months before trial, the prosecutor told BOP that Herrero had threatened the lives of all the FCI Beaumont prisoners she planned on using against Herrero, and she asked BOP to protect these witnesses by separating them from Herrero. Ex. '30'.  The

witnesses who the prosecutor said needed protection were Moreno,[13] even though he was already isolated from general population, Dominguez, Eddie Gomez and **Nathan Foreman.** *Id.*

A February 14, 2002, BOP documents that **Foreman** did **not** request that BOP separate him from Herrero. Ex. '30'.  It was the prosecutor, instead, who reported to BOP that **Foreman** "admitted that [he was] afraid that a death threat would be made against [his] life." *Id.*  The prosecutor also told BOP "that due to Inmate Herrero's past history and behavior, this defendant does not make idle threats." *Id.*  The prosecutor told BOP similar stories in order to convince BOP to separate Moreno, Domingue and Gomez from Herrero.  *Id.,* Ex. '30A'.  She then argued misleading facts she had augmented.  Thus, in opening argument, the prosector testified that  that Moreno was placed in

> 21 what's called the hole in the Beaumont prison where
> 22 they protect you even in prison from the other
> 23 inmates.
> 26  But things got so bad that they had to take
> 25 him out of the prison completely and put him in the
> 1 Liberty County Jail to protect Jesse Moreno.

3 RR 8-9.

During the State's case in chief, the prosecutor elicited testimony from Moreno and Dominguez that they had been placed in protective custody and promised protection from Herrero,

> **Q.** Where are you currently housed in the Harris
> 7 County Jail?
> 8 **A.** [Dominguez] 1301
> 9 **Q.** Where?
> 10 **A.** On the fifth floor under protective custody .
> 11 **Q.** Tell this jury your understanding of what
> 12 you receive in exchange for your testimony here today .
> 13 **A.** Well, I was promised protection against
> 14 Herrero's death threat against my life.

---

[13] Moreno was already separated because got in a fight over drug smuggling and because he began cooperating with BOPs drug smuggling investigation. Exs. '2', '3' and '4'.

4 RR 123.

In closing argument, the prosecutor expressly urged jurors to take into account fate awaiting her

witnesses the federal prisons system because of their testimony against Herrero:

> 12 and you
> 13 have to deal with the reality of what happens to Jesse
> 14 Moreno and what happens to Rafael Dominguez when they
> 15 go back to prison after having testified.

Review of BOP documents establishes that the prosecutor was the one and only source of

"information" regarding threats from Herrero.   Neither Moreno, Dominguez, Gomez, or **Foreman**

requested pretrial protection from Herrero.    Exs. '30', '30A'.   **Foreman's** January 11, 2016,

statement definitively proves the prosecutor created the threats, misled BOP, and then used BOP's

protective measures, which she alone had caused BOP take take, in order to incriminate Herrero

at trial:

> My BOP records show I got out of the SHU in August of 2001. I've
> seen a BOP Memorandum that says I was put back into the SHU in
> February of 2002. That time frame fits with what I remember. I don't
> think I got out of the SHU again until I was transferred out of FCI
> Beaumont.
>
> The Memorandum said that I was in danger from Herrero. But I did
> not ask to be put in the SHU, I did not report any threats against me
> from Herrero, and as far as I know, Herrero did not have any power
> in prison or out. I plain did not know the man or anything about him,
> except that he was been set up for the Guajardo murder.

Exhibit '40' at 2.

In violation of *Giglio,* 405 U.S. at 154, the State manufactured, sponsored and capitalized

on false testimony that was central to the case for conviction.  In violation of *Brady v. Maryland*,

373 U.S. 83 (1963), the State withheld favorable, material evidence that would have allowed

reasonably competent attorney to eviscerate the State's case by impeaching the two witnesses upon

whom Herrero's conviction depended entirely.   Relief therefore should be recommended and granted.

