United States District Court
Southern District of Texas
**ENTERED**
September 02, 2020
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| HERMILLO HERRERO, | § | |
| | § | |
| Petitioner, | § | |
| v. | § | CIVIL ACTION NO. 19-cv-2027 |
| | § | |
| BOBBY LUMPKIN,[1] | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER DENYING
## PETITION FOR A WRIT OF HABEAS CORPUS

Texas state inmate Hermillo Herrero has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 [Doc. # 1]. Herrero seeks relief from a Harris County conviction for murder that resulted in a sentence of life imprisonment in the Texas Department of Criminal Justice ("TDCJ"). The respondent has answered with a motion for summary judgment limited to the question of whether Herrero filed his federal petition in a timely manner [Doc. # 11]. Herrero has filed a reply to the motion [Doc. # 20]. After considering all the pleadings, the state court records, and the applicable law, the Court will grant the respondent's motion for summary judgment, deny the motions filed by Herrero, and dismiss this action for the reasons explained below.

---

[1] The previously named Respondent in this action was Lorie Davis. On August 11, 2020, Bobby Lumpkin succeeded Lorie Davis as Director of the Correctional Institutions Division. Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Bobby Lumpkin "is automatically substituted as a party.

## I.   <u>BACKGROUND</u>

Herrero is in custody pursuant to a judgment and sentence of the 179th District Court of Harris County, Texas, in cause number 90312.  *State of Texas v. Hermillo Herrero, Jr.,* CR at 66–67.[2]  After his sentencing in 2002, Herrero sought state appellate remedies and filed three state applications for habeas relief.  Due to the procedural posture of this case, federal court review of the merits of any constitutional claims is not available.  The issue now before the Court is whether Herrero filed his federal petition in a timely manner.  Because Herrero argues that his innocence should forgive strict compliance with the federal filing deadline, the Court will extensively review the factual basis for his conviction before considering whether he has met the high standards required to show his innocence.

### A.   **The Crime**

In January 1995, nineteen-year-old Carmelia Lugo noticed a roll of carpet in a ditch near her mother's home in Houston, Texas.  3 RR 22-23, 39.  The wooded residential area was a place people often dumped trash and abandoned cars.  3 RR 39.  Plastic was tightly wrapped around the heavy carpet and it was tied with rope.  3 RR 33.  Over the next couple of days, a smell started coming from the carpet and Lugo noticed flies swarming around it.  3 RR 23.  When Lugo asked a friend to help her unroll it, "[a] foot fell out [of] the carpet."  3 RR 24.  Inside the carpet the police found the body of a man later identified as Albert Guajardo (the "victim").

---

[2]       Respondent has filed the state court record on the Court's electronic filing system, CM/ECF.  The Court will refer to the transcript that contains pretrial motions, trial court orders, jury instructions, and other pleadings as "CR ___" and the Reporter's Record including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the penalty phase, cited as "___ RR ___."  The Court will cite to the state post-conviction actions by their entry in the CM/ECF docket.

Police observed unusual characteristics about victim Guajardo's body.  The victim was wearing socks, but not any shoes.  3 RR 52.  Blood did not extend past the victim's waistline, which suggested to the police that his throat had been cut while in a sitting position.  3 RR 53. Only a little blood stained the inside and outside of the carpet.  The police were unable to find any forensic evidence that would help identify the victim's killer.

Police investigation pieced together some information about the victim's movements around the time he was killed.  The victim's wife last saw him when he left their house on January 4, 1995, with a man named Freddie Hernandez.  3 RR 99.  The victim's wife told the police that the victim had spent time with Hernandez and his friend Herrero the day before that.  3 RR 112, 115.[3]

Because Herrero had previously been arrested with Hernandez, on January 24, 1995, the police brought in both men for questioning.  3 RR 68.  Their interviews of the two men, however, were unproductive.  The police searched Herrero's house but did not find anything connecting him to the murder.  3 RR 69, 97.  Even though the police still considered both Hernandez and Herrero to be suspects in the murder, 3 RR 74, the absence of viable leads lead to the victim's murder becoming a cold case in late 1995.  3 RR 73.

In 1995, Herrero was arrested after attempting to sell five kilograms of cocaine to an undercover police officer.  In March 1996, Herrero was sentenced to 168 months for federal charges of possession with intent to distribute cocaine.  *United States v. Herrero*, 4:95-cv-231-5 (S.D. Tex. 1996).  Herrero was subsequently incarcerated in FCI Beaumont.

---

[3]     The police also received anonymous tips that a man named "Freddie" had killed the victim.  3 RR 93-95, 103.

The investigation into the victim's murder became active again when the case was assigned to Assistant District Attorney Kelly Siegler.  In a factor common to other cold cases prosecuted by Sielger, she based the prosecution on testimony from inmates who said that they heard the defendant confess.[4]  In January 2001, Herrero was charged with the murder of Guajardo.  CR 2.  In April 2002, Herrero stood trial in the 179th Judicial District Court for Harris County, Texas, under cause number 90312 with the Honorable Judge J. Michael Wilkinson presiding.

The prosecution relied on testimony from two inmates, Jesse Moreno and Rafael Dominguez, to prove that Herrero committed the murder for which he was charged.  Trial counsel[5] understood his primary duty was to attack the credibility of those inmates.  Trial counsel later described his approach to the defense: "My trial strategy was to raise reasonable doubt by questioning the motivations of Moreno and Dominguez as well as to note inconsistencies between their respective testimonies and the evidence."  [Doc. # 12-21 at 991].  In opening arguments, the defense focused jurors' attention on the credibility of the State's star witness: "We expect the evidence to show that the State's case stands or falls on the testimony of Jesse Moreno."  3 RR 18.  Trial counsel summarized this strategy in closing arguments: the State based its case "upon the testimony of lying, stealing, beating, assaulting, aggravating dope dealers."  6 RR 20.

---

[4]    Other cases have examined, and criticized, Siegler's use of inmate testimony in cold cases.  Most recently, a district court granted federal habeas relief in a case prosecuted by Siegler.  In that case, Siegler not only concealed information about her reliance on informants, she instructed inmates to secure information from Prible, making them agents of the State.  *Prible v. Davis*, H-09-CV-1896, 2020 WL 2563544, at ** 20-40 (S.D. Tex. 2020).  At the outset, the Court observes a crucial difference between this case and Prible's which merited habeas relief.  This case is at a procedural stage which only involves the question of whether Herrero can overcome the untimeliness of his filing by showing actual innocence.  Unlike *Prible* which criticized Siegler's prosecutorial methods after a full evidentiary hearing, stringent rules of procedure limit the depth and focus of this Court's review.

[5]    Attorney Dan Cogdell represented Herrero at trial.  The Court will refer to Cogdell as "trial counsel."

4

### B.      Trial Testimony: The Inmate Testimony

The prosecution's case for guilt relied heavily on testimony from inmates who claimed that Herrero had confessed to the murder.   In opening arguments Siegler admitted to jurors that the inmate testimony "is pretty much the crux of this case." 3 RR 7.  After calling witnesses who provided general testimony about the circumstances of the murder, the State called inmate Moreno to link Herrero to the crime.