        **D.**      **<u>Foreman's</u> sworn statements demonstrates that the State sponsored false and misleading testimony that Herrero was the leader of a prison organization called  the "All Houston Group," when, in reality, evidence suppressed by the State proved that the members of this so called group comprised an informant's ring in contact with the prosecutor; relief on Claims One, Two, Three, Four, Five and Nine should therefore be recommended and granted.**

At trial, the prosecutor referred to a group photo in which Herrero is sitting on a stool in the center of a group of inmates who are seen kneeling at his side and standing in back of him. Exhibit '43'.  The inmate kneeling at Herrero's right hand (left corner of the photo) is Moreno, standing over his left shoulder is Dominguez.  Gomez, along with FCI inmates, Mark Martinez and Thomas Delgado, may also be in the photo, although a definitive identification has not yet been made.  The purpose of this trial exhibit was to create the impression that Herrero was a commanding figure. In closing, the prosecutor argued:

> 13 You know [Herrero's] a man to be
> 14 feared. Look at this picture; Don't think he's
> 15 significant at all that he's posed in the middle of
> 16 all of his Houston Group? Don't think this man wants
> 17 to be admired? Don't think he's a man to be feared?
> 18 I guess we can't really ask Albert Guajardo that, can
> 19 we? Don't cross Hermilio Herrero, Jr., a man who's
> 20 capable of -- have you thought about this – taking a
> 21 knife and slicing someone's head almost off and
> 22 calling it a smile? That's what kind of man this
> 23 defendant is. And if that's not enough, take a hammer
> 24 and grab a hammer when it's your friend laying there
> 25 in your arms bleeding to death, gurgling and gasping
> 1 for air as he dies, taking a hammer and beating him
> 2 repeatedly upside the head with that hammer. That's
> 3 what kind of man this defendant is.

6 RR 45-46.

The prosecutor knew this photograph was staged for trial, and was not a reflection of Herrero's alleged head-mobster position.   The prosecutor was simultaneously pursuing capital murder charges against another FCI Beaumont inmate Ronald Jeffrey Prible using a ring of FCI Beaumont informants, which included several witnesses she listed as witnesses against Herrero. In particular, **Foreman** and Dominguez were angling to incriminate Prible also.  In the Prible file, the prosecutor had a similarly staged photo, in which Prible is front in center and the prosecutor's "All Houston" informants, and would be informants, are arrayed in back and to Prible's sides. **Exhibit '3'**.  Dominguez is in the photo, so is **Foreman**, so is an inmate named, Carl Walker, Jr., and so is Michael Beckcom, standing directly in back of Prible.  *Id.*  Beckcom testified against Prible at his October 2002, trial. The prosecutor's Prible file also contained letters from other "All Houston" inmates in the Prible group photo – Felix and Oscar Gonazalez, Walker, and Martinez – in which they mention each other by name and offer to testify against Prible.  Exs. '20', 34'.  In sum, the prosecutor knew the "All Houston Group" was not a prison organization led by Herrero, but a ring of informants with whom she was in frequent contact, some of whom she had used before in other cases, some of whom she was scheming to use against Prible, and all of whom were looking to her for favors in return for incriminating her chosen targets.

**Foreman's** January 11, 2016, statements further solidifies the evidence of brazen prosecutorial misconduct.  FCI Beaumont phone records show that virtually every member of the "All Houston Group" seen in the staged group photographs had the prosecutor's telephone number. Ex. '35'.  Members of the group collectively placed numerous phone calls to the prosecutor just through ordinary prison phone channels.  *Id.,* Ex. '36'.  According to **Foreman**, the prosecutor also contacted members of her so called "All Houston Group" through backchannels, namely, the office phones of FCI Beaumont Unit Managers, which are not recorded.  **Exhibit '2'** at 3.

**Foreman** confirms that the prosecutor utilized FCI Beaumont Unit Managers to feed members of her so called All Houston Group information about the cold cases against FCI Beaumont inmates she was prosecuting. *Id*.

Foreman's January 11, 2016 statement supports Carl Walker, Jr.'s, August 24, 2010, taped statement.  Ex. '33'.Walker also described how FCI informants sought favors from the prosecutor for setting up both Herrero and Prible.  Walker also explained how the ring of Houston based informants operated, and he described how the prosecutor fed information to her informants through backchannels.  *Id.*   In addition, to the reasons presented in the enumerated claims above, this additional briefing supports those substantive claims and equitable defenses.[14]

## AEDPA ISSUES

Because the Texas Court of Criminal Appeals denied relief without a written order, federal courts must look to the last reasoned opinion, which, in this case would be the State's Proposed Findings of Fact and Conclusions of Law which the convicting court signed.   With respect to all claims Petitioner raises above, the convicting court's Findings of Fact violate 28 U.S.C. § 2254(d)(1) because they disposition of each claim is contrary to, or involve an unreasonable application of, federal law and determined by decisions of the Supreme Court of the United States. With respect to each claim the convicting court's Findings of Fact and Conclusions of Law violate 28 U.S.C. § 2254(d)(2) because the respective findings of fact on which the decision to deny each claim are unreasonable in light of the state court record.