Moreno had cooperated with federal or state authorities three times in the past.  3 RR 185-87.  In one of the cases, Moreno had received a five-year reduction in his sentence for his testimony.  3 RR 187.  In late 2000, Moreno contacted the prosecutor, Siegler.  3 RR 163.  Moreno knew Siegler because she had called him to testify as an informant in a different murder prosecution.  3 RR 165-66.  Siegler wrote a letter to the judge on Moreno's behalf because of his testimony in that case, but he did not receive a sentence reduction for his testimony.  3 RR 167.

Moreno had known both the victim and Herrero before his imprisonment.  Moreno met the victim through Freddie Hernandez (the man with whom the victim's wife saw him leave).  3 RR 142.  Moreno knew Herrero from middle school.  3 RR 145.

Moreno became reacquainted with Herrero when he was transferred to FCI Beaumont in 1999.  3 RR 147.  Moreno testified that Herrero was the leader of a loose group of inmates from Houston who called themselves the "All Houston Group."  3 RR 149-52.  Moreno and Herrero became "pretty close" and "hung out, went out and did things together."  3 RR 150-51.

Moreno testified that Herrero confessed to the murder in December 1999.  3 RR 172-73. Before that point, Moreno had heard a few things about the murder: "I heard [the victim] was dumped in a rug, and I heard something about him getting his throat cut, but I didn't know too

much about it." 4 RR 9.  Moreno, however, testified that Herrero admitted to the murder during a meeting Herrero had called because of rising tensions in the prison.  3 RR 173.  As the men were telling "war stories and stuff we had [done] in the past," 3 RR 174, Herrera confessed to having murdered the victim.  3 RR 175.  Moreno initially did not believe him.  33 RR 175.  Herrero then provided specific details about the killing.

Herrero told Moreno that he "and a buddy of his got off work one day" and went to a club "in a work van."  3 RR 176.[6]  When Herrero entered the club, he "[r]an into [the victim] at the bar" and they "started talking."  3 RR 177.  Herrero did not like the victim who "owed him some money for some drugs" for "about a year or so" and "said he wasn't going to pay him."  3 RR 176. Moreno testified that the victim owed "between 20 and 30,000.  I'm not sure."  3 RR 181.  As the two men "started talking and drinking" Herrero saw "the opportunity to get him for what he owed him.  So before the club closed, he invited him to go . . . to some girls' house."  3 R 176.  Herrero, his friend, and the victim all got in the van.  The victim "sat in the passenger seat."  3 RR 178.  As they drove on the freeway "[t]hey were just talking. . . . [The] driver didn't know what was going down."  3 RR 178.  When they exited the freeway, Herrero started reminding the victim that he owed money.  3 RR 178.  Before the victim could answer, Herrero "grabbed him from the back and *started* to choke him."  3 RR 178 (emphasis added).[7]  Herrero ordered the driver: "Pull over to that dumpster up ahead."  3 RR 179.  As "he's choking [the victim], [Herrero] let go with one

---

[6]     Moreno said that Herrero never disclosed the identity of the other man.  3 RR 177.

[7]     Forensic evidence would later dispute whether the victim's corpse bore signs of strangulation.  On federal habeas review, Herrero argues that forensic evidence proves that Moreno's testimony was false because the autopsy did not demonstrate that he was strangled.  The state habeas court emphasized that Moreno had testified that Herrero only *started* to choke the victim: "Moreno's testimony about [Herrero] starting to choke [the victim] before releasing his hand to slit [the victim's] throat does not rise to the level of [Herrero] asserting he completely choked [the victim] or choked [the victim] to death."  [Doc. # 12-21 at 935].

hand, pulled a knife out of his pocket, and slit his throat." 3 RR 179.  The driver "pulled up to the dumpster . . .  put the van in park" and then "took off running, and left the door open and everything." 3 RR 179.

Herrero described how he "dragg[ed] [the victim] to the back of the van." 3 RR 179-80. When Herrero "noticed [the victim] was still alive, . . . he laid him next to some rolls of carpet that were in the work van in the back, reached into a tool bag, got a hammer and started hitting him in the face and killed him." 3 RR 180.  Herrero then "rolled him into the carpet and drug him out next to the dumpster, and that was it." 3 RR 180.

Moreno was "kind of shocked," but Herrero's attitude was like "[t]hat bitch got what he deserved." 3 RR 180.  Moreno had never told Herrero that he and the victim "were pretty close. Not really close, but we did business." 3 RR 180.  Herrero explained that "he got picked up for [the murder], but [the police] didn't have no evidence to prove it was him." 3 RR 181.  Herrero said that, because the victim "bragged a lot," the police "would never know who it was anyway." 3 RR 181.  After the initial confession, Herrero occasionally "had remarks like, you know, you would be sitting around playing handball or something and he'd blurt out, Bitch got what he deserved.  And he liked to brag about it." 3 RR 184.

Moreno's testimony also described Herrero as a violent and dangerous man.  Moreno said that Herrero "used to brag that he was a hit man, collected money for people and stuff" and was "down" for "fighting, stabbing, whatever." 3 RR 183.  Despite their friendship, from the beginning Moreno was concerned about angering Herrero.  Moreno testified that was generally concerned for his safety if other inmates thought he had provided the government with cooperation in the past.  Moreno specifically worried that Herrero would have had him "hit or checked in"–meaning

7

stabbed or placed in administrative segregation–if he thought he had cooperated with authorities in the past.  3 RR 155-56.  Moreno made a fake PSI from his federal sentencing which showed that he had not cooperated with authorities.  3 RR 154-55.  In reality, Moreno had cooperated with both state and federal authorities.  3 RR 154.

In July 2000, however, Moreno got on Herrero's bad side after a fight with his cellmate.  3 RR 157-58.  After that Herrero acquired a true copy of Moreno's PSI.  3 RR 159. Moreno testified that by May 2001, prison officials determined it was no longer safe for Moreno at FCI Beaumont and transferred him to the Liberty County jail.  3 RR 160-61.

The defense extensively cross-examined Moreno.  The defense's cross examination emphasized that Moreno's direct testimony had minimized his cooperation with authorities.  In reality, since his arrest Moreno had provided a significant amount of assistance to state and federal law enforcement.  Trial counsel hammered on discrepancies in various portions of Moreno's testimony.  Trial counsel's cross examination forced Moreno to admit that he had lied about receiving a benefit from Siegler for earlier testimony.  4 RR 48-51, 55-57.  The defense solicited from Moreno that his testimony in that case was similar to Herrero's: an inmate had bragged to Moreno about committing a murder.  4 RR 52-53.

Trial counsel elicited that Moreno and the victim were more than just acquaintances.  A month before the murder Moreno "lent [the victim his] $100,000 Mercedes and fronted him 200 or $300,000 worth of cocaine."  4 RR 85.  Trial counsel elicited from Moreno that he had previously told Siegler a different version of the alleged confession.  4 RR 81-82

The prosecution bolstered Moreno's testimony through that of another inmate, Rafael Dominguez.  Dominguez expected to receive a letter from Siegler saying that he had cooperated

in hopes of receiving a reduction in his federal sentence.  5 RR 9-10.  Dominguez knew Moreno,

Freddie Hernandez, and the victim from the neighborhood before his incarceration.  4 RR 112-13.