---

[14] See also Exhibit '44' and '45', Second and Third Supplemental Briefing filed in state court.

## EQUITABLE TOLLING

Should this Court find that AEDPA statute of limitations has run because Herrero's 11.07 Application was, for some period, not properly filed for one year's time, this Court may nonetheless reach the merits of the foregoing claims.  Under *McQuiggin v. Perkins*, 569 U.S. 383 (2013), "gateway" innocence, as defined in *Schlup v. Delo*, 513 U.S. 298 (1995), is grounds for tolling AEDPA's statute of limitations.  For reasons stated in the foregoing Petition, Herrero meets the standards for gateway innocence.

Petitioner, Hermilo Herrero,himself, had no idea what the consequences of withdrawing his 11.07 Application might be for his opportunity to pursue a federal application.  He original attorney initially withdrew his Application before Congress passed the AEDPA, with its one year statute.   The same attorney withdrew the application in 2007, in order to obtain discovery.  Petitioner received a life sentence. Texas does not provide indigent defendants appointed counsel unless they are sentenced to death.  Tex. Code Crim P. § 11.071.  Petitioner's family eventually could not continue funding his pursuit of state habeas relief.   Present counsel's firm took Petitioner's case pro bono, because Petitioner is an innocent man, and because he was set up by the same set of lying informants that put their other client, Ronald Jeffrey Prible, on death row.  Petitioner's state Application was denied without an evidentiary hearing by a state court judge who had assumed the bench only two month before.  Justice surely requires that Petitioner receive fair review of his claims in a federal court.

## CONCLUSION

Petitioner respectfully requests: (i) leave to file a reply or traverse to the State's answer within a reasonable time set by the Court; (ii) that an evidentiary hearing be granted and  that he be allowed discovery under Habeas Rule 6 and sufficient time to prepare for an evidentiary; (iii)

the he be allowed time to brief, in an amended pleading or separate document, arguments against procedural default and the application of statute of limitations; (iv)that he be allowed to file exhibit evidence separately;  (iv) and that he be afforded all such relief in law or equity to which he may be entitled.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner requests that this Court:

(1)    Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

(2)    Permit additional briefing on procedural questions concerning procedural default, "gateway" innocence, statute of limitations, or issues arising under 28 U.S.C §§ 2241-2254 before issuing any opinion disposing of claims for relief on such grounds.

(3)    Grant him an evidentiary hearing, as requested in his motion for an evidentiary hearing, at which he may present evidence in support of the claims presented in this Fourth Amended Petition, and allow him a reasonable period of time, before any hearing this Court orders, in which to conduct reasonable discovery and brief the issues of fact and of law raised by this petition.

(4)    Grant him an evidentiary hearing at which he may present evidence in support of his arguments against procedural default and other procedural defenses Respondent has raised and may raise.

(5)    Issue a scheduling order governing discovery necessary to properly litigate the merits of Herrero's constitutional claims and contest Respondent's procedural defenses.

(6)    Grant such other relief as law and justice require.

Respectfully submitted,

HILDER & ASSOCIATES, P.C.


By: */s/ James G. Rytting*
James G. Rytting
State Bar No. 24002883
Philip H. Hilder
State Bar No. 19620050
819 Lovett Boulevard
Houston, Texas  77006
Telephone (713) 655-9111
Facsimile (713) 655-9112

ATTORNEYS FOR PETITIONER


## VERIFICATION

I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Hermilo Herrero.

*/s/James Rytting*
James G. Rytting


## CERTIFICATE OF SERVICE

On June 6 or 7, 2019, a copy of Petitioner's Writ of Habeas Corpus was served upon Respondent by ECF filing, via email, or U.S. Mail, return receipt requested, addressed to the Texas Attorney General, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

*/s/James Rytting*
James G. Rytting

132