Dominguez knew of Herrero and would see him at clubs, but they were not friends.  4 RR 114.  In

August 1999, Dominguez was sent to FCI Beaumont for 260 months for conspiracy to distribute

cocaine and marijuana.  4 RR 115-116.[8]  As a member of the All Houston group, Dominguez saw

Herrero every day while in Beaumont.  4 RR 119-20.  In March 2000, Dominguez was in the rec

yard with Herrero, Moreno and another inmate, Foreman.  5 RR 11.  Dominguez testified that

Herrero confessed:

> We were talking about our war stories and stuff, our past crimes we've done.  And
> Foreman, he had just finished telling a story how he had been kidnapped and
> tortured.  And when he finished, Herrero made the comment of saying, You guys
> haven't put in no real work.  And Foreman is like, What do you mean by real work?
> And he goes, Do you know [the victim] from the neighborhood?  And Foreman's
> like, No, I don't know him.  He's like, Well, I killed him.  And Foreman is like,
> Oh, for real?  And he's like, [Dominguez] and [Moreno] know.
> 
>         \*   \*   \*   \*
> 
> And then Foreman asked him, Well, what happened?  And [Herrero] said that [the
> victim] had jacked him out of some weed, and he didn't want to pay so . . . one
> night they caught [the victim and Hernandez] slipping at a club. . . and they started
> talking with him and stuff, and they convinced [the victim] to leave with them.
> They told him, Let's go somewhere and keep on partying. . . .  And as they were
> driving, [Herrero] and [the victim] got into an argument about the money for the
> weed. . . .  So they started arguing; so [Herrero] grabbed him from behind, pulled
> out a knife, and slit his throat.  And he told his driver to pull over, and the driver
> pulled over and he freaked out and he took off running.

---

[8]     As with Moreno, Herrero asked to see Dominguez's PSI.  4 RR 118.  Dominguez created a fake PSI to avoid
having a hit placed on him or being put in administrative segregation.

5 RR 11-12.  Herrero said that when he "went to pull [the victim] to the back of the van, [the victim] was still alive; so he reached for a hammer and he beat him to death."  5 RR 14.  Herrero then "rolled [the victim] in a carpet and threw him out next to a dumpster."  5 RR 14.[9]

During another conversation between Dominguez, Herrero, and another inmate, Herrero said: "You should have seen when I slit his throat.  I left him a smile from ear to ear."  5 RR 19. Herrero continued: "When you fuck with my money, I'm the devil."  5 RR 19.

After his indictment, Herrero was "complaining about Moreno.  He had snitched on him about this murder."  5 RR 20.  Herrero "was kind of pissed off" and said that "the cops had picked him up and questioned him about this murder already and stuff, because he was the last one seen with him; but he wasn't worried about it, because they couldn't break him."  5 RR 21.

### C.    Trial Testimony: Forensic Evidence

The prosecution called Dr. Dwayne Arthur Wolf, Deputy Chief Medical Examiner for Harris County Medical Examiner's Office to describe the condition of the victim's body.  Dr. Wolf, however, had not performed the autopsy.  Dr. Tommy Brown who had performed the autopsy was no longer employed by Harris County at the time of trial.  5 RR 64.  The defense did not raise any objection to Dr. Wolf describing the results of the autopsy.

Dr. Wolf described how the victim "had multiple lacerations on the scalp from the right forehead around the side, right side of the head across the back of the head and the back left side of the scalp."  5 RR 65.  The cause of death was "[c]utting wounds of the neck" with a "sharp weapon."  5 RR 86.  The jagged edge of the wound suggested that the perpetrator had sawed at the

---

[9]     Another time, after Dominguez told Herrero about a conversation he had with Freddy Hernandez while in Harris County Jail, Herrero said, "I hope that fat bitch don't rat on me."  5 RR 17.

victim's neck with a knife.  5 RR 69.  The cut would have produced "a fairly rapid death" because the "cutting wound of the neck goes completely through the windpipe or the larynx . . . so breathing would have been ineffective at best."  5 RR 71.  Also, because "the major blood vessels on the right side of the neck, carotid artery, the jugular vein, were completely transected . . . there would have been so much bleeding with that that situation would be part of the bleeding to death, in addition to the inability to breathe and depriving the brain of blood flow."  5 RR 71.  After being cut the victim would have only lived "a matter of seconds, less than a minute, possibly, or essentially gasping and/or gurgling."  5 RR 72, 78.  The victim had numerous bruises on his torso that were consistent with being hit with a round, flat object like the head of a hammer.  5 RR 70.  The autopsy revealed alcohol in the victim's body, "but it doesn't seem like it's very much.  But [Dr. Wolf's] interpretation is that he had alcohol in his system at the time of death."  5 RR 79.

Cross-examination highlighted discrepancies between the condition of the victim's body and the events described by Moreno and Dominguez.  The medical examiner testified that the victim would not have been able to move about much after suffering the wound to his neck.  5 RR 88.  The medical examiner could not tell whether the blows to the head happened before or after the victim's throat was cut.  5 RR 88.  The medical examiner explicitly testified that there was "no evidence for strangulation."  5 RR 89.

### D.  Trial Testimony: The Defense's Case and Argument

The defense called one witness, R.H. Sandy Bielstein, a judge of County Court at Law No. 4 in Fort Bend County.  5 RR 93.  While in private practice, Bielstein represented Dominguez's co-defendant in a federal prosecution. 5 RR 94.  He testified from that interaction that Dominguez

had a bad reputation for truthfulness.  5 RR 97.  He testified: "I do not believe Mr. Dominguez is worthy of belief under oath or not under oath."  5 RR 57.

The defense's closing summarized its argument: the jury should decide "if the [prosecution's] story is consistent with the facts."  6 RR 4.  This was a case where there "were no eyewitnesses, there was no confession, there w[ere] no weapons."  6 RR 5.  The defense tried to turn jurors' attention to Freddy Hernandez as the possible killer, particularly because the police had received anonymous phone calls fingering him.  6 RR 11.  But the defense's closing focused in on Moreno who "was a master manipulator, a convicted dope dealer, a person who wanted his sentence reduced, a person who testified or cooperated numerous times, and a person who is inherently [un]reliable."  6 RR 6.  Trial counsel hammered on Moreno's lies, including the claim that he had not received a benefit for earlier testimony.  6 RR 17.  Trial counsel identified many areas in which Moreno's testimony was "inconsistent with the specific details of the killing": the victim did not drive his truck to a nightclub that night; Moreno did not mention the plastic and rope that bound the rug; the body was not left near a dumpster; the victim's wife had never heard of Moreno, even though he allegedly lent the victim an expensive car and fronted him $300,000 in cocaine; nothing hinted that Herrero had access to a work van; and the medical examiner's testimony was not consistent with Moreno's account on several other grounds.  6 RR 9-24.

The prosecution bolstered its witnesses' testimony by acknowledging that, while Moreno and Dominguez were "bad, despicable people," they had placed themselves in considerable risk by testifying.  6 RR 26, 35-36.  Much of the prosecutor's argument was an emotional appeal to the jurors not to let a cold case end without justice being done.  The prosecutor acknowledged that some discrepancies existed between the inmates' accounts, 6 RR 35, 39, but noted areas in which

their testimony was consistent with the facts: the medical examiner testified in a manner that would support the claim that the victim was sitting when his throat was cut, tugging the victim to the back of the van could have removed his shoes, and Herrero had been questioned by police. The prosecutor urged jurors to focus only on the parts of the inmates' testimony that had a "ring of truth." 6 RR 37.

The jury found Herrero guilty.

**E.      Sentencing and State Court Challenges**

The penalty phased focused on Herrero's numerous other crimes. Specifically, Herrero stipulated to convictions for aggravated assault, criminal mischief, possession of a controlled substance, unlawfully carrying a weapon, and conspiracy to possess with intent to distribute cocaine. 7 RR 5-9. On April 30, 2002, the trial court assessed a $10,000 fine and sentenced Herrero to life in prison. CR 66-67. In the following years, Herrero availed himself of state appellate and habeas remedies.

*1.      Appeal*

Herrero's appeal to the Court of Appeals for the Fourteenth District of Texas challenged the legal and factual sufficiency of the evidence supporting his conviction. Herrero's appeal centered on weaknesses in the prosecution: "(1) the State presented no physical evidence linking [Herrero] to the crime; (2) the testimony by Moreno and Dominguez regarding [Herrero's] confession is factually inconsistent with other testimony; (3) [Herrero] and his wife cooperated with authorities; and (4) evidence exists to suggest someone else committed the crime." *Herrero v. State*, 124 S.W.3d 827, 832 (Tex. App.-Houston [14th Dist.] 2003, no pet.). After a detailed review of Herrero's arguments and the trial evidence, the Court of Appeals affirmed his conviction

13

and found: "The evidence suffices to prove the corpus delicti of murder.  Likewise, the evidence is legally and factually sufficient to sustain [Herrero's] murder conviction."  *Id*. at 837.  Herrero did not seek discretionary review in the Texas Court of Criminal Appeals.

      2.    *Habeas Actions*

Herrero twice initiated, and twice terminated, state habeas actions.  Herrero filed a state habeas application on January 3, 2005.  After the State answered and the trial court designated issues for resolution, Herrero filed a motion to withdraw the habeas application.  Herrero filed a second application in 2007, but again moved to withdraw that action.  On December 31, 2007, the trial court granted the motion to dismiss the pending application.

On October 1, 2015, Herrero filed a third state habeas application through his current counsel raising many of the same arguments as in the current lawsuit.  The state trial court allowed significant briefing and factual development, including the submission of affidavits from trial counsel and the prosecutor.  On March 6, 2017, the state habeas court entered extensive findings of facts and conclusions of law without holding an evidentiary hearing.  [Doc. # 12-21 at 925-81].  The state habeas court considered, and rejected with detailed findings, each argument raised in Herrero's state application.  Additionally, the state habeas court found that Herrero had not shown that he was actually innocent of the victim's murder.  On June 6, 2018, the Texas Court of Criminal Appeals denied the third application without a written order.

## II.    <u>THE FEDERAL PETITION</u>

On June 5, 2019, Herrero filed a federal petition for a writ of habeas corpus through counsel [Doc. # 1].  The habeas petition raises nine grounds for relief:

    1.    The State presented perjured testimony through its inmate witnesses.

2.     The State presented, or failed to correct, false testimony about several important issues, including about the inmates' testimony and autopsy results.

3.     The State's opening and closing arguments included false and misleading testimony.

4.     The State suppressed information that would have discredited the inmate informants' testimony.

5.     The State suppressed information showing that the prosecutor utilized a ring of informants to manufacture false testimony.

6.     The prosecutor engaged in misconduct during jury arguments.

7.     Trial counsel provided deficient representation.

8.     Appellate counsel provided deficient representation.

9.     Herrero is actually innocent.

[Doc. # 1].  While approaching the issues from different constitutional angles, the core of Herrero's arguments is that the prosecutor, Kelley Siegler, manufactured evidence and adduced perjured testimony to prosecute an innocent man.  In doing so, Herrero's petition attacks the two major categories of evidence against him.  First, Herrero picks apart the testimony of the two inmate witnesses, pointing out differences between their accounts and hammering on inconsistencies with known evidence.  Herrero contends that Siegler manufactured the inmates' testimony through her use of a ring of informants to "pin cold cases on defendants confined in FCI Beaumont." [Doc. # 1 at 4].  Second, Herrero argues that the medical examiner's testimony was riddled with errors, did not corroborate the inmate informants' story, and was irreconcilable with trial evidence.  By marshaling a great amount of evidence to prove these two, and other subsidiary, arguments, the thrust of Herrero's petition is that he is an innocent man unfairly prosecuted by the State.

15

Respondent moves for summary judgment [Doc. # 11].  Reserving arguments about other procedural or substantive defects in Herrero's claims, Respondent limits the summary judgment motion to the timeliness of Herrero's petition.  To summarize, Respondent argues that "Herrero's petition is barred by limitations pursuant to 28 U.S.C. §2244(d)." [Doc. # 11 at 5].  Herrero has filed a response, [Doc. # 17], which he has amended, [Doc. # 20].

## III.   <u>ANALYSIS</u>

The merits of Herrero's claims are not before the Court at time.  The question before the Court is whether Herrero can show equitable factors that will forgive the untimely filing of his federal petition.

### A.   **AEDPA Limitations Period**

According to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), all federal habeas corpus petitions filed after April 24, 1996, are subject to a one-year limitations period found in 28 U.S.C. § 2244(d), which provides as follows:

> (d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

      (D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Because the pending petition was filed well after April 24, 1996, the one-year limitations period clearly applies. *See Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).

In this case, the statute of limitations for federal habeas corpus review began to run pursuant to 28 U.S.C. § 2244(d)(1)(A), at "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." The intermediate court of appeals issued its decision on Dec. 9, 2003. Herrero did not file a Petition for Discretionary Review ("PDR") with the Texas Court of Criminal Appeals. Thus, under Rule 68.2(a) of the Texas Rules of Appellate Procedure, his conviction became final for purposes of federal habeas corpus review thirty days after the appellate court's judgment was entered. *See* Tex. R. App. P. 68.2(a); *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 (2012). AEDPA allowed Herrero one year from January 8, 2004, to file a timely federal petition for a writ of habeas corpus.

Under 28 U.S.C. § 2244(d)(2), the time during which a "properly filed" application for state habeas corpus or other collateral review is pending shall not be counted toward the limitations period. Herrero filed his first state habeas application on January 3, 2005. That application tolled the limitations period until the trial court dismissed the first habeas action in 2005. The remaining time on Herrero's limitations period expired five days later.

Herrero subsequently filed two additional state habeas applications. Because those state habeas proceedings occurred after the limitations period had already expired, they have no effect for purposes of tolling under § 2244(d)(2). *See Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000)

(noting that the statute of limitations is not tolled by a state habeas corpus application filed after the expiration of the limitations period).

Herrero does not dispute that the fact that he filed his petition outside AEDPA's limitations period. Herrero argues that this Court should forgive strict application of AEDPA standards because of equitable considerations. The Supreme Court has held that AEDPA's one-year limitations period "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). The exception, however, is available "only 'in rare and exceptional circumstances.'" *United States v. Riggs*, 314 F.3d 796, 800 n. 9 (5th Cir. 2002) (citing *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998)). The party seeking equitable tolling bears the burden of demonstrating that equitable tolling is appropriate. *United States v. Petty*, 530 F.3d 361, 365 (5th Cir. 2008). Herrero raises arguments for equitable tolling in his federal petition and his response to the summary judgment motion. The Court will discuss those arguments separately.

### B.  Actual Innocence Arguments in the Petition

In his petition, Herrero anticipated that the State would rely on the AEDPA limitations period to seek dismissal of his lawsuit [Doc. # 1 at 130]. Herrero's petition briefly raises two grounds for equitably tolling. First, Herrero explains that he did not understand that withdrawing his initial two state habeas applications could impact the federal limitations period. Second, Herrero suggests that the limitations period should be tolled because he did not receive a full and fair review of his third habeas application.

Neither of the two arguments in the petition provides an actionable basis for equitable tolling. Herrero's argument that he did not understand the consequences of his decisions in state habeas court is, in essence, an argument that he did not know the law. An inmate's ignorance of

18

the law does not excuse his failure to file a timely petition.  *See Felder v. Johnson*, 204 F.3d 168, 171-72 (5th Cir. 2000); *see also Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) (noting that a petitioner's ignorance or mistake is insufficient to warrant equitable tolling); *Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 478 (5th Cir. 1991) (finding that "lack of knowledge of [the] filing deadlines," "lack of representation," "unfamiliarity with the legal process," illiteracy, and "ignorance of legal rights" generally do not justify tolling).  To the extent that Herrero complains about the process afforded him in state court, he only points to events that transpired during his third habeas action.  Equitable tolling is unwarranted for events that happened long after the limitations period has run its course.  *See Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000); *see also Villegas v. Johnson*, 184 F.3d 467, 472-73 (5th Cir. 1999) (finding that a state petition filed after the expiration of the limitations period cannot "revive an expired limitation period").  The arguments in Herrero's habeas petition do not provide grounds for equitable tolling.

### C.    Actual Innocence as Grounds for Equitable Tolling

Herrero argues in his response to the summary judgment motion that his actual innocence should forgive the limitations bar.  In *McQuiggin v. Perkins*, 569 U.S. 383, 386-87(2013), the Supreme Court held that actual innocence, if proven, serves as a gateway through which a prisoner may raise § 2254 claims despite expiration of the limitations period.  The actual innocence gateway avoids a "fundamental miscarriage[s] of justice" and "is grounded on the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."  *Id*. at 392 (internal quotation marks and citation omitted).  In doing so, the *Perkins* Court

adopted "the 'actual innocence' gateway to federal habeas review applied in *Schlup v. Delo*, 513 U.S. 298 (1995)." *Id.* at 386.

Before turning to Herrero's arguments for equitable tolling, the Court makes several observations about federal consideration of actual-innocence arguments. First, actual innocence in this context means "factual innocence." *Bousely v. United States*, 523 U.S. 614, 623 (1998). "A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person for the crime." *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992). An inmate cannot show factual innocence by merely alleging an insufficiency of the evidence, *Bousley*, 523 U.S. at 623-24, or by relying on "inconsistencies derive[d] from old evidence that was presented at trial." *Cantu v. Thaler*, 632 F.3d 157, 166 (5th Cir. 2011), *cert. granted judgment vacated*, 566 U.S. 901 (2012). A petitioner claiming actual innocence must show that he did not commit the crime.

Second, even in the context of actual-innocence arguments, by the time a habeas litigant reaches federal court the presumption of innocence has long run its course. *See Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) ("[T]here is no presumption of innocence at a habeas proceeding."). A convicted defendant invoking federal habeas jurisdiction "comes before the habeas court with a strong–and in the vast majority of the cases conclusive–presumption of guilt." *Schlup*, 513 U.S. at 326; *see also Herrera*, 506 U.S. at 399-400; *see also Moore*, 534 F.3d at 464. Thus, the Supreme Court has commented that "tenable actual-innocence gateway pleas are rare." *Perkins*, 569 U.S. at 386; *see also Wilkerson v. Cain*, 233 F.3d 886, 889 (5th Cir. 2000) (stating that "a substantial showing of actual innocence is extremely rare").

Third, the law places strict requirements on the evidence which enables an inmate to pass through the actual-innocence gateway.  The *Perkins* Court "stressed the need to prove a gateway claim of actual innocence through *new and reliable evidence*."  *Merryman v. Davis*, 781 F. App'x 325, 330 (5th Cir. 2019) (emphasis added).  The Supreme Court has not provided guidance on what the modifiers "new" and "reliable" mean in this context.  *See Hancock v. Davis*, 906 F.3d 387, 389 (5th Cir. 2018) ("The Supreme Court has not explicitly defined what constitutes 'new reliable evidence' under the *Schlup* actual-innocence standard, and there is a circuit split.").  The circuit courts disagree as to whether "new" evidence must be "newly discovered, previously unavailable evidence, or, instead, evidence that was available but not presented at trial."  *Hancock*, 906 F.3d at 389 & n.1; *see also Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006) ("The courts of appeals disagree as to whether *Schlup* requires 'newly discovered' evidence or merely 'newly presented' evidence.").  While the Fifth Circuit has "not decided what affirmatively constitutes 'new' evidence," various cases "have explained what does not."  *Hancock*, 906 F.3d at 390.  The Fifth Circuit has observed that "[e]vidence does not qualify as 'new' . . . if 'it was always within the reach of [an inmate's] personal knowledge or reasonable investigation.'"  *Id.* (quoting *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)); *see also Shank v. Vannoy*, 2017 WL 6029846, at *2 (5th Cir. 2017) ("Evidence that was available to be presented to the jury at the time of trial is not now 'new' evidence, even if it was not actually presented to the jury."); *Lucas v. Johnson*, 123 F.3d 1069, 1074 (5th Cir. 1998) (stating that evidence that "in its essence and character, was presented, or available to present, to the trial jury" is not "new" evidence).  The "new evidence" must also be "reliable."  *Schlup*, 513 U.S. at 324.

Fourth, federal jurisprudence not only defines the type of evidence on which an inmate may base his actual-innocence claim, but also specifies the relationship between the new, reliable evidence that the evidence presented at trial.  To qualify under the miscarriage of justice exception, evidence must be "'material, not merely cumulative or impeaching.'"  *Vega v. Johnson*, 149 F.3d 354, 364 (5th Cir. 1998) (quoting *Lucas v. Johnson*, 132 F.3d 1069, 1076 n. 3 (5th Cir. 1998)); *see also Sawyer v. Whitley*, 505 U.S. 333, 349, (1992) ("[L]atter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of the [witness's] account."); *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) ("Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence.").  An inmate "must identify evidence that affirmatively demonstrates his innocence."  *Phillips v. Ferguson*, 182 F.3d 769, 774 (10th Cir. 1999).

Fifth, actual-innocence arguments do not exist independent from other tenets of habeas jurisprudence.  For instance, one consequence of the federal exhaustion requirement is that many actual-innocence arguments have already passed through state court.  When, as in this case, a state court has issued factual findings "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see Berry v. Montgomery*, 757 F. App'x 557. 560 (9th Cir. 2018) (applying AEDPA deference in adjudicating an actual-innocence argument); *Sharpe v. Bell*, 593 372, 378 (4th Cir. 2010) (same); *see also Burton v. Stephens*, 543 F. App'x 451, 458 (5th Cir. 2013) (applying AEDPA deference to a substantive actual-innocence claim).

This Court cannot "substitute [its] own judgment for the state court's credibility determinations [or] disregard the fact that the state courts soundly assessed [an inmate's] contentions." *Sharpe*, 593 F.3d at 375.

Sixth, a court's review of actual innocence encompasses a holistic view of all evidence amassed throughout the years. *See House v. Bell*, 547 U.S. 518, 538 (2006) ("*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.") (internal quotation marks omitted). Thus, "the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Id*. This review then requires a petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of new evidence.'" *Perkins*, 569 U.S. at 399 (quotation omitted). The Supreme Court has explained that "[t]he gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Perkins*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316); *see also Merryman*, 781 F. App'x at 328-29.

To summarize, an inmate showing actual innocence faces high hurdles, made even more difficult because of traditional habeas principles, in showing that "(1) the evidence is newly discovered and was unknown to the defendant at the time of the trial; (2) the defendant's failure to detect the evidence was not due to a lack of diligence; (3) the evidence is material, not merely

cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial." *United States v. Freeman*, 77 F.3d 812, 817 (5th Cir. 1996).

### D.   Herrero's Actual Innocence Arguments

Herrero's federal petition relies on a voluminous amount of evidence.  Herrero's evidence supports arguments which attack nearly every facet of the State's case against him.  While Herrero uses the evidence to support various constitutional claims, his Amended Response to Respondent's Motion for Summary Judgment focuses his arguments on a plea for equitable tolling based on actual innocence.  Unlike other actual-innocence arguments, Herrero does not rely on one new item of evidence, or even challenge one element of the case against him.  Instead, Herrero's actual-innocence arguments encompass various new defensive theories which, when considered in unison, attack almost every portion of the prosecution against him.  In doing so, Herrero provides almost no evidence that could independently prove that he did not kill the victim.  Instead, Herrero pieces together evidence like a puzzle, the whole of which is incomplete without each individual part.  The weight of Herrero's argument depends on the collective integrity of Herrero's evidence, and assembled in a manner consistent with his own view of the case.  In that respect, Herrero's arguments do not prove innocence, but seek to relitigate the case against him.  As the state habeas court observed, Herrero's "claim of actual innocence is actually an attack on the sufficiency of the evidence."  [Doc. # 12-21 at 959].

This Court's role is not to retry Herrero's capital-murder trial.  Herrero stands as one legally and lawfully convicted of an extremely serious crime.  Herrero has had opportunities to litigate his constitutional claims in state court.  The state courts have rejected his substantive claims with

24

detailed findings and analysis.  But at this specific stage, this Court's narrow role is only to decide whether Herrero's evidence is of the kind and nature that will allow him to litigate a federal habeas petition.  In doing so, the Court will collapse the arguments in Herrero's Amended Response into three categories: (1) direct evidence that someone else committed the crime for which Herrero was convicted; (2) forensic evidence challenging the medical testimony from trial; and (3) evidence undercutting the testimony of the State's witnesses.  While Herrero argues that this evidence operates in synchronous fashion, each category plays a distinct part in his argument and must be analyzed separately before considering the impact of the whole.

### 1.    *Direct Evidence of Innocence*

Among the most powerful categories of actual innocence are "'credible declarations of guilt by another.'"  *Reed v. Stephens*, 739 F.3d at 767 (quoting *Fairman*, 188 F.3d at 644).  In his petition, Herrero raises his actual innocence as a substantive ground for relief [Doc. # 1 at 112].  Among other evidence supporting that argument, Herrero presents an affidavit from Jaime Elizalde who signed an affidavit before his execution for capital murder claiming responsibility for victim Albert Guajardo's murder [Doc. # 1 at 115-16].[10]

Elizalde had been convicted of capital murder and sentenced to death for the killing of Marcos Vasquez and Juan Guajardo[11] on November 5, 1994.  While facing an imminent execution date in 2006, an attorney for Herrero visited Elizalde and secured an affidavit in which he claimed

---

[10]    Herrero bases a substantive actual innocence claim on Elizalde's affidavit, but curiously does not rely on it for equitable tolling purposes.  Because confessions of guilt occupy an important place in actual innocence arguments, in the interest of justice the Court will consider whether the Elizalde affidavit should forgive a strict application of AEDPA's limitations period.

[11]    The record does not identify whether the victim in this case and the victim in Elizalde's case were related.

responsibility for killing the victim in this case.[12]  Elizalde soon thereafter filed a petition for clemency based on his alleged intellectual disability.  The State asked the trial court to postpone Elizalde's execution date to allow time to investigate the affidavit and to investigate whether he suffered from intellectual disability.  The trial court modified the execution date and ordered a hearing on the affidavit.

According to Elizalde's affidavit, he and a friend took the victim to a house outside of Houston.  There, Elizalde claimed he took a hunting knife and some nylon cloth string, snuck up behind the victim, and strangled him until he ceased struggling.  Elizalde asserted he then grabbed a black jack and hit him with the flat bottom of it.  When the victim began twitching on the ground, Elizalde averred, he slit his throat and Elizalde then rolled the victim's body in carpet before burning his pager and shoes.[13]

Elizalde, however, would not testify to those facts in court.  During a video hearing on January 19, 2006, Elizalde asserted his Fifth Amendment rights when asked about the inculpatory affidavit.

Herrero relied on the Elizalde affidavit in his third habeas action to argue that he was innocent of victim Guajardo's murder.  The state habeas court found that the Elizalde affidavit did not prove Herrero's innocence.  The state habeas court specifically found that "a purported

---

[12]     A newspaper article at the time reported the perspective of Elizalde's attorney on the circumstances surrounding the affidavit: "My client allegedly gave this affidavit to the defense team of Hermilio Herrero without any advice from his own legal counsel about the consequences. . . ." [Doc. # 4, Exhibit 39, Cynthia Leonor Garza, Death row answers may not be what court hopes to hear, Houston Chronicle, Jan. 13, 2006].

[13]     Herrero did not include a copy of Elizalde's affidavit with his other habeas exhibits.

'confession' from a deceased death row inmate who chose to remain silent rather than face cross-examination and who claimed to be intellectually disabled does not meet the high standard to prove. . . actual innocence." [Doc. # 12-21 at 961].[14]

This Court likewise finds that Elizalde's affidavit does not amount to new reliable evidence that would show Herrero's innocence. As an initial matter, Elizalde's affidavit is not reliable because it is inconsistent with Herrero's other arguments. For example, as the Court will discuss below, Herrero relies on forensic evidence to argue that the victim was not strangled before his throat was cut. Elizalde claims he strangled the victim with a nylon rope before slitting his throat with a hunting knife. In that regard, Elizalde's affidavit contradicts the forensic evidence on which Herrero bases his actual-innocence arguments.

Herrero does not provide the full context of the Elizalde affidavit. A newspaper article from that time provides additional information about Elizalde's purported confession. Elizalde told a newspaper reporter that he wanted to confess to the murder for which Herrero was convicted because "I know what it feels like being here for what I didn't do."[15] Elizalde's confession, however, was self-serving. The reliability of Elizalde's confession is lessened because he links it to his own actual-innocence allegation: he claimed that the victim in this case was the actual murderer in his own. Elizalde told a newspaper reporter that "he had been accused of the murder

---

[14]    The state habeas court considered the Elizalde affidavit under the stricter standard for substantive actual-innocence claims in *Herrera v. Collins*, 506 U.S. 390 (1993). [Doc. # 12-21 at 960]. Herrero has not argued that the differences between the *Herrera* and *Schlup* standards would make any difference in how the Court considers the state court findings.

[15]    Cynthia Leonor Garza, "Death row answers may not be what court hopes to hear," Houston Chronicle, Jan. 13, 2006 [Doc. # 4, Exhibit 39].

which he knew [the victim in the Herrero case] had committed."[16]  The self-serving nature of

Elizalde's affidavit lessens its reliability.

Further, the State of Texas stayed Elizalde's execution to investigate whether he murdered

the victim in this case.  Elizalde, however, would not repeat his confession when subjected to the

rigors of cross-examination.  Despite providing voluminous and detailed evidence supporting the

other threads of his actual-innocence arguments, Herrero has not provided any evidence to

corroborate his claim that Elizalde was the actual killer.  Simply, Elizalde's affidavit is not "'a

credible declaration[] of guilt by another.'"  *Reed*, 739 F.3d at 767 (quoting *Fairman*, 188 F.3d at

644).

AEDPA requires strong deference to the state court's finding that the Elizalde affidavit

"does not meet the high standard to prove. . . actual innocence."  [Doc. # 12-21 at 961].  The

Court's review confirms that Elizalde's affidavit does not constitute new reliable evidence of

innocence to forgive AEDPA's limitations period.

### 2.    *Forensic Evidence*

Herrero also argues that he is entitled to equitable tolling because forensic evidence proves

his innocence.  The autopsy of the victim's body was conducted by Dr. Tommy Brown, then an

employee of the Harris County Medical Examiner's Office.  By the time of trial, Dr. Brown was

no longer employed by that office.  Dr. Wolf, therefore, testified at trial about the data obtained

from the autopsy performed by Dr. Brown.  The State used Dr. Wolf's conclusions to corroborate

---

[16]     *Id.*

certain aspects of the jailhouse snitches' testimony, such as that the victim could have been seated when Herrero cut his throat.

In his third application for state habeas relief, Herrero relied on a statement he obtained from Dr. Brown in 2015. Dr. Brown's statement did not contain any new empirical evidence. Dr. Brown, in fact, relied exclusively on his "autopsy report and autopsy photographs." [Doc. # 20, Exh. 1 at 1]. Dr. Brown came to some conclusions, however, that differed from Dr. Wolf's testimony at trial. For instance, Dr. Brown interpreted the autopsy findings to show that the victim was beaten first, was not choked before his throat was slit, and was likely not sitting when he suffered the killing wound. Dr. Brown explained that the victim's injuries would have covered the area around him with blood. Dr. Brown also opined that the victim was not drinking before his death (or at least not drinking heavily). [Doc. # 20, Exh. 1 at 4-5]. Herrero uses Dr. Brown's affidavit to argue that the jailhouse snitches' testimony did not reflect the manner in which the victim had been killed, thus impeaching their credibility.

Dr. Brown's affidavit, however, is not the type of new and reliable testimony on which an inmate may base a viable actual-innocence argument. Under Fifth Circuit law, evidence is not "new" if "it was always within the reach of [the petitioner's] personal knowledge or reasonable investigation." *Moore*, 534 F.3d at 465 (explaining if the allegation is that trial counsel should have presented evidence, then evidence was always within reach). Herrero has not identified any portion of Dr. Brown's report that relies on recently developed scientific theories; the defense

29

presumably could have secured a similar account from a forensic expert, such as Dr. Brown, at the time of trial.[17]   Dr. Brown's statement, therefore, is not "new" evidence as anticipated by *Schlup*.

Further, Dr. Brown's report does not amount to independent evidence of innocence, but instead serves to undercut the State's trial testimony.   The Supreme Court has stated that "impeachment evidence provides no basis for finding" actual innocence because "the evidence is a step removed from evidence pertaining to the crime itself."   *Calderon v. Thompson*, 523 U.S. 538, 563 (1998).[18]   The Fifth Circuit has explicitly held that new evidence of actual innocence must be "material, not merely cumulative or impeaching."   *Lucas*, 132 F.3d at 1075 n.3; *see also Shank*, 2017 WL 6029846, at *2.   Dr. Brown's report only provides a different interpretation of the evidence underlying the State's informant's testimony.   The primary thrust of Herrero's habeas evidence, therefore, is the impeachment of a State's witness.   Herrero attempts to argue that "Dr. Brown's statement does far more than impeach [the State's witnesses]; it disproves the State's entire theory of the crime."   [Doc. # 20 at 7].   But even making that argument, Herrero cannot sever Dr. Brown's conclusions from the credibility of trial witnesses.   In an subsection entitled, "Dr. Brown's analysis proves [the victim] died under completely different circumstances than the

---

[17]     In fact, Herrero raises a habeas claim alleging that trial counsel should have called a forensic expert, such as Dr. Brown who had performed the autopsy, to rebut the State's evidence about the murder.   The essence of that claim is an admission that the facts contained in Dr. Brown's report were available at the time of trial.

[18]     While Herrero argues that impeachment evidence may support a claim of actual innocence in some limited circumstances, those circumstances are not present in this case.   Herrero suggests that the *Thompson* case disallowed the use of impeachment evidence to support an actual-innocence argument because there was little evidence of the crime apart from the challenged testimony and the jury accepted the testimony without reservation.   While no evidence showed Herrero's identity as the killer other than inmate testimony, and little confirmed their testimony other than the forensic findings, nothing suggests that the jury accepted the testimony without reservation, particularly given the defense's zealous attacks on the reliability of their accounts.

State's theory of the case," Herrero strips his argument down to its essential thrust, which is not to prove that he did not commit the crime, but to impeach witnesses: "Dr. Brown's forensic analysis therefore refutes the theory of the crime that the State sponsored through Moreno and Dominguez in order to convict Herrero, and it demonstrates simultaneously that Moreno and Dominguez fabricated a confession completely at odds with the forensic evidence." [Doc. # 20 at 10]. Dr. Brown's evidence, therefore, does nothing to exculpate Herrero for the murder, except in relation to the trial evidence.

While Herrero has shown that a trial attorney could have crafted a strong defensive theory based on Dr. Brown's statement, he has not shown that it is evidence of the actual innocence anticipated by *Schlup*. The Court finds that Herrero is not entitled to equitable tolling based on his challenge to the forensic testimony presented at trial.

### 3.     *Impeachment of Trial Witnesses*

The remainder of Herrero's equitable tolling argument challenges the testimony of the State's two star witnesses: Moreno and Dominguez. In doing so, Herrero relies on the following evidence:

- An affidavit from Nathan Foreman, an inmate who both witnesses said was present when Herrero confessed. 3 RR 10, 4 RR 121, 5 RR 11. Foreman said that he only spoke to Herrero once in prison, that there was no "All Houston Group" led by Herrero, he never heard Herrero confess, and he was never threatened by Herrero. [Doc. # 20, Exhibit 2].[19]

- A transcript of an interview habeas counsel had with an inmate named Carl Walker. Walker said that a ring of informants at the Beaumont prison were part of a conspiracy to testify falsely to obtain favors, and that they had specifically manufactured Herrero's confession to murder [Doc #. 4, Exh.

---

[19]     The state habeas court explicitly found that Foreman was not credible. [Doc. # 12-21 at 962].

32

33].  Walker later provided an affidavit confirming the statements in the transcript are correct [Doc. # 20, Exh, 3].

- A police report that the trial court refused to admit into evidence from a man who lived near where the body was found [Doc. # 20, Exh. 4].  The man described seeing someone who did not match Herrero's description dumping something on the side of the road but did not specially provide information suggesting that it was the roll of carpet found later.

- Bureau of Prison records obtained by habeas counsel which provide a basis to argue that inmates did not seek protection from Herrero because they would testify against him.

- Various documents that were not disclosed to the defense.

- Excerpts of a deposition from the trial prosecutor describing her involvement in Herrero's case.

- Excerpts from a post-trial deposition by Dominguez which minimized the leadership role Herrero played among his peers and treated the Houston inmates as a less-cohesive group.

- A handwritten statement from Juan Castillas who was allegedly present when Herrero confessed but who now says that Herrero did not do so.

[Doc. # 20 at 4-5].  Each of these pieces serves one purpose: dismantling the testimony of the jailhouse snitches who testified against Herrero.

Herrero's evidence does not satisfy the high expectations of *Schlup* jurisprudence.  As an initial matter, Herrero argues that his evidence satisfies *Schlup*'s "new evidence" requirement because he mostly relies on affidavits that "did not exist at the time of trial" and on BOP records which were inaccessible "without a federal court order." [Doc. # 20 at 5].  The Fifth Circuit, however, has recited the relevant standard: the new impeachment information must have been "unavailable to [Herrero] or trial counsel at or before trial."  *Hancock*, 906 F.3d at 390.  While Herrero secured affidavits from various people years after trial, he has not shown that, had trial

counsel pursued the same investigate avenues, he could not have developed the same evidence. In fact, Herrero raises an ineffective-assistance-of-counsel claim in the instant petition which argues that trial counsel should have developed similar information before trial and used it to impeach the State's witnesses. Herrero has not brought forth any "new" evidence under the requirements set out in the Fifth Circuit.[20]

Further, Herrero's evidence falls short of proving actual innocence. The Supreme Court in *Schlup* contemplated that new, reliable evidence of actual innocence would include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." 513 U.S. at 324; *see also Lucas*, 132 F.3d at 1075 n.3 (stating that new evidence of actual innocence must be "material, not merely cumulative or impeaching"). At its core, Herrero's evidence does not independently show that he was not the one who killed the victim. The value of Herrero's evidence exists only in relationship to the jailhouse snitches' overall credibility. As noted by Respondent, "when one considers the evidence [Herrero] presents abstractly—and without reference to the trial testimony of any witness—they provide virtually no independent, free-standing evidence of factual innocence." [Doc. # 11 at 13]. Taking all Herrero's evidence together, its importance to the defense only exists to undermine the credibility of the inmate informers.

Herrero's evidence "is a step removed from the evidence pertaining to the crime itself." *Thompson*, 523 U.S. at 563; *see also Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) (stating that

---

[20]     As another indication that the information is not "new," Herrero has not argued that his federal petition his timely because the information only recently became available to him. If Herrero did not have access to the evidence, the limitations period would arguably run from when "the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1).

newly discovered impeachment evidence "will seldom, if ever" establish actual innocence"). Evidence that impeaches the credibility of trial witnesses does not prove actual innocence. While Herrero produces evidence on which an attorney could base a zealous trial defense, it is not new, reliable evidence which would forgive the untimely filing of his federal habeas petition.

     *4.    Conclusion of Equitable Tolling*

The case against Herrero was not strong. The State based its case on the testimony of two inmates who had testified as informants in other cases; the defense zealously challenged the credibility, consistency, and self-interest of those informers. Herrero's habeas attorney has raised troubling concerns about the evidence on which the State relied to secure Herrero's conviction. Yet federal habeas review exists only within the bounds of weighty jurisprudence and congressional mandate. Statutory principles require diligence and exigency in availing oneself of the habeas writ; Herrero sat on his claims for many years.

Herrero argues that innocence forgives his untimely filing, but federal law places strict limits on how an inmate must prove his innocence in habeas proceedings. The voluminous and intricate evidence suggests that an eager advocate could have put a much stronger case before jurors–and one that may have severely undercut the State's witnesses, but Herrero's evidence does not independently show that he is an innocent man. In sum, as the state habeas court found, Herrero "fails to show newly discovered evidence constituting affirmative evidence of innocence . . . ." [Doc. # 12-21 at 960]. Herrero's evidence is insufficient to overcome the consequences of his late filing.

The Court is mindful of the effect a dismissal will have on Herrero's ability to have his claims heard by a federal court.  *See Felder v. Johnson*, 204 F.3d 168, 173 (5th Cir. 2000). However, the Fifth Circuit has emphasized that the "strict one-year limitations period" imposed by Congress for the filing of all habeas corpus petitions is "subject only to the narrowest of exceptions."  *Fierro v. Cockrell*, 294 F.3d 674, 684 (5th Cir. 2002).  The Court concludes that his circumstances are not among those "rare and exceptional" conditions which warrant deviation from the express rules that Congress has provided.  *See Felder*, 204 F.3d at 173.  Accordingly, equitable tolling will not save Herrero's late-filed claims. The Court therefore concludes that his pending federal habeas corpus petition is barred by the applicable one-year limitations period.

## IV.    <u>CERTIFICATE OF APPEALABILITY</u>

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Herrero has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward:

The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Having considered Herrero's arguments, and in light of AEDPA's standards and controlling precedent, this Court determines that a COA should not issue.

## V.   CONCLUSION

Herrero filed his federal petition well outside the one-year limitations period established by AEDPA.  Herrero has not shown that statutory or equitable principles should forgive a strict application of AEDPA's timeliness requirements.  The Court, therefore, cannot address the merits of Herrero's constitutional claims and must dismiss this action.

It is therefore

**ORDERED** that Respondent's motion for summary judgment [Doc #. 11] is **GRANTED**. It is further

**ORDERED** that this case is **DISMISSED WITH PREJUDICE**.

The Court will not issue a Certificate of Appealability.

SIGNED this  2nd  day of  September  , 2020, at Houston, Texas.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE